652 F.2d 72
 209 U.S.App.D.C. 79, 1978-2 Trade Cases 62,205,
1980-1 Trade Cases 63,264
 UNITED STATES of America, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION,
Satellite Business Systems, Intervenor.
AMERICAN SATELLITE CORPORATION and Fairchild Industries,
Inc., Appellants,
v.
FEDERAL COMMUNICATIONS COMMISSION,
Satellite Business Systems, Intervenor.
The WESTERN UNION TELEGRAPH COMPANY, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION,
Satellite Business Systems, Intervenor.
AMERICAN TELEPHONE AND TELEGRAPH COMPANY, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION,
Satellite Business Systems, Intervenor.
 Nos. 77-1249 and 77-1252 to 77-1254.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued En Banc Sept. 24, 1979.
Decided March 7, 1980.
 
 Appeals from an Order of the Federal Communications Commission.
 Barry Grossman, Atty., Dept. of Justice, Washington, D. C., with whom Richard O. Levine, Atty., Dept. of Justice, Washington, D. C., was on brief, for appellant United States of America. Carl D. Lawson, Atty., Dept. of Justice, Washington, D. C., entered an appearance for appellant United States of America.
 Thomas H. Wall, Washington, D. C., with whom Daniel M. Redmond, and Richard R. Molleur, Washington, D. C., Michael D. Campbell, and Stuart G. Meister, Germantown, Md., were on brief, for appellants American Satellite Corp. and Fairchild Industries, Inc.
 William Warfield Ross, William R. Weissman, David B. Weinberg, and Joel Yohalem, Washington, D. C., were on brief, for appellant The Western Union Telegraph Company.
 Edgar Mayfield, Edmund B. Raftis, James D. Ellis, Bedminester, N. J., F. Mark Garlinghouse, and Alfred C. Partoll, New York City, were on brief, for appellant American Telephone and Telegraph Co.
 David J. Saylor, Deputy Gen. Counsel, F. C. C., Washington, D. C., with whom Daniel M. Armstrong, Associate Gen. Counsel, and Jack David Smith and Roberta L. Cook, Counsel, F. C. C., Washington, D. C., were on brief, for appellee. Werner K. Hartenberger, Counsel, F. C. C., Washington, D. C., entered an appearance for appellee.
 William E. Willis, New York City, with whom W. Theodore Pierson, Harold David Cohen, and William D. English, Washington, D. C., were on brief, for intervenor Satellite Business Systems.
 Daniel C. Schwartz, Deputy Director, F. T. C., and Albert A. Foer, Associate Director, F. T. C., Washington, D. C., were on brief, for amicus curiae Federal Trade Commission.
 Before WRIGHT, Chief Judge, and TAMM, LEVENTHAL,* SPOTTSWOOD W. ROBINSON, III, MacKINNON, and WILKEY, Circuit Judges.
 Opinion for the court filed by Chief Judge J. SKELLY WRIGHT.
 Dissenting opinion, in which Circuit Judge WILKEY joins, filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.
 J. SKELLY WRIGHT, Chief Judge:
 
 
 1
 These appeals are the most recent stage in a process beginning in 1966, during the course of which the Federal Communications Commission (FCC) has nurtured a dynamic new medium: domestic satellite communication. The order under review,[1] In Re Satellite Business Systems, 62 FCC2d 997 (1977), reconsideration denied, 64 FCC2d 872 (1977), granted Satellite Business Systems (SBS) authority to construct three domestic satellites and four fixed domestic satellite earth stations; it also gave SBS authority to operate channels of communications over the new system as a common carrier. SBS is a partnership among Comsat General Business Communications, Inc., a wholly-owned subsidiary of an affiliate of Communications Satellite Corporation, Information Satellite Corporation, a wholly-owned subsidiary of IBM Corporation, and Aetna Satellite Communications, Inc., a wholly-owned subsidiary of Aetna Casualty & Surety Company.[2]
 
 
 2
 At present, domestic satellite communications services are provided by RCA Global Communications (RCA), Western Union Telegraph Company, American Satellite Corporation (a subsidiary of Fairchild Industries, Inc., leasing a part of the Western Union system), and a joint venture between American Telephone & Telegraph Company (AT&T) and General Telephone & Electronics Corporation (GTE) (leasing the COMSTAR Domestic Satellite system from Comsat General). These companies may be joined by a recently-formed joint venture between American Satellite and Continental Telephone Company,[3] and by a system proposed by Xerox Corporation.[4]
 
 
 3
 The AT&T/GTE venture apparently has the potential to dominate the new field, by virtue of the overwhelming market position of its parents in the terrestrial specialized communications field. The Commission therefore restricted the AT& T/GTE venture from full competition as a common carrier for a three-year period, so that other firms would have time to establish a competitive foothold in the industry.[5] Now that FCC-imposed restrictions on their satellite operations have lapsed, the telephone companies will be able to lower the per unit cost of their satellite services by routing part or all of their switched telephone network traffic (WATS or MTS) via satellite. This will spread the fixed costs of the system over a larger number of units, thereby enabling the venture to price its satellite channels below the price of its competitors, who do not have the benefit of such a large arbitrarily-adjustable monopoly demand base.[6] Moreover, since satellite communication services will be in direct competition with terrestrial services a field dominated by AT&T AT&T's potential market dominance in the overall specialized communications industry is considerable.
 
 
 4
 The SBS entry into this concentrated industry would provide a significant increase in capacity of a highly technologically innovative sort. It would be the first system to integrate voice, data, and image transmission service in a largely digital format, to make available small earth stations at customers' premises, to make more efficient use of the available spectrum through a "time division multiple access" and demand assignment technology, and to operate in the 12 and 14 GHz frequency bands.[7] For purposes of this appeal, appellants concede that the SBS entry would provide a significant and beneficial new public service. Although SBS lacks the competitive advantages of AT&T and GTE described above, the combined expertise of Comsat in satellites and IBM in data processing a major expected use for the domestic satellite system offers the promise, as the FCC has repeatedly emphasized during the course of this proceeding, of challenging the expected market dominance of AT& T.[8] If all goes well, SBS satellites could be in the air by early 1981.
 
 
 5
 Twelve parties six competitors of SBS, two computer or communications equipment manufacturers' associations, two states, and two federal agencies[9] opposed the grant of a license to SBS on various grounds in the proceedings before the Commission. Four of these parties American Satellite, Western Union, AT&T, and the United States Department of Justice appeal the Commission's final order.[10] They argue principally that the FCC erroneously denied an evidentiary hearing into the possibilities of anticompetitive consequences resulting from the joint venture of Comsat and IBM.[11] They ask this court to reverse and remand to the FCC for such an evidentiary hearing.
 
 
 6
 The Commission argues that evidentiary hearings are not required by statute for all disputed issues, and that such hearings would not prove useful in evaluating the competitive conditions in a changing and experimental industry such as this one. Moreover, the Commission asserts that SBS's entry into the concentrated domestic satellite industry would interject strong and immediate competition, and that delay of SBS entry for the purpose of holding evidentiary hearings would not be in the public interest. We agree and affirm.
 
 I. BACKGROUND
 
 7
 The Commission's policy over the past ten years has been to develop the domestic satellite communications industry by permitting limited open entry and encouraging technological competition. Entry is limited only by legal, technical, and financial fitness qualifications.[12] In its First Report and Order (Domsat I), 22 FCC2d 86 (1970), issued after four years of study and public comment, the FCC concluded that satellites could play an important role in the field of domestic communications, but that the risks and uncertainties involved in the development of the industry were substantial. The Commission invited potential applicants to submit concrete system proposals for consideration.
 
 
 8
 In its Second Report and Order (Domsat II), 35 FCC2d 844 (1972), the Commission rejected the suggestion that it should restrict entry to one or a small number of licensees. It reached this conclusion partly on the basis of comments submitted by the Department of Justice detailing the delay, expense, and disutility of comparative hearings to select licensees. The Commission stated that "(t)he presence of competitive sources of specialized services, both among satellite system licensees and between satellite and terrestrial systems, should encourage service and technical innovation and provide an impetus for efforts to minimize costs and charges to the public."[13] Accordingly, it adopted the multiple entry policy, permitting firms to enter the industry singly or jointly, subject only to a basic fitness determination.
 
 
 9
 In adopting this policy, the FCC was aware that every one of the potential applicants for entry presented possible antitrust problems. All were satellite or communications equipment manufacturers, satellite users, broadcast networks, or major firms in related industries.[14] Each potential applicant would be in a position to use its market power in a related field to affect the domestic satellite communications market. Nevertheless, the FCC decided, at the urging of its staff and the Department of Justice,[15] that none of the potential applicants should be disqualified. It reasoned that only a company with experience in a related industry would be able to compete successfully in the market.[16] Moreover, FCC and the Department of Justice agreed that the Commission's powers to impose restrictions and take other remedial action would suffice to minimize anticompetitive abuses or to cure them should they occur.[17] The Commission specifically approved the formation of joint ventures, which offer the advantages of risk sharing and pooling of technical and financial resources.[18]
 
 
 10
 To obviate the anticompetitive consequences of entry by certain of the applicants, the FCC imposed restrictions on some satellite companies. Among the restricted companies was Comsat, which was required to form a separate corporate subsidiary to enter the domestic satellite industry. That subsidiary was required to choose between operating as a carrier's carrier on behalf of AT&T or others, and providing communications services directly to customers.[19] Later, on reconsideration, the FCC substantially modified these restrictions.[20]
 
 
 11
 Following the Domsat II policy, the FCC approved domestic satellite communications license applications without evidentiary hearings on antitrust consequences. In separate orders issued the same day in 1973, the FCC approved applications by AT&T[21] and by GTE[22] to construct and operate earth stations and to provide domestic communications services. In 1975, however, the Commission granted permission to the two telephone companies to combine their satellite operations in one joint venture.[23] The FCC was fully aware of the possible antitrust consequences of this decision: in granting GTE's earlier separate application the Commission had noted that GTE's separate entry "could also lessen AT&T's dominance and economic influence in the domestic communications field."[24] Despite this elimination of actual competition between the two firms, neither the Department of Justice nor the Federal Trade Commission objected, nor did any party request or receive an evidentiary hearing on antitrust consequences.
 
 
 12
 On that same day in 1973 the FCC approved applications by RCA,[25] Hughes Aircraft Company,[26] and American Satellite[27] for authority to construct and operate domestic satellite facilities. The Network Project, an unincorporated association that favored government ownership of satellite systems, opposed the applications, partly on antitrust grounds, and asked for an evidentiary hearing. The FCC denied an evidentiary hearing and granted all three applications. The Department of Justice did not oppose the grant of the applications or the denial of an evidentiary hearing. This court affirmed the Commission in Network Project v. FCC, 511 F.2d 786 (D.C.Cir.1975).[28] Because of its precedential importance to this case, it is worth quoting the Network Project opinion at some length.
 
 
 13
 In answer to the Network Project's antitrust arguments the court responded:
 
 
 14
 We need not speculate whether the arrangement will in fact some day so operate as to create antitrust problems. It is enough that the proposals are not per se a violation, * * * and that the Commission reasonably concluded that a violation would not occur. Indeed, the Commission found that competition would be enhanced.
 
 
 15
 Id. at 796 (citation omitted).
 
 
 16
 In response to the Network Project's argument that an evidentiary hearing was erroneously denied,[29] the court stated:
 
 
 17
 (A) hearing is not necessary where the Commission's decision is based on inferences and conclusions drawn from undisputed facts. Petitioner does not dispute any of the material facts on which the Commission's conclusions rest, but asserts only that insufficient facts were adduced to make a public interest finding. * * * The Commission was faced with a situation in which it determined that the new and increased services would be beneficial but, unlike the usual common carrier case, was unable to define with assurance the precise scope or content of all aspects of the proposals. In this unique and experimental situation, we believe that the Commission rationally determined, on the basis of all necessary factual investigation, that the grant of the applications, subject as the Commission recognizes to continuing supervision and evaluation, is in the public interest.
 
 
 18
 Id. at 796-797 (footnote omitted). The court specifically noted "that the Commission acted reasonably in taking cognizance of the fact that, in these special circumstances, considerable lead time is required for preparation of a system, and in determining that the public interest required avoidance of any unnecessary delay." Id., at 797 n.13.
 
 II. HISTORY OF THE COMSAT/IBM VENTURE
 
 19
 As we have noted above,[30] the FCC initially decided in Domsat II to prevent Comsat from operating both as a carrier's carrier for AT&T or others and as a multipurpose carrier serving customers directly.[31] In its Reconsideration Order, 38 FCC2d 665 (1972), the FCC relaxed this restriction, subject to the following conditions: (1) Comsat would have to be a minority participant in a joint venture, and would have to seek prior FCC approval before increasing its ownership above a one-third interest or acquiring de facto control in any fashion; (2) no AT&T officer or director could serve as a director of Comsat; and (3) Comsat would be required to establish a separate corporation to operate its domestic system, and this separate corporation could not include any representatives of AT&T. Id. at 684-685 PP 42, 44, 45. Under this modified policy the Commission declared a joint venture between Comsat, Lockheed Aircraft Corporation, and MCI Communications Corporation (to be called CML Satellite Corporation) eligible for further consideration to become a domestic satellite communications licensee. Subsequently, for financial reasons, Lockheed and MCI withdrew from the CML venture.
 
 A. The CML Decision
 
 20
 On July 15, 1974 Comsat, in conjunction with IBM, applied for approval of changes in the structure of the CML venture. As proposed, Comsat General would have owned 45 percent, and IBM 55 percent, of the operating company. Some seventeen parties filed written submissions concerning the proposed entry,[32] and the Commission set the matter for oral argument en banc.
 
 
 21
 Opponents of the Comsat/IBM entry made three principal objections to it. First, they argued that IBM could dominate the satellite transmission of data communications by offering a packaged end-to-end data processing communications service compatible only with IBM equipment. Second, they argued that IBM could promote its satellite services to its computer and data processing customers, possibly by offering discounts or other advantages to customers for using both IBM equipment and IBM satellite services. Finally, they argued that IBM and Comsat, both of which do business with AT&T, would refrain from competing with AT&T in the voice and image communications market, and would concentrate instead on the data communications market.
 
 
 22
 In February 1975 the FCC released its CML Decision, 51 FCC2d 14 (1975),[33] disapproving the specific proposal, but delineating the circumstances under which entry by Comsat and IBM would be considered. The FCC decided not to hold evidentiary hearings on the antitrust issues, noting that they were substantially similar to issues already considered and decided in the earlier Domsat proceedings. Id. at 43-44, PP 47-48. Nevertheless, the Commission imposed restrictions on the Comsat/IBM entry to reduce the likelihood of anticompetitive effects. To prevent IBM's abuse of its dominant position in the computer and data processing industries, the FCC required the venture to provide for interconnection of its customers' data processing and communications systems on reasonable terms and without discrimination, and required it to submit a detailed description of such arrangements to the FCC in advance of its application. Moreover, the Commission required IBM to create a separate corporate entity to operate its satellite system.[34] This entity was forbidden to market IBM equipment, and IBM was forbidden to market satellite communications services except through the separate entity. To ensure that the venture would compete vigorously with AT&T,[35] the FCC required that Comsat and IBM adopt one of three permissible forms of business organization. One of them, called the "balanced CML option," provided the framework for the plan now under review. The FCC described the option in this way:
 
 
 23
 Comsat General and IBM may choose to participate as partners in CML with another corporate partner(s) upon condition that no partner in CML shall have less than a 10% ownership interest or more than a 49% ownership interest or otherwise be in a position whereby it could exercise de facto control.[36]
 
 
 24
 CML Decision, 51 FCC2d at 38. In addition, the FCC stated its intention to employ its continuing authority to impose additional restrictions should the Comsat/IBM venture later cause serious anticompetitive effects. Id. at 44, P 48.
 
 
 25
 Subject to these restrictions, the FCC determined that IBM, backed by its extensive financial resources and its experience concerning the usages and needs of customers in communications and data processing, offered the prospect of a strong and innovative competitor to AT&T. Moreover, in view of the formidable barriers to entry into the industry, the Commission concluded that requiring Comsat and IBM to enter the field separately might well deprive the industry of one or both as competitors. Therefore, the FCC adopted the policy that is now being challenged in this case: to permit a Comsat/IBM joint venture, subject to protective conditions. SBS, neEe CML, is the product of that policy.
 
 B. The Order Under Review
 
 26
 Following the CML Decision, IBM and Comsat found a third partner to pursue the "balanced CML option": Aetna Casualty & Surety Company, through its subsidiary, Aetna Satellite Communications, Inc. Under the agreement each partner has committed $55 million to the enterprise, and may provide additional funds if needed.[37] During the pre-operational phase of the system the three partners will exercise equal control. When the system becomes operational Aetna will have the choice to retain its one-third equity interest in SBS, or to convert a part of that investment to debt. In no event may Aetna's equity interest fall below 15 percent. Major decisions will require the unanimous consent of the partners.[38]
 
 
 27
 In December 1975 SBS organized as a partnership and applied to the FCC for a license. Opponents of the license[39] made many objections,[40] but for purposes of this appeal only the antitrust-related objections are significant. In summary, the most important such objections are:[41] (1) that the SBS joint venture eliminates the actual competition that would occur were IBM and Comsat to enter the field individually, or the potential competition that would occur if one of the firms were to enter and the other to be perceived by the industry as a strong potential entrant; (2) that the combined strength of Comsat and IBM would be so great as to raise barriers to entry and to chill competition in the industry; and (3) that IBM could engage in predatory conduct in the satellite industry, the data processing industry, or both.[42]
 
 
 28
 The FCC denied an evidentiary hearing into the various objections by SBS's opponents, and granted the license in a lengthy opinion released on February 8, 1977. It explained its reasoning as follows:
 
 
 29
 In sum, we have chosen to dispose of SBS' Applications without a trial-type evidentiary hearing because (1) the benefits to the public of a more rapid institution of service far outweigh any possible benefits of such time-consuming procedures; (2) "facts" which lend themselves to adduction by oral testimony would not be forthcoming in such proceedings; (3) in ten years of rulemaking and application comment proceedings the issues now before us have been explored in detail and no new material is sought to be placed before us through trial-type evidentiary procedures; (4) we have assumed for the purposes of analysis that the parties' contentions are correct and drawn appropriate inferences therefrom; and (5) in view of the conditions and limitations we are imposing herein, as well as our continuing regulatory supervision and the remedies available to us, we can and will assure that the SBS proposal will serve the public interest. The domestic satellite field remains experimental, and speculation about its future is as tenable through the notice and comment procedures which we have adopted, as it would be in trial-type evidentiary proceedings. In this unique environment, SBS' future actions and conduct, under our close regulatory supervision, will be far more determinative than would speculation in an evidentiary proceeding.
 
 
 30
 SBS Decision, 62 FCC2d at 1068 P 199, JA 1591. With appropriate restrictions,[43] modelled on those in the Domsat II and CML decisions, the FCC granted the proposed construction and operating authority to SBS. The Commission emphasized, however, that "(i)f, for any reason, we deem it in the public interest to revisit any of these matters, we will not hesitate to do so. And we so condition our action today." Id. at 1044-1045 P 122, JA 1567-1568. Reconsideration was denied, 64 FCC2d 872 (1977).
 
 
 31
 American Satellite, Western Union, AT&T, and the Department of Justice have appealed the FCC order to this court. The appeal was first heard by a panel of this court, which released on August 29, 1978 a per curiam opinion reversing the Commission. The panel held: (1) that the FCC employed the wrong legal standard in balancing the public interest benefits of the SBS entry against the alleged violations of the antitrust laws, and (2) that the FCC did not adequately justify its failure to hold an evidentiary hearing on the antitrust question in the case. Because of the importance of the issues raised, we voted to rehear the appeal en banc, and vacated the panel opinion.[44] All parties and the amicus curiae have submitted supplemental briefs to assist the en banc court. At our request, their briefs primarily addressed two issues:
 
 
 32
 (1) Whether the case law and the legislative history of Section 11 of the Clayton Act (a) constrain the Court to interpret that provision as imposing "an absolute enforcement responsibility" on the FCC; or (b) warrant the interpretation of subsection 11(a) as a grant of discretionary enforcement authority, and the interpretation of subsection 11(b) as defining the procedures to be followed whenever such enforcement authority is exercised.
 
 
 33
 (2) Whether, and in what respects, the validity of the FCC's licensing determination is affected by the failure to conduct a full evidentiary hearing on the possibility of an antitrust violation and to review and analyze in depth such considerations.[45]
 
 
 34
 III. THE ANTITRUST ENFORCEMENT RESPONSIBILITIES OF THE FCC
 
 
 35
 More than ten years ago this court made clear that "competitive considerations are an important element of the 'public interest' " standard which governs federal agency decisions. Northern Natural Gas Co. v. FPC, 399 F.2d 953, 961 (D.C.Cir.1968). We therefore required such agencies to "make findings related to the pertinent antitrust policies, draw conclusions from the findings, and weigh these conclusions along with other important public interest considerations." Id. at 961.
 
 
 36
 No party to this proceeding denies that the FCC must make the appropriate findings and conclusions. Western Union and American Satellite, however, urge us to adopt a more demanding standard for the enforcement by the FCC of the Clayton Act. They argue that under Section 11 of the Clayton Act, 15 U.S.C. § 21 (1976), the FCC has an "unwaivable and unwavering" obligation to enforce the Clayton Act, and that this obligation "cannot be limited absent total frustration of the FCC's regulatory scheme * * *."[46] In other words, they argue that if a proposed entry would violate the Clayton Act the FCC must reject the proposal, no matter how important it might otherwise be to the public interest.[47] The FCC employed a different legal standard in reaching the decision under review:
 
 
 37
 (T)he Sherman and Clayton Acts assume that the public interest is served by competition, in and of itself. Under the statutory fabric of regulation and of the Communications Act, however, we are required to decide where the public interest lies, and competition is but one element of a determination of the public interest. * * *
 
 
 38
 SBS Decision, 62 FCC2d at 1069 P 204, JA 1592. In other words, the FCC asserts that it has "prosecutorial discretion" with respect to antitrust enforcement. In this contention the FCC is joined not only by SBS, but also by the Department of Justice and the FTC.
 
 
 39
 The position urged by American Satellite and Western Union would seem to be foreclosed by our recent statement in Home Box Office, Inc. v. FCC, 567 F.2d 9, 40 n.67 (D.C.Cir.), cert. denied, 434 U.S. 829, 98 S.Ct. 829, 54 L.Ed.2d 89 (1977): "We do not agree with the suggestion of some petitioners that the (Federal Communications) Commission must demonstrate that the means it has chosen have the least impact on competition consistent with achievement of the Commission's purposes. * * * Anticompetitive factors are also only one of a number of factors to be considered under the Communications Act * * *." (Citations omitted.) However, as the original panel opinion pointed out,[48] neither Home Box Office nor any other reported decision of this or the Supreme Court has specifically addressed the responsibility of the FCC under Section 11 of the Clayton Act.[49] We do so now, and find the interpretation suggested by Western Union and American Satellite unpersuasive.
 
 A. The Statute
 
 40
 Section 11 of the Clayton Act, 15 U.S.C. § 21 (1976),[50] provides in subsection (a) that authority to enforce certain substantive provisions of the Clayton Act, including Section 7, 15 U.S.C. § 18 (1976), is vested in the FCC "where applicable to common carriers engaged in wire or radio communication or radio transmission of energy(.)" Identical authority is vested in the Interstate Commerce Commission, the Civil Aeronautics Board, and the Federal Reserve Board with respect to their regulatory jurisdictions, and in the FTC with respect to other lines of commerce.[51] Subsection (b) provides:
 
 
 41
 Whenever the Commission or Board vested with jurisdiction thereof shall have reason to believe that any person is violating or has violated any of the (enumerated) provisions * * *, it shall issue and serve upon such person and the Attorney General a complaint * * *. * * *
 
 
 42
 (Emphasis added.) The remainder of the subsection spells out the procedures to be followed.[52] Western Union and American Satellite argue that the emphasized words of the statute, "whenever," "shall," and "shall," must be interpreted to mean that the Commission has no discretion in the matter; that it must take positive action when it has reason to believe that Section 7 has been violated.[53]
 
 
 43
 This is by no means a necessary reading of the statute. The grant of enforcement authority in subsection (a) contains no mandatory language. Such language is used only in subsection (b), the subsection devoted to procedural protections. One plausible reading of the statute is that the Commission has discretion with respect to whether it will enforce the Clayton Act,[54] but that it has no discretion with respect to the procedural protections to be afforded once the decision to enforce has been made.
 
 
 44
 Contrary to the assertion of Western Union and American Satellite, this reading of the Act does not render the section superfluous. Rather, the section makes three changes in the law: it displaces the FTC by the FCC as the enforcement agent of the Clayton Act within the regulatory jurisdiction of the latter, it gives the FCC additional authority for enforcement of its antitrust responsibilities, and it protects the regulated businesses by prescribing their procedural rights during a Clayton Act enforcement proceeding. In the light of the legislative history, interpretation by the Supreme Court, and purpose of the statute, we find this interpretation compelling.
 
 B. Legislative History
 
 45
 Both sides in this controversy have sought, and purport to have found, support for their positions in the legislative history of Section 11 of the Clayton Act. Our review of that history reveals nothing conclusive. However, we can state with assurance that nothing in the legislative history establishes any clear intention on the part of Congress to make the FCC's Clayton Act enforcement mandatory, whereas a great deal in that history indicates the contrary.
 
 
 46
 1. Original passage of the Clayton Act. The Clayton Act and the Federal Trade Commission Act, passed within a few weeks of each other in 1914, both included grants of enforcement authority to the FTC.[55] During much of the time the Clayton Act was debated the enforcement provisions of the two bills were identical. In fact, the Senate committee that reported the Clayton Act proposed language in the bill stipulating that, once a complaint had issued, "thereupon such proceedings shall be had as are provided for in section 5 of the (FTC) act."[56] Section 5 of the FTC bill then provided in relevant part:
 
 
 47
 Whenever the commission * * * shall have reason to believe that any person * * * is violating any of the provisions of * * * this act it shall issue and serve upon such person * * * a complaint * * *. * * *[57]
 
 
 48
 Senator Newlands, the principal sponsor of the FTC bill and Chairman of the Interstate Commerce Committee, interpreted the bill to mean that "(a)nyone who felt himself injured * * * could, of course, apply to this commission. It would then be in its discretion as to whether it would grant a hearing."[58] Since the FTC bill had not yet been passed, however, the committee decided it would be inappropriate to refer specifically to that Act in the Clayton Act. It therefore substituted for the formulation quoted above the actual language of Section 5 of the FTC bill as it then existed.[59] This language was ultimately adopted as Section 11(b) of the Clayton Act and is with us still.
 
 
 49
 Subsequently, however, the language of Section 5 of the FTC bill was amended to make it clear that the FTC would have the discretion not to institute enforcement proceedings in unimportant cases.[60] The amendment added new language to the grant of authority, here italicized:
 
 
 50
 Whenever the commission shall have reason to believe that any such person * * * has been or is using any unfair method of competition in commerce, and if it shall appear to the commission that a proceeding by it in respect thereof would be to the interest of the public, it shall issue and serve upon such person * * * a complaint * * *. * * *
 
 
 51
 See H.R.Rep. No. 1142, 63d Cong., 2d Sess. 3 (1914). In this form the FTC bill was passed, and is unchanged today.[61] There is no indication in the legislative history of the Clayton Act that that Act was intended to vest any less discretion in its enforcement agencies than the FTC Act vested in the FTC. On the contrary, the express purpose of using the language as it was at the time of Section 5 of the FTC bill was to ensure that the enforcement provisions of the Clayton and FTC Acts would be exactly the same.[62] In order to carry out that intention, we must interpret Section 11 of the Clayton Act as vesting prosecutorial discretion in its enforcement agencies.
 
 
 52
 2. The Communications Act of 1934. Section 11 of the Clayton Act was amended by Section 602(d) of the Communications Act of 1934[63] to include the FCC as one of the Clayton Act enforcement agencies. This amendment, listed among the "Miscellaneous Provisions" of the Communications Act, was plainly not intended to alter the discretion of the enforcement agencies under Section 11; rather, its sole purpose was to allocate Clayton Act enforcement authority over the communications industry to the newly-created FCC. Both the Senate and the House Reports' sole explanation of Section 602(d) was:The latter section also makes certain changes in other law, including the Clayton Act, made necessary by the setting up of the new commission and conferring upon it jurisdiction over communications.[64]
 
 
 53
 3. Later developments. Since the passage of the Communications Act of 1934, the enforcement agencies other than the FTC have seldom attempted to enforce the Act. Congress has been informed of this lack of enforcement,[65] and has never expressed any dissatisfaction. In 1938 bills were introduced in both houses of Congress that would have amended Section 313 of the Communications Act by adding a new paragraph:
 
 
 54
 It is hereby declared to be the intention and policy of the Congress to prevent monopoly and to encourage competition in direct foreign radio telegraph communication; and for the purposes of this act, in considering application for licenses * * *, the Federal Communications Commission shall consider competition in such communication to be in the public interest.
 
 
 55
 S. 3875, 75th Cong., 3d Sess. (1938); H.R. 10348, 75th Cong., 3d Sess. (1938). These bills were introduced in response to the holding of this court in Mackay Radio and Telegraph Co. v. FCC, 97 F.2d 641, 643 (D.C.Cir.1938), that the public interest standard of the Act "does not apply to the radiotelegraph business the policy of free competition * * *."[66] Hearings on the bills were held, but no report ever issued; the bills were not adopted. Senator White, a major participant in the hearings, expressed his view of the policy of Congress toward competition in the communications industry: "I would say that this encouragement of competition and the prevention of monopoly are only one of the elements or one of the factors that the Commission would take into consideration in passing on an application."[67]
 
 
 56
 In 1959 an amendment to Section 11 was introduced that would have made cease and desist orders under that section final.[68] In supporting this amendment Congressman Patman remarked: "This bill will not require better enforcement of the Clayton antitrust law, but it will make it possible for the Federal Trade Commission better to enforce the law if it cares to do so."[69]
 
 
 57
 Congressional inaction and statements by individual congressmen are not strong evidence of congressional intention, and if there were evidence to the contrary we would disregard them. However, this legislative history, meager as it is, does indicate that Congress did not make the FCC's Clayton Act enforcement authority mandatory when it had the opportunity to do so. It would not be the place of this court to impose such mandatory responsibility without congressional authorization, even if we thought it desirable.
 
 C. Supreme Court Precedent
 
 58
 The Supreme Court thoroughly addressed the relation between the public interest determination and the antitrust policy of the United States for the first time in McLean Trucking Co. v. United States, 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544 (1944). There the Court held that the ICC's responsibility to enforce the antitrust laws is but one part of its overall public interest determination:
 
 
 59
 In short, the Commission must estimate the scope and appraise the effects of the curtailment of competition which will result from the proposed consolidation and consider them along with the advantages of improved service, safer operation, lower costs, etc., to determine whether the consolidation will assist in effectuating the overall transportation policy. * * *
 
 
 60
 Id. at 87, 64 S.Ct. at 381.[70] The Court treated the issue similarly in Seaboard Air Lines R. Co. v. United States, 382 U.S. 154, 86 S.Ct. 277, 15 L.Ed.2d 223 (1965), a case that specifically addressed the ICC's responsibilities under Section 11 of the Clayton Act. The ICC had approved a railroad merger; a three-judge District Court reversed and remanded for a determination of whether the merger violated Section 7 of the Clayton Act. The Supreme Court reversed the lower court, reminding it that the ICC was obligated to determine whether the proposed merger is in the public interest and that, if it is, "(i)t matters not that the merger might otherwise violate the antitrust laws(.)" Id. at 156-157, 86 S.Ct. at 278.[71]
 
 
 61
 In the communications field the Court has followed a parallel course. In FCC v. RCA Communications, Inc., 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1400 (1953), the Court squarely rejected the theory that Clayton Act antitrust principles govern the antitrust component of the public interest determination. The Court emphasized that the competitive consequences of proposals before the FCC "must be read in the light of the special considerations that have influenced Congress to make specific provision for the particular industry." Id. at 98, 73 S.Ct. at 1006.
 
 
 62
 American Satellite and Western Union seek support for their view in language in Denver & Rio Grande Western Railroad v. United States, 387 U.S. 485, 87 S.Ct. 1754, 18 L.Ed.2d 905 (1967). The Denver case concerned ICC approval of the issuance of a large block of stock in a railroad express company to a major bus company. The opinion said that the agencies listed in Section 11 of the Clayton Act have an "affirmative duty * * * to enforce the Act's provisions." Id. at 496 n.7, 87 S.Ct. at 1761. The Court also said that the "obligation to enforce the Clayton Act is the rule," id. at 497, 87 S.Ct. at 1761, and "the Clayton Act is prohibitive, and imposes a positive obligation upon the (agency) to act." Id. at 502, 87 S.Ct. at 1764. American Satellite and Western Union interpret Denver to mean that an enforcing agency under Section 11 must disapprove any proposal that violates the Clayton Act, no matter how strong the public interest in the proposed service might otherwise be.
 
 
 63
 This interpretation of the Denver opinion stretches its words too far. It must be remembered that the question decided by the Court in Denver was "whether the Interstate Commerce Commission complied with its statutory responsibilities under § 20a of the Interstate Commerce Act when it approved without consideration of control or anticompetitive consequences" the proposed stock issuance. Id. at 487, 87 S.Ct. at 1756 (emphasis added; footnote omitted). In reversing the ICC the Court required "at least some degree of consideration of control and anticompetitive consequences." Id. at 492, 87 S.Ct. at 1759 (emphasis added). Any contention that Clayton Act considerations must outweigh other aspects of the public interest is belied by the Court's statements that the Commission is required to "consider( ) * * * all important consequences including anticompetitive effects," id. at 492, 87 S.Ct. at 1759, that the Commission has the responsibility "to weigh anticompetitive consequences," id. at 494, 87 S.Ct. at 1760, and that "the Commission is, of course, required to consider anticompetitive issues under the public interest standard," id. at 501, 87 S.Ct. at 1764.[72] The Denver decision stands for the principle, not different from this court's holding in Northern Natural Gas, that the agency is required to consider anticompetitive consequences as one part of its public interest calculus. Neither Denver nor any other authority we have found makes the antitrust component of that calculus conclusive.
 
 D. Statutory Policy
 
 64
 A holding that the FCC's enforcement of the Clayton Act is mandatory would clash with decisions holding that the FTC and the ICC have prosecutorial discretion in enforcing that Act,[73] since the enforcement authority of all three agencies derives from Section 11. Moreover, it is well established that the Department of Justice has prosecutorial discretion with reference to criminal laws of the United States.[74] These include the Clayton and Sherman Acts, despite seemingly mandatory language in those statutes.[75] There is no reason we can discern that the FCC, alone of these agencies, should retain no discretion over its antitrust enforcement actions.[76]
 
 
 65
 More fundamentally, the inflexible interpretation urged by American Satellite and Western Union runs counter to the purpose of industry regulation. As this court has observed before: "The whole theory of licensing and regulation by government agencies is based on the belief that competition cannot be trusted to do the job of regulation in that particular industry which competition does in other sectors of the economy." Hawaiian Telephone Co. v. FCC, 498 F.2d 771, 777 (D.C.Cir.1974).[77] Since "the basic goal of direct governmental regulation through administrative bodies and the goal of indirect governmental regulation in the form of antitrust law is the same to achieve the most efficient allocation of resources possible," Northern Natural Gas Co. v. FCC, supra, 399 F.2d at 959, we have insisted that the agencies consider antitrust policy as an important part of their public interest calculus. But the agencies are not "strictly bound by the dictates of (the antitrust) laws," id. at 961; rather, they are entrusted with the responsibility to determine when and to what extent the public interest would be served by competition in the industry.
 
 
 66
 The agency's determination about the proper role of competitive forces in an industry must therefore be based, not exclusively on the letter of the antitrust laws, but also on the "special considerations" of the particular industry.[78] As the Supreme Court has said, resolution of the sometimes-conflicting public interest considerations "is a complex task which requires extensive facilities, expert judgment and considerable knowledge of the * * * industry. Congress left that task to the Commission * * *." McLean Trucking Co. v. United States, supra, 321 U.S. at 87, 64 S.Ct. at 381.[79] We therefore reject American Satellite's and Western Union's attempt to constrict the FCC's discretion within the parameters of the antitrust laws. We hold that the requirements of Section 11 of the Clayton Act and Section 309(a) of the Communications Act are satisfied when the Commission seriously considers the antitrust consequences of a proposal and weighs those consequences with other public interest factors.
 
 
 67
 IV. THE COMMISSION'S DISCRETION TO DECIDE WHETHER TO CONDUCT
 
 AN EVIDENTIARY HEARING
 
 68
 Appellants argue that the SBS Decision must be reversed because of the FCC's failure to conduct evidentiary hearings on the antitrust issues. We must therefore decide whether the agency has the discretion to refuse to conduct such evidentiary hearings and, if it has, by what standard we must evaluate the exercise of that discretion. Then we must judge whether the FCC erred in this case.
 
 
 69
 We begin with the statute. Section 309(e) of the Communications Act of 1934, 47 U.S.C. § 309(e) (1976), specifies the hearing procedures to be followed in a licensing proceeding: "If * * * a substantial and material question of fact is presented or the Commission for any reason is unable to make the finding (of public convenience and necessity) * * *, it shall formally designate the application for (a) hearing * * *." The required hearing is described as a "full hearing in which the appellant and all other parties in interest shall be permitted to participate." Id.[80] The hearing requirement therefore is triggered in one of two ways. First, a party may raise factual questions in his petition to deny. Second, the Commission may lack sufficient information on which to make an informed judgment. See Citizens Committee to Save WEFM v. FCC, 506 F.2d 246, 259 (D.C.Cir.1973) (en banc).
 
 
 70
 Section 309(d) describes the burden on an opponent of a license in submitting a petition to deny :
 
 
 71
 The petition shall contain specific allegations of fact sufficient to show that * * * a grant of the application would be prima facie inconsistent with subsection (a) of this section. Such allegations of fact shall, except for those of which official notice may be taken, be supported by affidavit of a person or persons with personal knowledge thereof. * * *
 
 
 72
 This provision, which was added to the Act by amendment in 1960, was intended to require "a substantially stronger showing of greater probative value" than had been required before. S.Rep. No. 690, 86th Cong., 1st Sess. 3 (1959). The allegations must be of specific evidentiary facts, not "ultimate, conclusionary facts or more general allegations * * *." Id.[81]
 
 
 73
 American Satellite and Western Union each submitted a petition to deny supported by three affidavits. The allegations in these petitions consisted largely of generalized and unsupported criticisms of the SBS venture, or of undisputed facts derived from the SBS application and prior FCC statements. These were supplemented by legal and economic conclusions concerning market structure, competitive effect, and public interest.[82] The Department of Justice submitted neither petition nor affidavits; even in its briefs on appeal it did no more than suggest avenues for FCC investigation. JA 1518-1519.[83] Since these petitions and supporting affidavits manifestly do not contain "specific allegations of fact sufficient to show that * * * a grant of the application would be prima facie inconsistent" with the public interest standard, 47 U.S.C. § 309(d) (1976), the Commission was not obligated to schedule an evidentiary hearing on that ground. See Columbus Broadcasting Coalition v. FCC, 505 F.2d 320, 323-324 (D.C.Cir.1974). Appellants' principal argument must, therefore, be based on the second ground necessitating a hearing under Section 309(d): that the FCC lacked sufficient data on which to make an informed decision.[84]
 
 
 74
 There is no clear answer to the question whether there was enough evidence to make a decision. The Department of Justice has admitted that "the nature of the 'full hearing' required by Section 309(e) turns on the type of factual questions raised,"[85] and has commended the FCC for not holding evidentiary hearings on some of the antitrust objections to the SBS entry.[86] Someone must decide when enough data is enough. In the first instance that decision must be made by the Commission not by the Department of Justice or the FTC, not by the parties to the proceeding, and not by the courts. West Michigan Telecasters, Inc. v. FCC, 396 F.2d 688, 691 (D.C.Cir.1968).[87]
 
 
 75
 To allow others to force the Commission to conduct further evidentiary inquiry would be to arm interested parties with a potent instrument for delay. The sad truth about agency decisionmaking and evidentiary inquiries is that they take time; and time often works to the advantage of one party over another. Although evidentiary hearings and other procedural devices are useful and sometimes indispensable they may also be exploited for unworthy purposes. For that reason this court has held:
 
 
 76
 (T)he decision of whether or not hearings are necessary or desirable is a matter in which the Commission's discretion and expertise is paramount. We must examine the Commission's statement of reasons for denial, and if the Commission's action was not arbitrary, capricious or unreasonable, we must affirm.
 
 
 77
 Columbus Broadcasting Coalition v. FCC, supra, 164 U.S.App.D.C. at 217, 505 F.2d at 324 (footnote omitted). In the context of another administrative agency we have said:
 
 
 78
 (A)n agency is not required to hold hearings in matters where the ultimate decision will not be enhanced or assisted by the receipt of evidence. And as to interventions raising anti-competitive issues we see no objection in law to a disposition without (a) hearing that is accompanied by an explanation, supported in the record, that the intervenor's contentions are too insubstantial or barren to indicate the existence of substantial anticompetitive issues * * *.
 
 
 79
 City of Lafayette v. SEC, 454 F.2d 941, 953 (D.C.Cir.1971), aff'd sub nom. Gulf States Utilities Co. v. FPC, 411 U.S. 747, 93 S.Ct. 1870, 36 L.Ed.2d 635 (1973) (footnote omitted).[88]
 
 
 80
 These holdings are fully consistent with recent holdings of the Supreme Court. In Gulf States Utilities Co. v. FPC, supra, 411 U.S. at 762, 93 S.Ct. at 1880, the Court held that the agency's responsibility to consider the antitrust implications of its actions does not entail holding a hearing on antitrust objections in every case, or fully investigating every allegation regardless of its facial merit. The Court noted that "(s)o strict a rule would unduly limit the discretion the Commission must have in order to mold its procedures to the exigencies of the particular case * * *." Id. The Court reaffirmed its earlier statement that where the agency has disposed of antitrust objections summarily, the reviewing court must "closely scrutinize" the decision. 411 U.S. at 763, 93 S.Ct. at 1880, citing Denver, supra, 387 U.S. at 498, 87 S.Ct. at 1762.[89]
 
 
 81
 We recognize that the Commission's discretion to dispose of significant antitrust issues without an evidentiary hearing is not unlimited. This court has pointed out that questions about "probable competitive behavior and its probable effects" require knowledge of the factual context and expert evaluation, and that they should not be "determined exclusively by reasoning in the abstract, based upon logical speculation." United States v. CAB, 511 F.2d 1315, 1326 (D.C.Cir.1975). Since no evidentiary hearing was conducted, we must examine the agency's conclusions with particular care. See Nat'l Air Carrier Ass'n v. CAB, 141 U.S.App.D.C. 31, 41, 436 F.2d 185, 195 (D.C.Cir.1970). Nevertheless, our inquiry is limited to two questions: (1) Was the Commission's decision not to conduct evidentiary hearings reasonable, and not arbitrary or capricious?[90] and (2) given the absence of an evidentiary hearing, was the conclusion of the Commission otherwise supportable under the applicable standard of review? We turn now to those questions.
 
 
 82
 V. THE REASONABLENESS OF THE COMMISSION'S PROCEDURES
 
 
 83
 All parties to this appeal agree that some sort of hearing was needed to investigate the antitrust consequences of the SBS entry; the disputed question is what particular kind of hearing was needed. The FCC, on two different occasions, invited interested parties to submit whatever written material they wanted the Commission to consider, and on one occasion heard oral argument en banc on the antitrust issues of the SBS venture. All of the business parties to this case, and others, participated in the argument,[91] and the submitted materials were voluminous. Appellants, however, argue that notice, comment, and oral argument were insufficient; they demand a trial-type evidentiary hearing, complete with discovery, witnesses, and cross-examination. No one can predict how long such a proceeding would take; at the least, it would surely take several months, and it would be more likely to take over a year. The Commission decided not to conduct an evidentiary hearing because it concluded that the benefits of such a hearing would be outweighed by the delay and attendant costs.[92]
 
 
 84
 In evaluating that judgment we observe at the outset that the FCC has consistently acted without evidentiary hearings during the course of the domestic satellite communications decisions. Each of the appellants has been either a proponent or a beneficiary of this policy.[93] Throughout the proceedings the FCC has emphasized the importance of getting satellite communications systems under way without procedural delay. This court has approved this FCC policy when it was challenged before. Network Project v. FCC, supra, 511 F.2d 786. In view of this consistent policy, suggested by the Department of Justice,[94] adopted by the FCC,[95] and affirmed by this court,[96] appellants bear a heavy burden of explaining why a change is in order now.[97]
 
 A. The Usefulness of an Evidentiary Hearing
 
 85
 As the FCC has pointed out,[98] the domestic satellite communications industry is in its highly risky and experimental phase. The field is rapidly changing technologically and economically. As a result the Commission's determinations must necessarily "depend to a greater extent upon policy judgments and less upon purely factual analysis." Industrial Union Department, AFL-CIO, v. Hodgson, 499 F.2d 467, 474 (D.C.Cir.1974). As the Supreme Court has said, where agency decisions are "of a judgmental or predictive nature," FCC v. National Citizens Committee for Broadcasting, 436 U.S. 775, 813, 98 S.Ct. 2096, 2121, 56 L.Ed.2d 697 (1978), "complete factual support in the record for the Commission's judgment or prediction is not possible or required; 'a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency,' * * *." Id. at 814, 98 S.Ct. at 2122.
 
 
 86
 Only a few years ago there were no firms in the industry; soon there will be half a dozen; in ten years there might be many more. On the other hand, technological developments and resultant economies of scale might make the FCC's present policy of limited open entry obsolete; conceivably there might emerge a natural monopoly. We are in similar ignorance about the extent of the demand for satellite services: it might be immense or it might be limited to a relatively small class of specialized users. We do not know, and months of hearings and witnesses and cross-examinations will not enable us to divine, the future course of the industry.
 
 
 87
 Even the economist solicited by Western Union as an expert witness to urge further hearings admitted in his affidavit that "we are not dealing with a static or settled product line, like cement or steel or even transportation service, but with a rolling, sometimes galloping, technology, creating new markets and new ways to serve old ones as it goes along." JA 1489. The best this expert could claim was that "at any given time the 'reasonable interchangeability' of services can be identified and 'relevant submarkets' delineated * * *." Id. (emphasis added). But the FCC's decision cannot be based on competitive conditions "at any given time"; it must be based on a reasonable prediction of future conditions. The FCC has concluded that the attempt to resolve these speculative matters through adversary proceedings would be futile. We believe that conclusion is reasonable.
 
 
 88
 Merely stating the problem exposes the formidable obstacles to obtaining probative evidence in a case such as the one at bar.[99] The first step is to decide what markets or submarkets exist that might be affected by the joint venture. Essentially, the appellants attempt to identify a communications submarket that does not yet exist, made up of data processing customers, large users, or some other subgroup. Once an industry pattern emerges it will become possible to talk of "reasonable interchangeability" and "cross-elasticity" and the other economic concepts that are used to define relevant markets and submarkets. In the meantime, the Commission can do little more than analyze suggested submarkets and make an informed guess about their future characteristics. This the Commission has done. We accept its judgment that expert witnesses and cross-examination would not add appreciably to its already-expert knowledge of the field.
 
 
 89
 But even if it were possible to delineate relevant markets and submarkets more precisely, there would remain the difficulty of predicting whether, if the SBS venture were disallowed, IBM and Comsat would enter separately, or whether the presence of one of them on the fringes of the industry would exert a pro-competitive effect. Appellants seek to procure testimony from IBM officers about their intentions, and from actual and potential competitors about their reactions to hypothetical competitive situations. Unfortunately, such subjective evidence of the intentions and perceptions of the companies involved is often misleading and unreliable. Even disregarding the ever-present tendency of interested witnesses to adapt the facts to their courtroom strategy, corporate decisionmaking processes are too decentralized and too much the product of compromise to yield clear answers about corporate intentions.
 
 
 90
 This difficulty is greatest when the subject of the inquiry is purely hypothetical: What would IBM have done if the SBS venture had not been available? How would RCA and Western Union behave competitively if IBM or Comsat were "waiting in the wings"? The uncertainty of subjective evidence on such questions has led observers and courts to suggest principal reliance on objective, not subjective, evidence.[100] As the Supreme Court has said, "Potential competition cannot be put to a subjective test. It is not 'susceptible of a ready and precise answer.' "[101] In view of this, the suggested cross-examination of IBM and other corporate officers might well be considered futile. We cannot fault the FCC for making such a judgment.
 
 
 91
 Moreover, we observe that the basic information needed for the SBS Decision was in the possession of the FCC.[102] The hard facts concern the economic power and capability of IBM and Comsat, the nature of the proposed services, the characteristics of the competition, and the capacity of IBM and Comsat to enter the field. All else is inference or speculation.
 
 
 92
 Finally, even though the FCC concluded, based on the limited available information, that Comsat and IBM were unlikely both to enter the field separately, it analyzed the merits of the venture on the assumption that the anticompetitive effects charged by the opposing parties would occur.[103] Even granting that assumption, the FCC concluded that the technological advance, efficient operation, and competitive nudge to AT&T that the SBS venture offers would outweigh the assumed harms.[104] There remained no material issue of disputed fact on which to hold an evidentiary hearing, because the FCC was able to conclude that the SBS license should be approved even if the appellants are correct in their factual speculations. An evidentiary hearing would be a mere waste of time, since it "would not aid in, nor change," the result.[105]
 
 
 93
 Appellants challenge the FCC's use of this assumption, quoting the Supreme Court's statement in United States v. Third National Bank, 390 U.S. 171, 183, 88 S.Ct. 882, 890, 19 L.Ed.2d 1015 (1968):
 
 
 94
 Because the District Court erroneously concluded that the merger would not tend to lessen competition, its conclusion upon weighing the competitive effect against the asserted benefits to the community is suspect. To weigh adequately one of these factors against the other requires a proper conclusion as to each. * * *
 
 
 95
 Appellants infer from this statement that a court or agency may not conduct a balancing of competing factors without first reaching conclusive factual findings based on an evidentiary hearing. We do not read Third National Bank that way. In Third National Bank the District Court erred in its assessment of both competitive consequences of the challenged merger and the public benefits resulting from it. In contrast, in this case we expressly affirm the FCC's substantive conclusions regarding the competitive consequences and public benefits from the SBS venture.[106] Moreover, the hypothetical balance struck here by the FCC was not based on its actual conclusions about the competitive consequences of the SBS venture, but rather on the assumed consequences posed by appellants. The ultimate balance reached is therefore not subject to the same suspicion as was that reached by the District Court in Third National Bank.[107]
 
 
 96
 The position urged by appellants is directly contrary to the expressed intent of Congress that, in its pre-grant procedures, the FCC "should be guided by rules applicable to a motion for summary judgment * * *." S.Rep. No. 690, 86th Cong., 1st Sess. 4 (1959). In deciding whether to grant summary judgment a court is not required to reach full factual findings on every issue; if, granting the inferences and assumptions of the party opposing summary judgment, the moving party is entitled to judgment as a matter of law, then the court must grant the motion. The FCC did as much here.
 
 B. The Need for Expedition
 
 97
 Ever since the decision in Domsat II the FCC has designed its procedures to minimize delay in developing the domestic satellite communications industry. This court has specifically approved that approach. Network Project v. FCC, supra, 511 F.2d at 797 n.13. In this dynamic and technologically innovative industry, a proposed venture may become obsolete in just a few years. Even without regulatory delay, a satellite firm is faced with the daunting prospect of time-consuming research and construction, which entail advance planning and risky lead time and which may lead to naught. To delay a proposed project six months will increase capital cost and diminish technological advantage; to delay it a year or more may destroy its attractiveness as an investment. Unless this proceeding is further delayed, an SBS satellite will be operating in early 1981. If it is remanded for trial-type hearings, the SBS launching will be much delayed, if not precluded altogether.[108] We recognize that the need for expedition will not justify an agency's failure to carry out its statutory responsibilities,[109] but the relative urgency of a decision is a thoroughly appropriate factor for an agency to consider when crafting its procedures.
 
 
 98
 Under the circumstances of this proceeding, we cannot find the FCC's decision not to conduct an evidentiary hearing on the antitrust issues to be arbitrary or capricious; indeed, we recognize that an evidentiary hearing would less promote reasoned decisionmaking in this case than it would delay and impede technological progress.
 
 VI. THE FCC'S SUBSTANTIVE FINDINGS
 
 99
 We now reach the ultimate issue in this appeal: whether the decision of the FCC to grant construction and operating authority to SBS comports with the "public convenience and necessity" standard of Section 214 of the Communications Act of 1934, 47 U.S.C. § 214 (1976). The scope of our review in this type of case was exhaustively described by this court in Greater Boston Television Corp. v. FCC, 444 F.2d 841, 850-853 (D.C.Cir.1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). In summary, we cannot interfere with the agency's "latitude not merely to find facts and make judgments, but also to select the policies deemed in the public interest." Id. at 851. Our substantive review is satisfied if we find that the agency has "really taken a 'hard look' at the salient problems, and has * * * genuinely engaged in reasoned decision-making." Id. (footnote omitted). As we have noted,[110] the absence of evidentiary hearings requires that we examine the supporting findings and assumptions with especial care, but we cannot substitute our judgment for that of the agency.
 
 
 100
 A. The Conclusion That the SBS Venture Would Not Be Anticompetitive
 
 
 101
 The FCC has concluded that the entry of the SBS venture would not be anticompetitive in its effect. This conclusion rests on specific technical conclusions regarding relevant markets and submarkets, the effect of the joint entry, the possible entrenchment of SBS in the market, and the potential for predatory competitive behavior by SBS. We will consider the agency's analysis of each of these points in turn. But first, we note that the general conditions of the domestic satellite communications industry are such that the FCC's ultimate conclusions are highly plausible. The overriding fact about the SBS entry is that it introduces a strong new competitor into a concentrated industry dominated by a giant firm, AT&T. Entrenchment and predatory conduct theories aside, the essential objection to the SBS entry is not that it is anticompetitive, but that it is not as pro-competitive as some other entry might be.
 
 
 102
 Even that argument is difficult to believe in light of the posture of the parties to this case: AT&T, Western Union, and American Satellite have a natural interest in inhibiting future competition and delaying future competitive entry. Their protestations in favor of vigorous competition ring hollow, especially considering that the immediate result of their victory would be to block the entry into the industry of a strong and technologically innovative competitor. Of course, these corporate giants have the right to pursue whatever litigious strategies the law may sanction, and this court has an obligation to ensure that the FCC seriously considers their arguments and reaches a reasoned conclusion. But we observe at the outset that there is great commonsense merit in the FCC's decision to permit one strong competitive entry now, rather than to hope for two such entries in the future.
 
 
 103
 1. Definition of relevant market. The FCC concluded that the "major market" to be considered is the "entire private line voice/data/image domestic telecommunications market." The market includes both satellite and terrestrial specialized communication services. SBS Decision, 62 FCC2d at 1075 P 223, JA 1598. In reaching that conclusion the FCC recognized that "(t)hat market is composed of products that have reasonable interchangeability for the purposes for which they are produced price, use and qualities considered."[111] The FCC found that "as a technical matter" that is, considering the channel bandwidth, noise potential, speed, need for related equipment, error rate, and cost "virtually all channels of point to point communication are substitutable between those points." SBS Decision, 62 FCC2d at 1077 P 228, JA 1600.
 
 
 104
 The FCC reviewed two purported differences between satellite and terrestrial communications that might indicate that they are not "reasonably interchangeable." It rejected both. First, it noted that the end-to-end time interval for satellite communications is fixed, and longer than the typical end-to-end interval in ground communications. The FCC did not, however, consider this difference very important, because it primarily affects only the efficiency of certain high-speed bidirectional data communications, and because it might be possible to offset the difference by using the higher bandwidth channels available on satellites. The second purported difference is the greater facility of satellites to generate simultaneous transmissions to multiple receivers. Even this service, however, is provided by terrestrial systems as well.[112]
 
 
 105
 The FCC observed that present satellite carriers are able to shift customers from terrestrial to satellite channels, and that competition between the two media is already under way.[113] From this, and from its technical analysis, the Commission concluded:
 
 
 106
 Users will, in the final analysis, choose the facility or mix of facilities which is most efficient for their individual purposes. In any event, satellite channels present no clearcut advantage which would create a separate relevant domestic satellite market for purposes of our analysis.
 
 
 107
 SBS Decision, 62 FCC2d at 1080 P 236, JA 1603.
 
 
 108
 Appellants have called this major market analysis "superficial" and "arbitrary,"[114] but do not seriously attempt to argue that satellite and terrestrial systems do not compete. On the record, and judging by this lack of analysis by appellants, we are inclined to agree that the existence of such competition is "inarguable."[115] Appellants' more serious point is, not that the FCC misconstrued the major relevant market, but that it failed to recognize certain relevant submarkets.
 
 
 109
 A shift in the focus from the major market to the relevant submarkets is vital to appellants' argument, because the terrestrial communications field is so dominated by one supplier, AT&T,[116] that even the Department of Justice was constrained to admit:
 
 
 110
 The entry of IBM into the domestic communications field could inject an aggressive, well-financed new entrant into a market too long dominated by a monopoly supplier. * * *
 
 
 111
 Reply Comments of the Department of Justice, JA 1509. Only when focusing on smaller submarkets where AT&T is not (yet) dominant does one gain the luxury of exchanging immediate and obvious pro-competitive entry for the potential advantages of multiple entry in the future.
 
 
 112
 The FCC carefully considered a number of possible submarkets, and rejected each as a basis for competitive analysis.
 
 
 113
 (a) Satellite Communications. As discussed above,[117] the FCC considered the purported differences between satellite and terrestrial communications systems, and concluded that the two media are reasonably interchangeable, and thus that satellite communications do not comprise a distinct submarket.
 
 
 114
 (b) Data communications. Technical differences between data and facsimile transmissions, which generally employ digital signals, and voice transmissions, which generally employ analog signals, might serve to divide the communications market into two distinct submarkets. Appellants suggest that SBS, concentrating in data and facsimile transmission, and AT&T, concentrating in voice transmission, might effectively divide the market and create a duopoly.
 
 
 115
 The FCC considered this possibility in its order. SBS Decision, 62 FCC2d at 1080-1082 PP 237-245, JA 1603-1605. It first noted that, as a technical matter, analog channels of communication and digital channels can be rendered compatible. The proposed SBS system offers an integrated service, transmitting data, facsimile, and voice signals. Similarly, terrestrial systems offer both analog and digital channels for data transmission purposes. The FCC observed that "virtually every communications common carrier that we regulate, both terrestrial and satellite," serves the data transmission market, but that AT&T has by far the largest number of channels open for such purposes.[118] Thus the FCC concluded reasonably, in our view that the data communications market is not separate from the overall communications market, and that even if it were, the entry of SBS would serve to mitigate the dominant and growing position of AT&T.
 
 
 116
 (c) Large users. The FCC found "(s)ome historical support" for the argument that large users, such as the federal government and certain large corporations, have special communications needs, and may constitute a separate submarket.[119] Recent developments have, however, blurred the distinction between large and small users. In particular, the Resale Decision, 60 FCC2d 261 (1976), amended on reconsideration, 62 FCC2d 588 (1977), aff'd sub nom. AT& T v. FCC, 572 F.2d 17 (2d Cir.), cert. denied, 439 U.S. 875, 99 S.Ct. 213, 58 L.Ed.2d 190 (1978), permitted smaller users to reach private sharing agreements that would make available to them the advantages of aggregate communications offerings formerly attractive only to large users.[120] Of course, as the Department of Justice has pointed out, this "shared user" decision does not eliminate all differences between large and small users: not all small users will choose to join a sharing agreement.[121] But as the FCC observed, the main difference between the two classes of users is not technical, but economic. They use essentially the same type of services, but the greater bulk of demand gives large users an economic advantage.[122] Under the "shared user" decision, that advantage is lessened, if not eliminated.
 
 
 117
 (d) New, emerging uses. The principal objection by the Department of Justice to the FCC's relevant submarket analysis was that "the Commission failed to consider the possibility that there may well be new, emerging uses for satellites for which, as a practical matter, terrestrial channels do not offer a realistic alternative." Dep't of Justice brief at 28. We cannot agree.
 
 
 118
 It would be anomalous to hold that SBS could be guilty of lessening competition in a submarket which it will create. As the FCC observed, its mandate does not require it "to penalize innovation and ignore the public interest benefits resulting from such innovation by declaring each new and innovative service offering or operating mode a discrete submarket subject to unique regulatory and/or antitrust treatment." SBS Decision, 62 FCC2d at 1086 P 258, JA 1609. Nevertheless, the FCC in its order analyzed no fewer than six characteristics of the proposed SBS system that might tend to create distinct submarkets.[123] However, in each instance the FCC identified terrestrial systems with similar, albeit not identical, characteristics, and concluded:
 
 
 119
 (W)hile SBS' package of characteristics may, in the aggregate, be different in degree from competitive offerings today, in our judgment, it is not so different in degree as to lose its reasonable interchangeability with alternatives, and therefore establish a separate relevant market and/or submarket. * * *
 
 
 120
 SBS Decision, 62 FCC2d at 1086 P 258, JA 1609 (emphasis in original). Significantly, appellants do not attempt to refute the FCC's judgment on this score, or to prove that what appears to be reasoned decisionmaking for some reason falls short. Appellants' response is to ignore the FCC analysis, to assert that the Commission "fail(ed) to evaluate a new demand for which SBS-type technology would be, for a short time, the only supplier,"[124] and to ask us to reverse for this "arbitrary" failure.
 
 
 121
 This court lacks the technical and economic background to second-guess the FCC's conclusions on relevant submarkets. The Commission has apparently taken a "hard look" at the possibilities and has explained its reasons for rejecting them. Appellants have complained that the FCC's analysis is insufficient, but have offered no competing reasoning for us to evaluate. Perhaps relevant submarkets will emerge in the future, but the Commission's responsibility today under Section 7 of the Clayton Act is to deal with " 'probabilities,' not 'ephemeral possibilities.' " United States v. Marine Bancorporation, 418 U.S. 602, 623, 94 S.Ct. 2856, 2870, 41 L.Ed.2d 978 (1974) (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 323, 82 S.Ct. 1502, 1522, 8 L.Ed.2d 510 (1962)). Accordingly, we decline to interfere with the Commission's judgment.
 
 
 122
 2. Potential competition. The FCC considered the possibility of a diminution in potential competition under the doctrine of United States v. Penn-Olin Chemical Co., supra, 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775. Under that theory the SBS venture might be thought to be anticompetitive because it would preclude the separate entry of both Comsat and IBM into the industry. In the alternative, it might reduce competition even if only one of the parent firms entered alone, because the other would remain "in the wings" exerting a pro-competitive influence. The Commission concluded that IBM and Comsat were unlikely to enter the industry alone, and that little pro-competitive effect would result from a firm remaining "in the wings."[125]
 
 
 123
 (a) Double entry. The Commission supplied two major reasons for its belief that IBM and Comsat would not enter the market alone. First, the barriers to entry are unusually steep. The technology is new and risky, fixed development and start-up costs are high, and it is likely to be years before the entrants will begin to earn a profit. This situation, in the FCC's view, makes the likelihood of entry by any given firm quite low. Second, IBM and Comsat would begin at a decided disadvantage in the industry. By the time they would be able to enter the industry the other firms will already have established a position. Moreover, each of those firms is also a terrestrial communications carrier, capable of switching traffic from ground lines to satellite channels and thereby lowering its per unit costs of satellite service.[126]
 
 
 124
 Neither IBM nor Comsat has such an advantage. Their sole source of traffic would be new customers won over from the current satellite or terrestrial carriers. Needless to say, this substantially increases the risks Comsat or IBM would face, and decreases the prospects of eventual gain. Therefore, the Commission concluded that "it would be most difficult for either IBM or Comsat General to enter into providing domestic satellite services alone." SBS Decision, 62 FCC2d at 1091 P 278, JA 1614. In the FCC's view, these disadvantages are offset by the combination of IBM and Comsat in a single joint venture: their unique capabilities and resources may well enable them to overcome their other disabilities.[127]
 
 
 125
 We are by no means certain that the FCC was correct in this conclusion. In a dynamic field such as satellite communications, it seems to us that the technological resources of IBM might well be sufficient, even without Comsat's contribution, to make entry attractive to IBM.[128] And Comsat has in the past sought approval for satellite ventures with partners other than IBM. If we were making the decision de novo, we would think the likelihood of separate entry a close question. Nevertheless, we affirm. Our task is not to judge whether the opponents of the joint venture have stated a prima facie case under the antitrust laws; rather, we are reviewing the agency's decision that the SBS license conforms to the public convenience and necessity. In that role, we could not overturn the FCC's findings, even if we preferred another conclusion. The FCC has here considered all of the evidence and reasoning presented by the interested parties, has recognized the necessarily speculative nature of its inquiry, and has concluded that it is not likely that IBM and Comsat would enter the field alone.[129] Under the applicable standard of review, we cannot reverse.
 
 
 126
 (b) The "in the wings" effect. As the Supreme Court said in United States v. Marine Bancorporation, supra, 418 U.S. at 624, 94 S.Ct. at 2871:
 
 
 127
 Unequivocal proof that an acquiring firm actually would have entered de novo but for a merger is rarely available. Thus * * * the principal focus of the (potential competition) doctrine is on the likely effects of the premerger position of the acquiring firm on the fringe of the target market. * * *
 
 
 128
 Here, where there is certainly no unequivocal evidence about the separate entry of Comsat and IBM, it is particularly important to analyze the possibility that their joint venture may have eliminated the competitive pressure that one of the firms would have exerted on the domestic satellite industry by its continuing threat to enter.[130]
 
 
 129
 In this analysis, we are reminded by the Supreme Court that "ease of entry on the part of the acquiring firm is a central premise of the potential-competition doctrine," id. at 628, 94 S.Ct. at 2873, and that we must "accord full weight to * * * federal and state regulatory barriers to entry * * *." Id. This focus on ease of entry is vital because the pro-competitive effect from a firm "in the wings" is entirely produced by the perceptions of the current competitors. Only if they perceive the fringe company as a likely entrant will they respond in a competitive fashion.
 
 
 130
 In the domestic satellite communications industry, we have observed that barriers to entry are steep. If Comsat or IBM took over full operation of the SBS venture, the remaining firm would have to obtain large amounts of capital, either in the capital markets or from a replacement joint venturer, in order to enter the field. The new entrant would have to begin development of a system anew, and would take a minimum of three to five years, in the FCC's estimation, to become an actual competitor.[131]
 
 
 131
 Thus the current satellite firms will have distant advance notice that a new entry is forthcoming, and more than enough time to alter their competitive behavior to meet that threat. In the meantime, they have little to fear from the firm "in the wings." Moreover, the regulatory hurdles in the face of IBM or Comsat entering are high. Comsat first proposed entering the field in 1972, and has only now received authority to do so. IBM's entry, even alone, will be staunchly opposed by many parties, just as its entry has been opposed in the present order. Ironically, if the SBS Decision is reversed, then entry by IBM, Comsat, or any other major competitor would be much less likely; potential entrants would have to overcome more stringent regulatory obstacles before being granted a license. Reversing the SBS Decision might well decrease the potential competition now resulting from other fringe firms that might take advantage of the present open entry policy.[132]
 
 
 132
 We thus believe that the FCC reasonably concluded that "it is unlikely that the non-entrant would ever enter, or realistically ever be perceived as a threatening potential competitor." SBS Decision, 62 FCC2d at 1091 P 280, JA 1614.
 
 
 133
 3. The Entrenchment Theory. The FCC also considered the argument that the SBS venture would be anticompetitive under the "entrenchment theory" as expounded in FTC v. Proctor & Gamble Co., 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967). Under this theory SBS might be thought to have advantages from its connection to IBM that would enable it to dominate the relevant market[133] and to drive out actual or potential competitors. As explained by Western Union in its reply comments, "Data processing customers are the likely principal users of domestic satellite service, and IBM's well-established and loyal data processing customer base inevitably will provide extraordinary competitive advantages to any satellite carrier affiliated with IBM." JA 1475-1476 (footnote omitted). Acceptance of this argument would lead to the conclusion that IBM should not be permitted to enter the domestic satellite communications field, with or without Comsat.[134] Any advantage IBM may have it can exploit as easily alone as in a joint venture. Unlike the potential competition theory, therefore, the entrenchment argument is not predicated on the joint venture character of SBS, but on the identity of one of the SBS partners.
 
 
 134
 We consider below[135] the related argument[136] that IBM may engage in predatory practices such as cross-subsidization. Here we consider the theory that IBM's expertise, aggressiveness, size, or efficiency may overwhelm Western Union, RCA, American Satellite, and their fellows in the domestic satellite communications market. In this we are reminded of the Supreme Court's warning that the antitrust laws exist to protect "competition, not competitors * * *." Brown Shoe Co. v. United States, supra, 370 U.S. at 320, 82 S.Ct. at 1521 (emphasis in original).
 
 
 135
 The purpose of the entrenchment doctrine as it has developed in the courts is not to exclude strong or even potentially dominant firms from entering a new market, but instead to require them to do so by internal expansion or toe-hold acquisition rather than by merger with firms already established in the market. For example, in FTC v. Proctor & Gamble Co., supra, 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303, the leading case on entrenchment, the doctrine was applied to prevent Proctor & Gamble from entering the household bleach market through acquisition of the leading bleach firm, Clorox; the FTC would have welcomed independent entry by Proctor & Gamble. Appellants have cited no precedent for their remarkable attempt to extend this doctrine to prohibit a strong firm such as IBM from entering a promising new market out of a fear that it might come to dominate the field. Their suggestion turns the purpose of the antitrust laws on its head.
 
 
 136
 For reasons already discussed, the Commission concluded that SBS will be at a substantial competitive disadvantage when it enters the field.[137] We see no reason to dispute the FCC's conclusion that SBS will not be in a position to dominate the domestic satellite communications field or to raise entry barriers within the foreseeable future.
 
 
 137
 4. Predatory Practices. More troublesome is appellants' objection that IBM may be able to use its dominant position in the computer and data processing field to gain unfair advantage in the domestic satellite communications market. We observe that each of the entrants into the domestic satellite industry has presented some possibility of similar competitive abuse. For example, similar concerns about AT&T were responsible for the FCC's decision to place major restrictions on AT&T's satellite venture.[138] The FCC does not deny that IBM's participation presents prospects for predatory behavior that must be obviated. The dispute in this case is over the adequacy of the FCC's response to the problem as perceived.
 
 
 138
 To prevent IBM from using its position in the computer industry as a lever to gain control of the satellite communications field, the FCC placed certain restrictions on IBM's and SBS's operations. It prohibited advertising or promotional assistance by IBM to SBS,[139] joint or cooperative sales presentations between SBS and IBM,[140] packaged end-to-end data communications services,[141] and price discrimination by SBS in favor of users of IBM equipment.[142] It required that all financial or procurement dealings between IBM and SBS be conducted at arm's length,[143] and that IBM remain a minority and noncontrolling partner in SBS.[144] It also promises to impose additional restrictions or take other action if these do not suffice.[145]
 
 
 139
 Appellants have not attempted a precise refutation of the adequacy of the FCC's restrictions. The Department of Justice does not challenge the FCC on this point at all. Western Union merely says that the FCC's conclusion was "without the aid of factual analysis," and that "certain of the Commission's restrictions" had been thought unworkable by SBS.[146] American Satellite argues that "it cannot be determined how effective, if at all," the FCC's restrictions may be.[147]
 
 
 140
 After considering the FCC's analysis and response to the problem, and the arguments of appellants, we conclude that the Commission's disposition of the predatory practices argument was acceptable for the purpose of this review.
 
 
 141
 B. The Conclusion That Other Public Benefits Will Outweigh Any Possible Anticompetitive Effects
 
 
 142
 In reviewing the FCC's conclusion that the public benefits from the SBS venture outweigh any possible anticompetitive effects from it even assuming that those effects could be established we bear in mind that the Commission's overriding responsibility is not to foster the maximum level of competition in the industry it oversees, but to promote the public interest. FCC v. RCA Communications, Inc., supra, 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470; Hawaiian Telephone Co. v. FCC, supra, 498 F.2d 771. The principal advantages to be gained from competition in this heavily regulated industry are two. First, the presence of a large number of competitors and a large capacity may prevent supracompetitive price pressures that the Commission might not be able to perceive or control. Second, the increased competition may spur firms in the industry to greater technological advances and more efficient operations.
 
 
 143
 Given the rapid increase in the number and size of the satellite systems,[148] supracompetitive price pressures are unlikely to occur, since such pressures are caused by an artificial restriction in the supply of the service. Moreover, under the circumstances, the entry of an innovative force such as SBS is as likely to spur as to stifle technological competition. This suggests that a mere incantation of the words "anticompetitive consequences" in this case may not suffice to prove damage to the public interest.
 
 
 144
 1. Service benefits. We have already reviewed the technological advances that the SBS proposal embodies: small earth stations at the premises of customers, integrated voice/data/image transmission service in a largely digital format, new demand assignment formulas to promote more efficient use of the spectrum, and use of the 12 and 14 GHz bands.[149] These developments have touched off other technological advances on the part of SBS's competitors. The public is the beneficiary of these advances; new services will enable communications users to transmit messages, data, and images with greater ease and flexibility, and the increased efficiencies will lower cost.
 
 
 145
 Significantly, none of the parties to this appeal save AT&T[150] denies that the SBS proposal will provide the public valuable new services. We observe, moreover, that partially as a result of the FCC's decision not to undertake time-consuming evidentiary hearings on the antitrust issues in this case, the public will enjoy the benefits of the SBS system in early 1981. As the Department of Justice has admitted:
 
 
 146
 The Commission has already approved the joint venture's technological approach, finding it to be a "technologically innovative approach" with the potential to afford significant benefits to the public. We have no reason to doubt that assessment and believe that the public should be afforded the option to utilize that service without undue delay. * * *
 
 
 147
 Department of Justice supplemental brief at 61.
 
 
 148
 2. Competitive benefits. Even assuming that the identified anticompetitive consequences of the SBS venture will occur, the FCC concluded that the SBS entry would promote the public interest by enhancing competition in communications.[151] In particular, the Commission observed that SBS would challenge AT&T's hegemony in the specialized communications market, and would impede the achievement by the AT&T/GTE venture of a dominant position in the satellite segment of that market.[152] The Commission further concluded that this competition would be enhanced by the participation of both Comsat and IBM in the joint venture, because of their combined technical and financial resources,[153] and also because of their joint control, which will promote more vigorous competition with AT&T.[154] Finally, the FCC opined that even an additional entry by IBM alone would be of little additional practical value in promoting competition because such an entry would take many years to develop.[155]
 
 
 149
 These conclusions are sharply challenged by appellants, who assert that SBS and AT&T will not compete with each other, but will rather create a duopoly, with AT&T controlling voice service and SBS controlling data service. Western Union reasoned as follows:
 
 
 150
 This result (duopolization) was predicted for several reasons: First, because satellite service offers particular promise for high speed data communications * * *, a field of great importance to IBM because of its predominant position in the data processing industry; second, because of AT&T's present dominance in voice communications; and third, because IBM and AT&T have a history of deferring to each other in fields in which only one company has an established position. * * *
 
 
 151
 Western Union brief at 52-53 (citation to record omitted). Appellants' reasoning is not persuasive. Admittedly, IBM has a great interest in the data communications field, and may be expected to compete vigorously in it; but, as Western Union has itself pointed out,[156] AT&T has heretofore dominated that market. Thus, even if IBM were to confine itself to data transmission, it would enhance competition. AT&T is not expected to withdraw from this lucrative segment of the market after having invested, with GTE, in a satellite venture that should improve its position.[157] In the voice segment of the industry, any contribution SBS might make to the market would help to break AT& T's predominant control; SBS proposes to provide full satellite communications services, including voice transmission.[158]
 
 
 152
 Finally, a history of cooperation between IBM and AT&T (and appellants have also suggested such a history with respect to Comsat and AT&T) may provide cause for concern; but we do not understand how excluding IBM, or Comsat, or the SBS joint venture, from the domestic satellite communications industry will stimulate competition. Surely, SBS will compete more vigorously against AT&T if it is granted a license than it will if that license is denied.
 
 
 153
 In its CML Decision the FCC carefully considered the problem of cooperation between AT&T, Comsat, and IBM, and designed the "balanced CML option" to obviate the problem by denying both Comsat and IBM a controlling interest in SBS. In the Commission's judgment, the presence of a third partner and the minority status of Comsat and IBM would make it difficult for either of the latter to curry favor with AT&T at the expense of vigorous competition by SBS.[159] Appellants may not consider this solution to be adequate, but they have not carried their burden in this court of showing that the Commission's decision was wanting in reason or care.
 
 
 154
 3. The FCC's continuing oversight. Finally, the FCC has explicitly declared itself prepared to exercise its continuing authority under Section 214 of the Communications Act to prevent anticompetitive behavior as it may occur.[160] Although the provisions of Section 7 of the Clayton Act are intended to stop anticompetitive arrangements in their incipiency, see Brown Shoe Co. v. United States, supra, 370 U.S. at 317-318 & n.32, 82 S.Ct. at 1520 & n.32, this court has recognized that continuing supervision by a regulatory agency may accomplish the same end, where "(t)he serious anticompetitive effects, if they arise at all, will do so only after full implementation begins." Nat'l Ass'n of Regulatory Utility Comm'rs v. FCC, 525 F.2d 630, 638 (D.C.Cir.), cert. denied, 425 U.S. 992, 96 S.Ct. 2203, 48 L.Ed.2d 816 (1976).[161] The power of the FCC to employ a full range of remedies, including restrictions, conditions, nonrenewal of licenses, or divestiture, makes the antitrust problems in this case less immediate, and more controllable, than appellants would suggest.
 
 VII. CONCLUSION
 
 155
 Freedom of entry is the single most important guarantor of competition in a concentrated industry, because so long as other firms can enter, the firms already in the industry are forced to price their products and services at a level close to the competitive price. As this case illustrates, however, other competitive concerns sometimes come into conflict with freedom of entry. Here the Department of Justice, the Federal Trade Commission, and several private corporations have argued that preventing the entry of a firm, SBS, into the domestic satellite communications field would promote competition. The FCC, which has been delegated the authority to decide this question, disagreed: it concluded that the SBS venture is unlikely to produce significant anticompetitive effects and that, even if it did, the public benefits from the entry would be so substantial as to outweigh those effects.
 
 
 156
 In making this judgment, the FCC remained true to its established policy of permitting open entry into the domestic satellite field, subject only to basic competency requirements. Without cumbersome evidentiary proceedings that would delay or even prevent the entry of otherwise worthy firms, the FCC has granted licenses to each of the corporate appellants in this case: to AT&T, to Western Union, and to American Satellite. When a joint venture composed of IBM, Comsat, and Aetna applied to join the concentrated pack, the FCC did not deviate from its limited open entry policy; it examined submitted data, heard oral argument, took a hard look at suggested antitrust problems, and granted the license.
 
 
 157
 The earlier entrants now ask this court to require the FCC to change its policy. They would have us place the hurdle of an evidentiary hearing, which could take a year or more, in the way of SBS's entry; they defend their position by proclaiming the benefits of competition. We are inclined to ask who in this case is truly promoting the policy of competition: the FCC, which granted a license to a new and potent competitive force, or those who invoke the cry of "competition" in the interest of restricting entry. Our function in this case is limited. In review both of the procedures used by the FCC and of the ultimate conclusion, we must defer to the Commission's judgment in the absence of legal error. The order under review is
 
 
 158
 Affirmed.
 
 
 159
 SPOTTSWOOD W. ROBINSON, III, Circuit Judge, with whom WILKEY, Circuit Judge, joins, dissenting:
 
 
 160
 As a member of the panel considering this litigation when it first reached the court, I was then of the view that the licensing decision at issue had to be reversed on each of two independent grounds. First, I felt that the dual responsibilities of the Federal Communications Commission (sometimes FCC) under the Communications[1] and Clayton Acts[2] required it to deny a construction permit or station license to anyone whom it found to be in violation of Section 7 of the Clayton Act,[3] irrespective of public benefits that might otherwise accrue, unless the Commission could in no other way discharge its function under Section 309(a) of the Communications Act of regulating to serve the "public interest, convenience, and necessity."[4] Because FCC clearly had not hewed to a standard of that caliber, a remand for further proceedings seemed necessary. Additionally, review of the procedures followed by the agency persuaded me that in any event it had not conducted the full evidentiary hearing required by Section 309(e) of the Communications Act.[5]
 
 
 161
 Rehearing by the court en banc has been accompanied by more exhaustive exploration of relevant legislative history and precedential materials. I remain firmly convinced that principled application of the Communication Act's mandate made an evidentiary-type hearing obligatory in the circumstances of this case.[6] I have, however, modified my position respecting the standard by which the Commission must appraise anticompetitive effects that rise to the level of Clayton Act transgressions.[7] I find myself now in agreement with the conclusion today reached by the court that "the requirements of Section 11 of the Clayton Act and Section 309(a) of the Communications Act are satisfied when the Commission seriously considers the antitrust consequences of a proposal and weighs those consequences with other public interest factors."[8] Since, however, I arrive at this result in somewhat different fashion than does the court, I set forth my reasoning separately.
 
 I. STATUTORY DYNAMICS
 
 162
 My starting point is the statutory language delineating FCC's responsibilities when, during the licensing process, it encounters activity impinging upon the Clayton Act. Under Section 309(a) of the Communications Act, the Commission is empowered to grant applications for construction permits and station licenses if the "public interest, convenience, and necessity (would) be served" thereby.[9] It is by now indisputable that in reaching a determination under this criterion, the agency must give serious consideration to conduct portending substantial anticompetitive consequences, including activity proscribed by the Sherman[10] and Clayton Acts.[11] In addition to this task, the Clayton Act itself, in Section 11, increases the Commission's regulatory range as well as its arsenal of regulatory weapons by empowering it to enforce compliance with designated portions of that Act insofar as they apply to communications common carriers.[12]
 
 
 163
 I do not quarrel with the court's position that, despite the presence of mandatory language in Section 11,[13] the statute tolerates an agency exercise of normal prosecutorial discretion in deciding when and against whom to institute enforcement proceedings pursuant to that provision.[14] But we are not faced with the question whether FCC may refrain from taking affirmative steps when confronted by evidence that a carrier subject to its jurisdiction has acted in defiance of the law. Here the Commission embarked upon an inquiry pursuant to its responsibilities under the Communications Act, and undertook as an essential part of that process to weigh the anticompetitive consequences of granting SBS's license application.[15] The issue, then, is whether the nature of that inquiry and the otherwise broad discretion granted FCC to act in the public interest,[16] are changed because Congress has given the agency a dual role in regulating communications common carriers. Normal concepts of prosecutorial discretion are irrelevant to resolution of this problem. Instead, the call is to determine how the Communications and Clayton Acts interrelate in defining the parameters of the decision whether or not to license. I have been particularly concerned by the need to identify accurately the reason why Congress allotted antitrust-enforcement authority to FCC, and what intention that bespoke with respect to the agency's other duties.
 
 
 164
 Preliminarily, I will review the legislative history of both the Clayton and the Communications Acts, seeking insights into congressional attitudes respecting the relationship between these two competing regulatory schemes.[17] It is true, as the court writes, that the history "reveals nothing conclusive,"[18] but I do find some guidance in the legislative action and pronouncements that the court does not mention. I will then consider subsequent interpretations placed on these statutes, particularly by the Supreme Court.[19]
 
 
 165
 A. The Statutes and Their Legislative Histories
 
 1. The Clayton Act
 
 166
 The Clayton Act was passed in 1914 to supplement the antitrust protection afforded by the antecedent Sherman Act.[20] In a major departure from the earlier approach, the Clayton Act placed enforcement responsibility in the first instance in administrative agencies.[21] As first passed by the House of Representatives the bill specified criminal penalties for violation,[22] just as the Sherman Act had.[23] It was in the Senate, upon recommendation of the committee to which the bill had been referred, that the administrative enforcement scheme was added.[24]
 
 
 167
 It is at least clear why Congress preferred administrative over criminal enforcement of the new provision. "This was done," the Senate committee explained, "because it was thought best, especially in view of the experimental stage of this legislation, that the harshness of the criminal law should not be applied but that the enforcement of the section should be given to the Federal Trade Commission."[25] Repeated attempts to amend the bill to make violation a misdemeanor were all rejected.[26] For similar reasons of flexibility in regulation of this new field, committee members favored leaving the prohibition of discriminatory pricing and tying contracts to the Federal Trade Commission (FTC) in its exercise of authority to regulate unfair business practices, to be granted under pending Federal Trade Commission legislation.[27] The provisions of the Clayton Act dealing with these two subjects were deleted from the antitrust bill on the floor of the Senate,[28] but both were later restored.[29]
 
 
 168
 Though it thus is apparent that agencies were designated as enforcement mechanisms in part to provide some kind of prosecutorial discretion, it is much less clear why Congress separated the regulation of common carriers and banks from FTC's otherwise comprehensive jurisdiction and granted oversight instead to the Interstate Commerce Commission (ICC) and the Federal Reserve Board (sometimes FRB). The purpose in doing so has great significance here, for it was from ICC's initial Clayton Act responsibility that FCC's parallel authority was later carved.[30] Moreover, it seems likely, at least in the absence of any contrary indication, that in each instance Congress had similar reasons for placing authority elsewhere than in FTC.
 
 
 169
 Unfortunately, no ready-made explanations are recorded in the committee reports or debates, and no consistent pattern emerges from congressional treatment of the transportation and banking industries, overall supervision of which had already been established in federal agencies that would now have antitrust regulation added to their jurisdiction. One can, however, discern some tentative congressional concerns that form a basis for consideration of later amendments to the scheme initially constructed in the Clayton Act.
 
 
 170
 First, Congress clearly intended that common carriers and banks, despite the intense federal supervision to which they were subject, would in general be accountable under the antitrust laws as well. Two of the Clayton Act prohibitions barring discriminatory pricing to force a competitor out of business[31] and the use of tying contracts by sellers to prevent purchasers from dealing in another's product[32] were applicable to all persons engaged in interstate commerce. Section 8, which forbade interlocking directorates, did expressly limit coverage of banks to those of substantial size,[33] but this is a de minimus exception and if anything reflects a desire to ensure liability under most circumstances. A paragraph that some believed would sanction meetings among common-carrier officers that otherwise might violate the Sherman or Clayton Acts[34] was removed for that reason, despite language making clear that any resulting agreement would require ICC approval.[35]
 
 
 171
 Aside from the general intent to apply antitrust concepts to regulated industries, there are also indications that many viewed those industries as materially different from others because there existed bodies of law specifically aimed at their control, and consequently that the proscriptions of the Clayton Act belonged more appropriately in the legislation specially governing them. Thus the Senate attempted to remove any reference to interlocking bank directorates on the theory that "such legislation ... more properly belongs to the domain of banking rather than of commerce and such additional regulation of bank directorates as may be wise and just" should come by way of amendments to the banking laws, with enforcement authority in the Federal Reserve Board and the Comptroller of the Currency.[36] The final bill, however, reinstated the particularizing of bank coverage[37] but also added the FRB to those with administrative enforcement power.[38] Additionally, the House bill left most of the prohibition on interlocking common-carrier directorates to later amendment of the Interstate Commerce Act.[39]
 
 
 172
 A third theme that can be discerned from the legislative history was a reluctance to remit entirely to agency discretion the decision on whether particular actions violate the spirit of the antitrust laws. The House rejected two amendments that would have permitted bankers to serve as corporate officers of more than one institution and would have left it to the Federal Reserve Board to decide whether to forbid the practice in individual instances where restraint of trade resulted.[40] One opponent suggested that "in the course of a very short time, (the Board will perhaps) need regulating as badly as do the directors of banks now."[41] This kind of concern might also explain why the Clayton Act provided for two means of enforcement in addition to the authority granted FTC, ICC and FRB. Both the Attorney General and private parties were granted leave to bring suit in a federal district court to enjoin violation of any of the Clayton Act provisions.[42] One exception to this is noteworthy: no private suit was permitted against common carriers subject to ICC supervision,[43] perhaps further reflecting a view that more flexibility was desirable in a field so densely regulated.[44] This special immunity was withdrawn from communications common carriers, however, when they were later transferred from ICC to FCC control.[45]
 
 
 173
 Finally, there was also substantial recognition that exemptions from the general rule disfavoring anticompetitive conduct were necessary, particularly for common carriers. Proposed amendments to the Interstate Commerce Act to forbid interlocking common-carrier directorates would also have given ICC authority to "provide for relief in extreme cases...."[46] The section actually passed allowed approval of such directorates upon a finding "that neither public nor private interests will be adversely affected thereby."[47] ICC was also empowered to permit certain mergers that otherwise would violate Section 7 of the Clayton Act[48] and, upon approval, those transactions became immune from any other attempt to enforce the antitrust laws.[49] The Clayton Act itself dealt with interlocking directorates between common carriers and their suppliers. The House version had forbidden such connections entirely,[50] but the Senate removed the ban so long as all purchases from related corporations were made through formal bidding under ICC supervision.[51] This was another manifestation of the perceived need for flexibility in applying the antitrust laws to a regulated field.
 
 
 174
 It thus appears that Congress assigned great importance to strengthening the antitrust laws to protect all forms of commerce, but also favored some degree of accommodation with possibly conflicting regulatory regimes. It went so far as expressly to confer agency discretion to sanction anticompetitive activity in particular instances, and thereby to immunize that activity from prosecution. But I have been unable to find a definite expression of intent regarding the appropriate accommodation between antitrust and other regulatory goals when no such immunity is available. Under express statutory terms, a violator of the Clayton Act remains liable to public or private suit regardless of agency action. But neither the Act itself nor its legislative history instructs us whether that perceived need for flexibility in heavily regulated industries means that an agency entrusted with enforcement of the Act can overlook its violation in pursuit of the remainder of its regulatory mandate. I turn, then, for enlightenment to the legislation that established this mandate for FCC.
 
 2. The Communications Act of 1934
 
 175
 The Communications Act of 1934 added FCC to Section 11 of the Clayton Act and allotted to it enforcement power over "common carriers engaged in wire or radio communication or radio transmission of energy ...."[52] As the court correctly intimates,[53] no interpretive assistance can be gleaned from the legislative comments, which assigned to this amendment merely the housekeeping function of transferring jurisdiction over such common carriers from ICC to the newly created FCC.[54] Because, however, the court limits its inquiry narrowly to the issue of prosecutorial discretion, it does not look to the relevance of other provisions of the Communications Act and their history.
 
 
 176
 The Act combined in FCC jurisdiction over both communications common carriers[55] and radio broadcasters,[56] but contained important differences between the groups in scope of coverage, particularly with respect to antitrust considerations. The Commission's primary authority over broadcasters arose from its control over licensing to use the Nation's airwaves,[57] and it has become well established that in exercising this function the Commission must give serious attention to any alleged anticompetitive activity.[58] This responsibility derives directly from the agency's charge to license for "the public interest, convenience, and necessity ...,"[59] and is underscored by expressions, found throughout the congressional debates, of dismay at the prospect of monopolistically controlled airwaves.[60] Even more positively, the pertinence of the antitrust laws to the communications industry was explicitly declared in the Act,[61] and was supplemented by a provision permitting the courts to penalize those convicted of civil or criminal violations of the Sherman or Clayton Acts by revoking previously-granted licenses.[62] Indeed, once a court orders revocation, the Commission is forbidden subsequently to issue a station license or construction permit to the guilty party "or to any person directly or indirectly controlled by such person...."[63]
 
 
 177
 All of these provisions apply whenever anyone, broadcaster or common carrier, seeks a license or permit, but communications common carriers are subject to additional forms of FCC supervision. First and foremost, of course, are the special powers the Commission has under the Clayton Act to order a regulated carrier to cease and desist from activities found by the agency to violate any of the Act's prohibitions.[64] Beyond that, FCC is authorized to approve consolidations and mergers of telephone and telegraph companies that otherwise would contravene Section 7 of the Clayton Act.[65] FCC may also allow interlocking directorates if "neither public nor private interests will be adversely affected thereby."[66]
 
 
 178
 The crucial question to be asked is whether this variation in treatment between broadcasters and common carriers sheds any light on how Congress intended FCC to accommodate its Clayton Act jurisdiction over communications common carriers and its more generally applicable licensing authority. Since the decision here under review was made pursuant to a statutory provision covering both of the groups subject to Commission control, the question becomes whether the "public interest" standard there specified means one thing for issuance of construction permits and station licenses to broadcasters but, because of the nature of FCC common-carrier responsibilities, means something else when the permit is to be issued to such a carrier. As with the Clayton Act, there are no express statements in the legislative history to answer these queries. But several things do combine to now suggest to me that Congress did not mean to compel FCC to refuse to license a carrier, any more than a broadcaster, solely on the ground that the applicant is an anticompetitive consolidation in contravention of Section 7.
 
 
 179
 The first is a consideration of the source of what became the Communications Act, and what that indicates about how Congress viewed the legislation it was writing. As previously described,[67] the Act granted FCC two distinct functions common carrier supervision and broadcast licensing largely to be exercised over two distinct groups, and did so by transferring authority from two unrelated statutory schemes the Interstate Commerce Act and the Radio Act of 1927.[68] Common carrier provisions derived from the former,[69] and the licensing provisions, including the one at issue here, from the latter.[70] Very importantly, consolidation of federal authority over these two forms of communication was intended primarily to centralize these functions, not to make any significant change in the substance of the law.[71] Although the new agency might thereafter consider under its station-licensing authority a grant to an entity over which it had additional supervisory power pursuant to the common carrier provisions, this compounding of functions was not alone to alter the agency's responsibilities under either branch of its mandate.
 
 
 180
 Any conclusion that the decision whether to license SBS would be obviated by an FCC finding of a Clayton Act violation, however, would have to depend upon just such an implied alteration of functions. Under the Radio Act, the Radio Commission had no supervisory power over communications common carriers and so, as with broadcast license determination today,[72] need not have given disproportionate or decisive value to antitrust considerations. After the most exacting review of the origins of FCC's regulatory authority, I now believe Congress did not intend a change when it gave FCC jurisdiction over both broadcast licensing and common carrier regulation, a panoply of authority that includes also the Clayton Act enforcement powers. Any other view would suggest the anomalous result that in the field of broadcast regulation, where Congress expressly declared competition to be of major significance,[73] FCC could find that other public interest factors outweigh anticompetitive conduct, while it could not do so when dealing with common carriers, which operate in an environment where competition is less important as a controlling device.[74]
 
 
 181
 This reading of the legislative history leads to another helpful conclusion. By analyzing the separate sources and the resulting disjunctive nature of FCC's responsibilities, the purpose in granting it Clayton Act enforcement authority becomes plainer. Under the Radio Act and the provisions derived from it, a license applicant must establish his good character,[75] and thus any anticompetitive conduct may, in the absence of contravening factors, warrant refusal of a license.[76] Moreover, a license may be revoked at any time "because of conditions coming to the attention of the Commission which would warrant it in refusing to grant a license or permit on an original application."[77] Under such a scheme the Commission has the ability to coax, if not directly order, a potential licensee to cease violating the antitrust laws. The addition of Clayton Act authority thus adds only in abstract, not practical, terms to FCC powers to win compliance from broadcasters.
 
 
 182
 The Commission's common carrier supervisory powers, however, are more cumbersome to use in this manner. For example, although anticompetitive conduct is clearly relevant to review of rates, in order to punish antitrust violations in that context the Commission would have to find that the carrier's actions made its charges unjust or unreasonable, and hence unlawful.[78] While this might easily be done where the illegal behavior is price discrimination under Section 2 of the Clayton Act,[79] a cause-and-effect relationship presumably would be harder to establish when the proscribed deed is, for instance, intercorporate acquisition.[80] Similar difficulties would seem likely in adapting such other Commission duties as the issuance of certificates of public convenience and necessity[81] to the task of preventing harmful anticompetitive conduct. Here, consequently, the addition of Clayton Act authority has some significance. The Commission is elsewhere given authority under special circumstances to approve mergers[82] and interlocking directorates,[83] but without Section 11 of the Clayton Act it would in many instances lack sufficient power to halt such activities even when it finds that they infringe the public interest.
 
 
 183
 Additional light is shed by the history of the section of the Communications Act that governs agency response after a licensee is convicted in court of antitrust violations. That history shows a steady progression from considering a Clayton or Sherman Act conviction conclusive proof that a permit applicant is unfit, to a view that his guilt is only one of many factors to be weighed in the licensing decision. The section's roots were in the Radio Act, which took a relatively harsh line by compelling the Radio Commission to refuse a license to one who previously had been judicially adjudged guilty of conduct in contravention of any of the antitrust laws.[84] There was, to be sure, considerable sentiment at that time for stiffening the law by permitting or even requiring license denials, even in the absence of a court conviction, if the agency found that the applicant was guilty of monopolizing radio communications,[85] but moves thus to amend the bill were defeated.[86] When adopted in the Communications Act, the penalty for anticompetitive conduct was further eased; only if the convicting court itself revoked the party's license would the Commission be required to refuse further licensing,[87] and otherwise FCC could, but need not, deny future licenses to the party previously adjudged guilty.[88] The Senate committee report explained that under these circumstances "the Commission can determine whether or not public interest will be served by the granting of a license."[89]
 
 
 184
 In a 1952 amendment to the section, Congress removed the clause stating that the Commission could in its discretion withhold licenses because of past court convictions.[90] The Senate Report made it clear that the Commission retained its authority to consider antitrust violations, and could deny licenses solely because of such infractions if in its judgment they affected the applicant's character so adversely as to warrant that action.[91] Nonetheless, Congress did not want the Commission to have the power to penalize a licensee by revocation if a court had not already so ordered.[92]
 
 
 185
 Because this provision of the Communications Act deals with punishment for past acts, and not with the importance of ongoing antitrust violations, it does not decisively answer the question we face here. Moreover, there are indications in the legislative history of the 1952 amendment that Congress viewed the section as referring only to Sherman Act violations,[93] though the language plainly is broader.[94] It may be that the Commission's Section 11 responsibilities were overlooked,[95] which would hardly be surprising since agencies other than FTC have rarely if ever exercised this power.[96] Nevertheless, by reaffirming FCC's general charter to weigh antitrust matters in making its public interest balance, while at the same time deemphasizing the singular importance of the antitrust consideration alone[97] even after a court conviction Congress bolstered the view that the Commission's role in licensing was not changed by the addition of Clayton Act enforcement authority.[98]
 
 3. Regulatory Policy
 
 186
 Before proceeding to a discussion of the gloss placed on the statutory provisions by subsequent judicial interpretation, one last word seems warranted on the overall nature of FCC responsibilities and how the Clayton Act authority conforms to it. The court suggests that to make Clayton Act considerations determinative in licensing decisions is to contravene the central concept of governmental regulation that " 'competition cannot be trusted to do the job of regulation in that particular industry which competition does in other sectors of the economy.' "[99] While this may be true, it is a choice that Congress was entirely free to make, and our task here is to ascertain whether it did so, not to make an independent selection of what we deem to be better policy.[100] Of course, in the absence of clear statutory language or legislative intent, we must draw upon such general considerations as regulatory purpose and consistency, and here the court is correct in assessing their implications.[101] But if I did not find a similar conclusion emanating from the legislative history, I would be hard pressed to rest a holding in this case solely on those grounds because the statute itself, when considered only on its face, commends the contrary result.
 
 B. Supreme Court Precedent
 
 187
 The relevant statutory texts and the legislative history thus indicate that the Communications and Clayton Acts are best reconciled by construing the latter as the addition merely of a separate antitrust enforcement tool and not as an antitrust mandate essentially changing the Commission's task as a licensing agency. I now move on to an examination of such judicial interpretations as there are. The court correctly concludes that none of the cases inexorably demands that antitrust considerations be elevated above other public interest factors when the agency proceeds to make a licensing decision.[102] Yet I find the cases less easily dismissable than does the court and for this reason feel it necessary to review them independently.
 
 
 188
 Indisputably, FCC and other federal agencies must consider anticompetitive conduct under their broad mandates to promote the public interest.[103] And there are, as the court points out, numerous cases holding that responsibility to enforce the antitrust laws is but one aspect of the public interest determination, and may be outweighed by other considerations appropriate to the regulatory decision.[104] But close analysis of these opinions reveals that they are not precisely applicable to the statutory scheme now before us, and consequently could not dictate the outcome.
 
 
 189
 Both McLean Trucking Co. v. United States,[105] and Seaboard Air Line Railroad v. United States,[106] upon which the court relies, plainly declare that the public interest standard to be applied by ICC encompasses more than simply a policy favoring competition.[107] And because that agency, like FCC, has Clayton Act enforcement responsibilities, one might conclude, as the court apparently does,[108] that these decisions indicate the proper result for the instant suit as well. Both McLean and Seaboard reviewed, however, not licensing decisions under a completely neutral public interest test, but ICC approval of possibly anticompetitive consolidations under Section 5(2) of the Interstate Commerce Act,[109] a provision clearly choosing to subordinate antitrust concerns to other policies that are embodied in that legislation.[110] This legislative choice is reflected also in Section 5(11), which expressly grants immunity from the antitrust laws to mergers so authorized.[111]
 
 
 190
 The court declines to distinguish these cases on this ground because the Supreme Court found in McLean that " '(t)he history of the development of the special national transportation policy suggests, quite apart from the explicit provision of § 5(11), that the policies of the antitrust laws determine "the public interest" in railroad regulation only in a qualified way.' "[112] This the court takes as presumably demonstrating that all ICC determinations under the public interest standard, not just determinations that could confer antitrust immunity, must involve balancing in this manner.[113] The McLean Court was careful to point out, however, that the agency's principal mandate may be affected by other statutes that bear upon its regulatory field; the amount it varies will depend on "the extent to which Congress indicates a desire to have (those conflicting) policies leavened or implemented in the enforcement of the various specific provisions of the legislation with which the (agency) is primarily and directly concerned."[114] In its decision the Court indulged Section 5(11) a significant role at this point, demonstrating conclusively the congressional intent to subordinate antitrust to other considerations in balancing under Section 5(2).[115] Whatever effect Section 11 of the Clayton Act, to which the McLean Court never referred, might have had was thus overridden by the more evident choice indicated by Section 5(11). In the case at bar, however, there is no external congressional statement lending that measure of clarity or influence, so we are returned to the original question whether by giving FCC Clayton Act authority Congress evinced an intention to put antitrust considerations above others in the public interest balance. With this issue neither McLean nor Seaboard is of assistance.[116]
 
 
 191
 Nor is much help to be gained from the decisions reviewing FCC attention to antitrust problems. These cases either dealt with regulation of broadcasters,[117] over whom the Commission has no Clayton Act authority,[118] and hence no conflicting regulatory policy to be reconciled, or presented only the question whether encouraging competition could be used as the sole basis for granting a license.[119] The only guidance available is afforded by Denver & Rio Grande Western Railroad v. United States,[120] and even that is far from clear. Several of the appellants find in that opinion support for their view that Clayton Act considerations should have governed the licensing decision here,[121] but the court claims that the suggested interpretation "stretches its words too far."[122] Yet it was just this reading of the Denver opinion that formed the sole basis of one of the dissents filed therein,[123] an indication of at least some facial plausibility.
 
 
 192
 An understanding of the Supreme Court's reasoning in Denver necessitates an awareness of the statutory context in which it arose. ICC was asked to review a stock issuance, by Railway Express Agency to Greyhound Corporation, pursuant to agency authority under Section 20a(2) of the Interstate Commerce Act to approve issuance upon a finding that it "is for some lawful object ... and compatible with the public interest...."[124] ICC gave its endorsement, but only after deferring consideration of two matters: whether this undertaking would have anticompetitive consequences rising to the level of a Clayton Act violation[125] and whether acquisition of the stock by Greyhound would constitute "control" of Railway Express and thus require endorsement under Section 5(2).[126]
 
 
 193
 After first approving postponement of "control" questions, the Court held that the antitrust issues could not be held in abeyance,[127] distinguishing between the two inquiries on the ground that Section 5 sets forth a carrier-initiated procedure while Section 11 of the Clayton Act imposes its obligations upon the agency, and is in this sense "mandatory."[128] It is in this context that most of the Court's language suggesting that the Clayton Act function is nondisgretionary is to be found.[129] While hardly dicta, the Court's statements focused on a question decidedly different from the one presented here, and cannot safely be read as establishing Section 11 as unalterably mandatory for all purposes.
 
 
 194
 The Court went on to imply, however, that the legislative scheme did compel ICC to forbid under Section 20a stock acquisitions that transgress the Clayton Act, though it may under Section 5(2) allow mergers and consolidations that otherwise would break the law.[130] Here I agree with the court that, because the Denver Court was actually deciding only the question whether ICC should have deferred consideration of antitrust consequences, its discussion cannot be regarded as binding precedent on the nature of proper agency handling on remand.[131]
 
 
 195
 The judicial precedents, then, do not provide a reliable solution to our question. In the absence of persuasive decisional authority, I must rely upon my reading of the legislative materials. I thus conclude that the law is satisfied when FCC adequately explores and seriously considers antitrust consequences in making the public interest determination incumbent upon license applications and that it need not reject an applicant solely because of a Clayton Act violation.
 
 II. SECTION 309
 
 196
 An agency impermissibly exceeds the bounds of administrative discretion when it fails to adhere to procedures specifically mandated by statute; judicial deference to the agency is neither required nor warranted in such circumstances.[132] This is precisely the sort of administrative intransigence facing the court with respect to the second fundamental issue in this case: whether the Commission was justified in refusing to hold an evidentiary hearing on the anticompetitive aspects of the SBS entry. By adopting this stance, the Commission has frustrated the intent of Section 309(e) of the Communications Act,[133] thus leaving as the only proper disposition of this case a remand for further proceedings. That course the court has elected to avoid at an appalling cost in terms of compromising the relevant legal principles.
 
 A. The Statutory Scheme
 
 197
 My analysis begins with a resume of the salient features of the Act. Section 308 empowers the Commission to award construction permits and station licenses subject to designated conditions.[134] Section 309(a) provides broadly that "the Commission shall determine, in the case of each application (therefor) filed with it ..., whether the public interest, convenience, and necessity will be served by the granting of such application...."[135] Section 309(d)(1) opens that inquiry to public participation by authorizing interested parties to petition the Commission for denial of the application.[136] Section 309(d) (2) requires the Commission to deny the petition and grant the application upon a finding "that there are no substantial and material questions of fact and that a grant of the application would be consistent with (Section 309(a))...."[137] That section warns, however, that "(i)f a substantial and material question of fact is presented or if the Commission for any reason is unable to find that grant of the application would be consistent with (Section 309(a)), it shall proceed as provided in (Section 309(e))."[138] The latter, which is critical in this litigation, in pertinent part specifies:
 
 
 198
 If, in the case of any application to which (Section 309(a)) applies, a substantial and material question of fact is presented or the Commission for any reason is unable to make the finding specified in such subsection, it shall formally designate the application for hearing on the ground or reasons then obtaining.... Any hearing subsequently held upon such application shall be a full hearing in which the applicant and all other parties in interest shall be permitted to participate. The burden of proceeding with the introduction of evidence and the burden of proof shall be upon the applicant, except that with respect to any issue presented by a petition to deny or a petition to enlarge the issues, such burdens shall be as determined by the Commission.[139]
 
 
 199
 The import of this language is plain. Whenever, in the course of reviewing a petition to deny an application or in considering the application itself, the Commission is confronted with a material factual dispute or it finds itself unable, for any reason, to determine whether a grant of the requested permit or license will serve the public interest, a hearing must be held a full hearing in which all parties must be permitted to participate. The remainder of Section 309(e), by referring to introduction of evidence and assignment of burdens of proof, leaves no room for doubt that the "full" hearing demanded is a trial-type evidentiary proceeding.[140]
 
 
 200
 1. Application of the Full Hearing Requirement
 
 
 201
 In entertaining the petitions to deny the SBS license application, the Commission ignored the explicit directive of Section 309(e) and proceeded to employ only those procedures it deemed necessary and appropriate in light of its own view of the requisites of the licensing process. An oral argument was held before the Commission en banc and on two occasions written materials were solicited from interested parties,[141] but the agency consistently maintained that a full hearing was unnecessary. Invoking its alleged "procedural flexibility under the Communications Act,"[142] the Commission held forth the argument and written submissions as an acceptable means of gathering data on the SBS entry without "the detriment to the public of undue delay which necessarily would occur if ... further proceedings ... of a trial-type evidentiary nature" were instituted.[143]
 
 
 202
 I do not denigrate the usefulness of either oral or written presentations, for these measures are frequently of considerable value as investigatory tools in the preliminary stages of dispute resolution, and in some cases such streamlined procedures may be both appropriate and desirable as a means of achieving a final disposition. When, however, the procedural format of a matter is governed by a statute such as Section 309, the agency must take the actions prescribed once the conditions set forth therein arise. Thus, I cannot subscribe to the court's assertion that "(a)ll parties to this appeal agree that some sort of hearing was needed to investigate the antitrust consequences of the SBS entry (, therefore) the disputed question is what particular kind of hearing was needed."[144] If there were material facts in dispute concerning the SBS venture or the Commission was unable adequately to appraise the public interest on the basis of the record as it then stood, a full hearing was required. Anything less than that would have been lawful only if, after completion of the preliminary steps undertaken here, no material fact remained in controversy and the agency possessed all the information reasonably necessary to assess the public interest properly.
 
 
 203
 Similarly unsupportable is the Commission's attempt to justify its procedural disposition of the SBS application on the basis of the decisions of the Supreme Court in Gulf States Utilities Co. v. FPC[145] and the Third Circuit in Bell Telephone Co. v. FCC.[146] The statutes at issue in those cases[147] direct that the relevant public interest determinations shall be made after "opportunity for hearing."[148] This language imposes a far lighter burden on an agency than Section 309(e)'s mandate that upon satisfaction of the conditions specified the matter involving it "shall formally designate the application for hearing."[149] The phrase from the Third Circuit opinion employed by the Commission to conclude its dissertation on this point aptly demonstrates its failure to comprehend the essential point. Quoting from Bell Telephone Co.,[150] the Commission stated that, "(i)n the absence of a per se statutory directive, the type of procedure chosen must be related to the kinds of issues involved."[151] A "per se statutory directive" is precisely what is supplied by Section 309(e).[152]
 
 
 204
 The Commission cannot, therefore, escape the dictates of Section 309 by the expedient of weighing the nature of the questions involved in a particular matter against the pros and cons of other available procedural devices to reach a decision on the disputed license application. Congress itself struck that balance in 1960;[153] the Commission has no choice other than to abide by this legislative command. Shortcut procedures, no matter how desirable from the Commission's perspective, will not satisfy the requisites of Section 309.[154]
 
 2. The Need for Expedition
 
 205
 Just as foreshortened procedural dispositions are not legally sufficient when disputed issues of fact or doubts about where the public interest lies arise in Section 309 proceedings, the requirement of a full hearing an evidentiary hearing cannot be circumvented on grounds of an alleged need for expedition. On its face the statute contains no provision for dispensing with the hearing to avoid potential delays,[155] and nothing in the legislative history suggests that Congress intended such an exception.[156]
 
 
 206
 The language now codified as subsection (e) was added to Section 309 of the Communications Act in 1960. Until then, an objection to a license application was registered by means of a protest filed by an interested party after the Commission had determined to issue the license.[157] The 1960 amendment resulted in displacement of this system by the current pre-grant petition process.[158] The Senate Report accompanying the bill proposing this change explained that then "existing mandatory protest procedures (left) the Commission little discretion to dispense with useless or even frivolous proceedings;"[159] Congress was concerned that "(p)rotest hearings (had) created immeasurable delays in bringing service to the public, but (had) resulted in few final reversals of grants."[160] Moreover, this arrangement placed a heavy burden
 
 
 207
 on the Commission and on successful applicants by requiring unnecessary and lengthy proceedings, after grants (were) made, to vindicate the grants in situations where there (was) no substantial basis for attacking them. At the same time the protest procedure fail(ed) to give real assurance to protesting parties in interest that legitimate objections to a grant (would) be given timely and adequate consideration by the Commission.[161]
 
 
 208
 These passages illustrate that Congress was disturbed by the inefficiency of a scheme that frequently resulted in prolonged time lags prior to the issuance of licenses and effectively delayed the granting of applications benefiting the public interest, but seldom succeeded in screening out those to which significant objections were made. Accordingly, Congress revamped the old protest system and created the present pre-grant petition process.[162] This new device enabled the Commission to prevent the needless delay inexorably resulting from frivolous objections to license applications, while simultaneously ensuring that substantial complaints would not be dismissed by the Commission before they had been accorded the degree of consideration Congress thought necessary a full evidentiary proceeding. As the House Report stated, "(t)he purpose of this language is to make it absolutely clear that the application will be designated for hearing before a grant in any case where a substantial and material question of fact is presented and not disposed of."[163]
 
 
 209
 Given this clear legislative directive, it is evident that an attempt by the Commission to justify its refusal to hold a hearing in the SBS matter on the ground that an exception to the requirements of Section 309(e) is permitted because of a supposed overriding need for expedition would be wholly devoid of merit. Apparently cognizant of the indefensibility of that position, the agency has not attempted to explain the absence of a hearing on the basis of this theory.[164] Instead, the Commission asserts that "the benefits to the public of a more rapid institution of service far outweigh any possible benefits of such time-consuming procedures."[165] The court jumps on the bandwagon along with the agency because it supposes "that an evidentiary hearing would less promote reasoned decisionmaking in this case than it would delay and impede technological progress."[166]
 
 
 210
 The most obvious inquiry is how this premature balancing of what the agency and the court take to be the public interest was permitted to creep into the decisionmaking process in the first place. A second question that must be asked is why the agency has been allowed to continue to cling tenaciously to such a faulty analysis despite discerning judicial scrutiny.
 
 
 211
 The naked proposition that an agency may choose to disregard procedures prescribed by statute has repeatedly been given short shrift by this court and others.[167] Surely the Commission's effort to disguise that offense here by clothing it in the habiliments of a factor to be included in weighing the public interest is a thinly-veiled effort that should not succeed. While the public likely would benefit in the short run from expedited service from new satellites,[168] Section 309 gives the Commission no authority to consider the public interest in deciding whether a hearing must be conducted pursuant to subsection (e). In framing Section 309 as it now stands, Congress itself made that decision; in its view, a full hearing is necessary to ensure adequate consideration of the issues involved in licensing proceedings whenever material facts are disputed or the public interest is in doubt for some other reason. The potential for delay inherent in evidentiary hearings was balanced against the public interest in expedition when Section 309(e) was enacted, and Congress concluded that whatever time lags such a hearing may entail are worth the cost.[169] It is not for the Commission to reject that determination and proceed to make its own; however camouflaged, an agency's attempt to override Congress cannot be permitted to stand.
 
 
 212
 My position on this point does not mean that I quarrel with the court's view that delays in providing service to the public are regrettable. Neither does it imply that I favor abusive use of the procedures required by Section 309 and similar statutes by parties who seek to latch on to these measures simply as a means of promoting their own economic welfare. I agree with the court that compliance with such provisions may sometimes "arm interested parties with a potent instrument for delay,"[170] and that "(a)lthough evidentiary hearings ... are useful and sometimes indispensable they may also be exploited for unworthy purposes."[171] There are two sides to this coin, however. Unlike the court, not only would I hold the Commission to the procedure specified in Section 309(e) because it is congressionally mandated but I would also give full value to evidentiary hearings and recognize that even when not indispensable they can have great utility in complex and important cases.
 
 
 213
 Ventilation of issues, for example, is a solid reason to hold hearings when material facts are in controversy or the public interest defies summary resolution. When decisions are made hastily, without adequate consideration of all of their ramifications, important long run consequences are often obfuscated by concentration on immediate problems and by the natural desire to reap immediate benefits. A communications license is a broad grant of power and economic advantage, and Congress rather obviously viewed it as too important to approve without ensuring thorough investigation a degree of scrutiny that only an evidentiary-type hearing can provide in cases where significant controversies arise.
 
 
 214
 This is not a situation in which the public is on one side and self-seeking would-be oligopolists are on the other; the potential licensee and those opposing the application all seek economic benefits. The interaction of these adversaries would not only ensure that license privileges will be allocated fairly, but would also serve to illuminate issues vital to the public interest determination. Moreover, in addition to SBS's competitors for the license, the Department of Justice and the Federal Trade Commission were drawn into this litigation by the threatened anticompetitive effects of the proposed SBS entry. The Commission should not be allowed to conclude lightly that its institutional bent for advancing communications interests at the expense of other national policies inevitably coincides with the welfare of the public. Indeed, antitrust problems could cause severe consequences for the very industry the Commission is charged with regulating.
 
 
 215
 The delay involved in resolving the SBS matter has been lengthy, but the reasons for it lie partly in the way Congress designed the statute and the Commission's desire to litigate in the hope of escaping the dictates of Section 309 instead of honoring them. The time lapse is certainly regrettable, but the court's willingness to allow the agency to ignore the law is even more unfortunate.
 
 
 216
 B. The Material Facts in Controversy and the Determination of the Public Interest
 
 
 217
 Once it is understood that neither the Commission's shortcutting procedures nor its assertion of an imperative need for speed can override the requirements of Section 309, the pivotal issue in this case is clear: whether there were material facts in controversy concerning the anticompetitive effects of the SBS venture or, if not, whether the Commission for any reason was unable adequately to determine the public interest without further inquiry.
 
 1. Disputed Issues of Fact
 
 218
 There allegedly were four classes of material facts in dispute[172] with respect to the SBS application: (1) how to define the relevant market and submarkets;[173] (2) the effect a licensing of the joint venture would have on potential competition in the domestic satellite industry encompassing such questions as the likelihood of independent entry by IBM and Comsat, and the potential "in-the-wings" consequences if either or both were to remain on the fringes of the market;[174] (3) the possibility that SBS, once established, could become entrenched to an extent that would inhibit future competition in the industry;[175] and (4) the danger that SBS might engage in predatory practices at some future time.[176]
 
 2. Statutory Affidavit Requirements
 
 219
 The court begins its endeavor to justify the Commission's actions in the SBS proceeding by seizing on a technicality. Section 309(d)(1) of the Act provides that a petition to deny a license application
 
 
 220
 shall contain specific allegations of fact sufficient to show that ... a grant of the application would be prima facie inconsistent with (Section 309(a)).[177] Such allegations of fact shall, except for those of which official notice may be taken, be supported by affidavit of a person or persons with personal knowledge thereof....[178]
 
 
 221
 Referring to the legislative history of this 1960 addition to Section 309,[179] the court emphasizes that it "was intended to require 'a substantially stronger showing of greater probative value' than had been required before,"[180] and that "(t)he allegations must be of specific evidentiary facts, not 'ultimate, conclusionary facts or more general allegations.' "[181] The court then proceeds to employ these statements as the predicate for the rather startling conclusion that the Commission was not obligated to consider the fact issues recounted above assertedly because they were not properly raised by opponents of the license application. The court says Section 309(d) requires affidavits detailing factual allegations, and it finds the requisite specificity lacking in the affidavits accompanying the Western Union and American Satellite petitions.[182] The thesis of this analysis is that the Commission may ignore issues tendered by petitions accompanied by affidavits having that fault, regardless of the factual specificity of the petitions themselves.
 
 
 222
 The court is correct that the affidavits in support of the petitions opposing SBS's application are neither lengthy nor abounding in detail,[183] but the conclusion that they are insufficient to satisfy Section 309(d) is erroneous. Even a cursory reading of the section reveals that its demand is that "(t)he petition," not the affidavit, "shall contain specific allegations of fact."[184] In complete compliance with this rule, the petitions submitted by Western Union and American Satellite set forth allegations that indisputably are specific in nature.[185] In light of this fact, it would be pointless to require the affidavits to repeat every detail contained in the petitions, and Section 309(d) does not dictate that this be done. Rather, the only condition the section places on the affidavits is that, "except for (facts) of which official notice may be taken," they must be based on "personal knowledge."[186]
 
 
 223
 The "personal knowledge" language is the key to the change Congress intended Section 309(d) to effectuate in the prior statutory provisions on demonstrating support for objections to license grants.[187] Formerly, protests to approval of applications could be based on information and belief.[188] Consequently, "allegation(s) of ultimate, conclusionary facts or mere allegations on information and belief, supported by generalized affidavits"[189] deluged the Commission with frivolous complaints. Often the filings consisted of "ill-founded protests with allegations based not on known facts, but on suspicion or less."[190] Congress sought to ensure that the new pre-grant petition process would not acquire a similar handicap when it specified that the allegations of the petitions must be specific, while the supporting affidavit need only be supplied by someone with personal knowledge of the facts set forth in the petition. That is precisely what Western Union and American Satellite did here.
 
 
 224
 After explaining the above change, the section of the Senate Report addressing the proposal to amend Section 309(d) stated that "(i)n considering a petition to deny, the Commission should be guided by rules applicable to a motion for summary judgment,"[191] and it is well settled that a verified pleading may serve as an affidavit for summary judgment purposes. Professors Wright and Miller tell us that "(a) verified pleading may be treated as an affidavit and used in any way in which an affidavit would be suitable."[192] Professor Moore observes that "(i)f facts are clearly stated in a pleading as true to the affiant's own knowledge, and are not so interspersed with generalized allegations or allegations based on information and belief that it cannot be readily ascertained what facts are sworn to, then the pleading ought to be equivalent to an affidavit relative to the facts set forth."[193] The court's position on this point is thus weak, especially given the Commission's ready acceptance of the Western Union and American Satellite petitions.[194] That the argument is made at all suggests the court's lack of confidence in its ability to defend the Commission's failure to hold a hearing in the face of the acknowledged existence of disputed questions of material fact.
 
 
 225
 3. Known Obstacles to the Public Interest Determination
 
 
 226
 Even stranger than its concern over the Western Union and American Satellite affidavits, however, is the court's emphasis on the absence of affidavits from the Department of Justice.[195] I am unable to grasp the court's point since the Department did not file a petition to deny the SBS application; instead, both the Department and the Federal Trade Commission submitted comments to the Commission sharing the same types of concerns advanced by Western Union and American Satellite.[196] It is far from clear from the language of Section 309(e) that these comments were not an acceptable alternative vehicle for the presentation of material factual disputes triggering the evidentiary hearing requirement. In any event, they certainly put the Commission on notice that there were serious antitrust problems with the SBS entry, and thus alerted it to a reason why a trial-type hearing was required to determine the public interest, as dictated by the second prong of the Section 309(e) test. This court has already
 
 
 227
 point(ed) out that the Federal Communications Commission was intended by Congress to function as far more than a mere referee between conflicting parties. Regardless of the formal status of a party, or the technical merits of a particular petition, the FCC "should not close its eyes to the public interest factors" raised by the material in its files. We have noted that, as a general matter, the federal regulatory agencies should construe pleadings filed before them so as to raise rather than avoid important questions. They "should not adopt procedures that foreclose full inquiry into broad public interest questions, either patent or latent."[197]
 
 
 228
 A hearing was therefore necessary regardless of the final product of the court's pedantic reliance on technicalities with respect to material fact questions. This conclusion clashes violently with the court's claim that the only review called for in this case is an examination to see whether the Commission has "really taken a 'hard look' at the salient problems, and has * * * genuinely engaged in reasoned decisionmaking."[198] Here the agency failed to observe the hearing requirement of Section 309(e), ignoring the will of Congress, and however hard its look or reasoned its decisionmaking there is no excuse for its flat disregard of a procedure mandated by statute.[199]
 
 C. The Usefulness of a Hearing
 
 229
 With the hearing requirement of Section 309(e) triggered, the Commission's decision can withstand judicial scrutiny only if an evidentiary inquiry would have served no useful purpose.[200] The agency advances four arguments to this effect, but none I consider satisfactory.
 
 1. The Commission's Factual Assumptions
 
 230
 The Commission's first and most significant thesis is that it "assumed for the purposes of analysis that the ... contentions (of the SBS license opponents were) correct and (drew) appropriate inferences therefrom."[201] In some cases the Commission may be at liberty to adopt this approach acting, as it may, analogously to a court addressing a motion for summary judgment.[202] But whether confronting an administrative agency or a court, an antitrust dispute may be peculiarly unsuited to that methodology, as we have recognized.[203] This is due, at least in part, to the intrinsic nature of alleged anticompetitive effects; they are not black and white, but vary across an infinite spectrum in terms of magnitude and severity. It is thus nearly impossible to "assume" anticompetitive effects in a meaningful fashion.[204] It is not simply a matter of factoring the occurrence of an antitrust problem into a decision; the extent of the potential damage to competition must be determined, and it may be impossible even to estimate the significance of the potential dangers without an evidentiary proceeding. The Department of Justice believes that just such a situation exists in the instant case, and so do I. The Department has aptly stated that "(w)e lack sufficient information to make such a judgment. So does the Commission, but it has refused to admit as much."[205]
 
 
 231
 The difficulty of mere assumptions of anticompetitive effects is compounded when the product of the assumption must be taken into account in attempting to balance the pejorative influence of antitrust elements against other considerations. What weight is to be given the factors assumed? The answer is as elusive as evaluation of the significance of an object that is known to be present but cannot be seen, touched or heard. What can be done with it? It cannot be used properly, yet it cannot be ignored. As the Supreme Court has declared in vacating conclusions of a district court based on a blind "balancing" of potential anticompetitive effects against alleged benefits to the community of permitting a bank merger, "(t)o weigh adequately one of these factors against the other requires a proper conclusion as to each."[206]
 
 
 232
 The Commission seeks to avoid these complications by asserting that it has assumed the worst with respect to each disputed fact and still the public interest favors granting the SBS license.[207] We cannot probe the minds of administrative decisionmakers,[208] but it is not necessary to do so in order to discern the inaccuracy of this statement. It is evident that the agency could not have viewed the facts in the light most favorable to the opponents of the SBS license; the Commission's opinion is replete with examples. In discussing the loss of benefit from the independent entry of either IBM or Comsat, combined with the influence on competition derived from the in-the-wings effect of knowledge that the other would remain just outside the market, the Commission stated that "even assuming the validity of the arguments which claim that one or the other would enter individually, it must be recognized that the non-entering entity would exert little or no competitive influence from the fringes."[209] Similarly, in addressing specific anticompetitive effects, the Commission expressed its "view (that) SBS will not have any significant advantage in the domestic satellite or major telecommunications markets by virtue of IBM's participation therein, notwithstanding IBM's alleged domination of various computer and data equipment markets,"[210] and subsequently reflected on its opinion that predatory conduct by SBS is unlikely to occur.[211] Even the Commission's own conclusions destroy any doubt that it "assumed the worst" and construed the disputed facts against SBS: "In sum, the anticompetitive effects which might arguably flow from SBS' entry in satellite communications (e. g., loss of potential competition, of increased barriers to entry, future illegal conduct of SBS in restraint of trade) are not likely to occur...."[212] Obviously the agency's assumption-of-facts theory is baseless.
 
 2. The Commission's Fallback Theories
 
 233
 The remaining arguments[213] in support of the Commission's refusal to hold an evidentiary hearing are (1) that the facts are legislative in nature and thus inappropriate subjects of an adjudicative hearing, (2) that they are incapable of definite ascertainment, and (3) that to the extent these facts can be determined they are so far within the agency's expertise that it needed no assistance in evaluating them. These attempted justifications, in my view, deserve the same fate as the others.
 
 
 234
 In defending its assertion that the matters in controversy herein are legislative facts, the Commission cites Professor Davis' treatise on administrative law[214] a very useful place to begin. Professor Davis defines the concepts in the following way: "Legislative facts do not usually concern the immediate parties but are the general facts which help the tribunal decide questions of law and policy and discretion."[215] In contrast, "(a)djudicative facts usually answer the questions of who did what, where, when, how, why, with what motive or intent...."[216]
 
 
 235
 It is evident that the controversy in the SBS proceeding is limited to the immediate parties. The issue is whether the partnership formed by IBM, Comsat and Aetna should be granted a license, not whether the licensing of earth stations is a good idea, or to what extent competition should be encouraged in the industry.[217] No new policies are at stake; the positive and negative aspects of the SBS entry are the focus of concern.[218] The disputed facts relate wholly to economic power, motives and services of specific companies. Mere assertions to the contrary cannot transform them into legislative facts.[219]
 
 
 236
 The final points pressed by the Commission are interrelated and should therefore be considered together. First, the agency asserts that the facts at issue are incapable of definite ascertainment.[220] The court agrees, stating, "(w)e do not know, and months of hearings and cross-examinations will not enable us to divine, the future course of the industry."[221] What would IBM and Comsat do without the joint venture? How do other potential entrants and established competitors perceive SBS? To what extent would the advent of SBS deter subsequent entries into the industry? How competitive are terrestrial and satellite services? The court's statement that no final answers can presently be found to these questions may be correct. Few future facts are ever known definitely, especially when they deal with economic behavior or questions of motivation and intent,[222] but this is not a reason to dispense with all inquiry into antitrust problems. The more careful the analysis and the exploration, the more likely it becomes that accurate predictions and sound decisions will result. To say that something is "incapable of definite ascertainment" is not to justify the absence of an informed estimate; and lack of obedience to Section 309(e) would be excused only if it could be shown that an evidentiary-type proceeding would not have been useful that it would not have shed further light on the problem. Both the Commission and the court have yet to demonstrate that this is so.
 
 
 237
 Finally, the Commission tells us that it is so expert in handling these types of questions that it would derive no benefit from a hearing. This is difficult to believe, for more reasons than one. Concededly, considerable deference must be given to agency expertise,[223] but expertise "can(not) substitute for the adequate evidentiary basis upon which the Commission's finding(s) must rest,"[224] nor can it excuse a failure to hold a hearing in a Section 309(e) proceeding unless that hearing would be pointless. Even experts can garner substantial assistance from testimony and cross-examination of those who not only are conversant in the particular field of knowledge but also with the particular facts of the case. Nonexpert witnesses company officers, for example can shed light on the motivation behind a firm's actions and on industry perceptions of disputed issues.
 
 
 238
 There is, too, the further question whether FCC's area of expertise does extend to the controversy before us.[225] This is neither a dispute over the needs of the communications industry nor a controversy concerning the technological feasibility of a potential licensee's proposal. Given the proportion of its time that must be spent on these and a multitude of other matters, it is surprising that the Commission has also become expert in the antitrust field. Neither the Department of Justice nor the Federal Trade Commission lay claim to that sort of fame; indeed, both have found themselves unable to evaluate the potential antitrust impact of the SBS entry on the basis of the record before the Commission.[226] FCC undoubtedly is intimately acquainted with the communications industry, but I daresay there are others far more learned on the effects of barriers to entry, perceived potential competitors, the role of technological, cost, and risk elements in corporate decisionmaking, and other antitrust factors at issue in this case.[227] Even if there are no certain answers to questions concerning the SBS application, the Commission's decision surely would have rested on a much firmer foundation with the aid of an evidentiary hearing. The point simply is not whether the decision was rational and substantially supported by the administrative record. The linchpin of this court's analysis should be whether the decision was predicated upon the type of searching inquiry and complete record Congress intended to ensure in Section 309(e) proceedings, and clearly it was not.
 
 
 239
 The absence of an evidentiary hearing should be fatal to the Commission's decision to grant the SBS license application. Although some sections of the Communications Act[228] allow the agency discretion to choose the methods to be employed in proceedings thereunder, Section 309 sets forth specific statutory requirements which must be followed by the Commission in determining whether to grant a given license. Where, as here, material issues of fact remain in controversy or the direction in which the public interest lies is unclear, the Commission is required to designate the matter for a hearing a full evidentiary proceeding. Both the Commission and the court have failed to demonstrate why we should not hold the agency bound by the mandate of Section 309. Consequently, I would reverse the Commission's decision and remand this case for a full hearing.
 
 
 
 *
 Circuit Judge LEVENTHAL participated in the consideration of this case but died before the decision and judgment were announced
 
 
 [1]
 Reprinted in the Joint Appendix (JA) at 1522. Hereafter this will be referred to as the SBS Decision
 
 
 [2]
 The three partners will be referred to as Comsat, IBM, and Aetna, for convenience, without distinguishing between parents and subsidiaries
 
 
 [3]
 Letter from Thomas H. Wall and Daniel Redmond, attorneys for American Satellite, Fairchild Industries, and Western Union, filed in this court September 7, 1979. See also Influx of cash set for Westar, (1979) Broadcasting 63 (Nov. 5, 1979)
 
 
 [4]
 See Xerox Corp. Petition for Rulemaking, RM-3247 (filed Nov. 16, 1978)
 
 
 [5]
 The most important restriction on the operations of the AT&T/GTE venture was that it was temporarily prohibited from using satellites for transmissions other than MTT, WATS, AUTOVON, emergency restoration in the event of failures in the terrestrial system, and possibly other services to Alaska, Hawaii, Puerto Rico, and the Virgin Islands. Second Report and Order (Domsat II), 35 FCC2d 844, 851-852 P 21 (1972). The restrictions lapsed in July 1979
 
 
 [6]
 SBS Decision, 62 FCC2d at 1071-1072 P 212, JA 1594-1595
 
 
 [7]
 Id. at 1098 P 303, JA 1621. These innovations are discussed in some detail at id., 1083-1086 PP 247-257, JA 1606-1609
 
 
 [8]
 See id. at 1079-1080 PP 234-235, JA 1602-1603; id. at 1082 P 245, JA 1605; id. at 1092-1093 PP 282-285, JA 1615-1616; id. at 1098 P 303, JA 1621
 
 
 [9]
 For a list of these parties, see SBS Decision, 62 FCC2d at 998 P 2, JA 1523
 
 
 [10]
 The Federal Trade Commission has submitted a brief as amicus curiae, asking for reversal; SBS has intervened, asking for affirmance. This court has jurisdiction pursuant to § 402(b) of the Communications Act of 1934, 47 U.S.C. § 402(b) (1976)
 
 
 [11]
 AT&T, alone of the appellants, does not raise antitrust objections to the order. Rather, it argues that the order under review was issued without the required evidentiary hearing on the type of service to be provided by SBS. Specifically, it charges that SBS might not actually limit its services to private line services, that it might not provide "end-to-end" service to customers, and that it might not interconnect SBS services with other communications facilities. We have considered AT&T's arguments and do not believe they require reversal. The remainder of this opinion will be devoted exclusively to the antitrust objections of the other parties
 
 
 [12]
 SBS Decision, 62 FCC2d at 1070 P 207, JA 1593. Despite the limited open entry policy, the industry remains fully subject to the FCC's regulation of price, terms of service, exit, and nondiscrimination. Id
 
 
 [13]
 Domsat II, supra note 5, 35 FCC2d at 847 P 8
 
 
 [14]
 Hughes Aircraft Co., Fairchild-American Satellite, RCA, and Lockheed are satellite manufacturers. AT&T, GTE, RCA, and Western Union are communications common carriers, and Comsat is an international satellite communications carrier. See Proposed Second Report and Order, 34 FCC2d 9, 44-59 PP 84-119 (1972)
 
 
 [15]
 See Dep't of Justice Comments and Reply Comments in Docket 16495, Supplemental Exhibits to FCC and SBS briefs at 6-8; Proposed Second Report and Order, supra note 14, 34 FCC2d at 44-59 PP 84-119, 90-92 PP 32-39
 
 
 [16]
 (A)lmost a year was afforded for the submission of applications and these are the only system applicants who came forth. They have demonstrated an immediate, concrete interest in the field and they are the sole entities now available for early authorization. Moreover, each has some background or experience of a nature that might make a useful contribution toward the activation of this new, and somewhat risky, domestic technology and the expeditious realization of its potential benefits for the public. Indeed, it seems dubious whether an applicant which lacked any experience in terrestrial or satellite communications or in building communications satellites or any stake as a user, would possess the practical know-how needed to bring this sophisticated communications medium into being for domestic use in a prompt, effective and efficient manner. * * *
 Proposed Second Report and Order, supra note 14, 34 FCC2d at 43-44 P 83.
 
 
 [17]
 Id. at 91 P 36
 
 
 [18]
 Domsat II, supra note 5, 35 FCC2d at 850 P 17. The FCC staff had recommended that the applicants be induced or required to form joint ventures. This course the Commission rejected, preferring to rely on the "prudent business judgment" of the applicants. Id
 
 
 [19]
 See SBS Decision, 62 FCC2d at 1037 n.45, JA 1560; Domsat II, supra note 5, 35 FCC2d at 852 P 23. AT&T and Comsat had jointly proposed a system wherein the former would lease communications channels from the latter
 
 
 [20]
 Reconsideration Order, 38 FCC2d 665 (1972)
 
 
 [21]
 American Telephone & Telegraph Co., 42 FCC2d 654 (1973). AT&T was to lease satellite communications transponders from Comsat General
 
 
 [22]
 GTE Satellite Corp., 43 FCC2d 1141 (1973). GTE was to lease satellite transponders from National Satellite Services, Inc., a subsidiary of Hughes Aircraft Co
 
 
 [23]
 GTE Satellite Corp., 57 FCC2d 147 (1975)
 
 
 [24]
 Id. at 157 n.10
 
 
 [25]
 RCA Global Communications, Inc./RCA Alaska Communications, Inc., 42 FCC2d 774 (1973). RCA's domestic satellite system is operated through two subsidiaries
 
 
 [26]
 Hughes Aircraft Co./National Satellite Services, Inc., 43 FCC2d 1141 (1973). National Satellite is a subsidiary of Hughes
 
 
 [27]
 American Satellite Corp., 43 FCC2d 348 (1973)
 
 
 [28]
 The court reserved judgment on the Hughes application because Hughes no longer sought the challenged license. Network Project v. FCC, 511 F.2d 786, 797 (D.C.Cir.1975)
 
 
 [29]
 The Network Project's evidentiary hearing argument was specifically made with respect to both the general public interest determination, see brief of Network Project at 27, and also the antitrust issue, see id. at 37
 
 
 [30]
 See text and note at note 19 supra
 
 
 [31]
 Domsat II, supra note 5, 35 FCC2d at 852 P 23
 
 
 [32]
 Comments were submitted by all the parties and the amicus curiae in this case
 
 
 [33]
 Appeal dismissed sub nom. RCA Global Communications, Inc. v. FCC, Nos. 75-1236 & 75-1241 (D.C.Cir. Feb. 23, 1976) (appeal was premature, because Comsat and IBM had not yet applied for actual system authorization)
 
 
 [34]
 A similar requirement was still in effect for Comsat. See Domsat II, supra note 5, 35 FCC2d at 853 P 26
 
 
 [35]
 The FCC described the threat that IBM and AT&T might not compete with one another vigorously as "remote," in view of AT&T's demonstrations of its competitive objectives. CML Decision, 51 FCC2d 14, 35 P 36 (1975). The Commission sought to mitigate even these minor consequences by prohibiting IBM and Comsat from controlling any joint venture, and by requiring the participation of a third partner. In that way the corporate objectives of Comsat or IBM which might favor cooperation with AT&T would not control the venture's policies. Rather, the venture would be free to promote its own corporate interests, which presumably include vigorous competition with AT&T. Id. at 41-42 P 44
 
 
 [36]
 Under this option Comsat was also required to terminate its role as carrier's carrier for AT&T upon expiration of the initial contract. Id
 
 
 [37]
 SBS will need a projected $70.5 million prior to operation in excess of the partners' committed $165 million. An additional $241.9 million will be needed to meet total projected cost. SBS hopes to raise this from external sources. Otherwise, the partners will consider making additional contributions to capital. SBS Decision, 62 FCC2d at 1045 P 124, JA 1568. Aetna has invested only $1,000 to date; its full contribution is due only after licensing is approved
 
 
 [38]
 Id. at 1044 P 19, JA 1567
 
 
 [39]
 See text and note at note 9 supra
 
 
 [40]
 See, e.g., Western Union's Petition to Deny (June 1, 1976), JA 1013-1057; AT&T's Comments (June 1, 1976), JA 1173-1215
 
 
 [41]
 Not all the antitrust objections warranted an evidentiary hearing, even in the view of the Department of Justice. See text and note at note 85 infra
 
 
 [42]
 See SBS Decision, 62 FCC2d at 1062 PP 180-182, JA 1585
 
 
 [43]
 See id., P P 121, 123, 127-129, 131, 138, 142-147, 154, 158, 160, 164-165, 173-174, 177, in 62 FCC2d at 1044-1061, JA 1567-1584
 
 
 [44]
 The order granting rehearing en banc was filed on May 10, 1979
 
 
 [45]
 En banc order of this court filed July 20, 1979
 
 
 [46]
 Supplemental brief of appellants American Satellite and Western Union at 6, 10
 
 
 [47]
 In oral argument American Satellite and Western Union took a somewhat softer position. They supported the following interpretation, made by the original panel opinion:
 We think the reconciliation proper is that, where FCC has found or, as here, assumed a Clayton Act violation within its Section 11 authority, it must disapprove the challenged conduct unless no other alternative to approval would adequately not just "as adequately" serve the public interest.
 Slip op. at 29 (footnotes omitted).
 
 
 [48]
 Id., slip op. at 16 n.50
 
 
 [49]
 See cases cited in id
 
 
 [50]
 Originally passed in relevant part as § 602(d) of the Communications Act, 48 Stat. 1102 (1934)
 
 
 [51]
 15 U.S.C. § 21(a) (1976) provides:
 Authority to enforce compliance with sections 13, 14, 18, and 19 of this title by the persons respectively subject thereto is vested in the Interstate Commerce Commission where applicable to common carriers subject to the Interstate Commerce Act, as amended; in the Federal Communications Commission where applicable to common carriers engaged in wire or radio communication or radio transmission of energy; in the Civil Aeronautics Board where applicable to air carriers and foreign air carriers subject to the Civil Aeronautics Act of 1938; in the (Board of Governors of the) Federal Reserve System where applicable to banks, banking associations, and trust companies; and in the Federal Trade Commission where applicable to all other character of commerce to be exercised as follows(.)
 
 
 [52]
 The person charged with a Clayton Act violation must be notified of the charge and be given the opportunity to appear in person or through counsel to answer it. Although the statute refers to "testimony" which must be reduced to writing and filed it does not require discovery or cross-examination
 
 
 [53]
 Supplemental brief of American Satellite and Western Union at 5-7
 
 
 [54]
 That the FCC has prosecutorial discretion with respect to the Clayton Act does not imply that it has discretion to disregard the anticompetitive factors in its public interest balancing. See Northern Natural Gas Co. v. FPC, 399 F.2d 953 (D.C.Cir.1968)
 
 
 [55]
 The Clayton Act, § 9(b), later renumbered § 11, granted the ICC and the Federal Reserve Board enforcement authority within their regulatory bailiwicks, and the FTC enforcement authority over other lines of commerce
 
 
 [56]
 See 51 Cong.Rec. 14224 (Aug. 25, 1914)
 
 
 [57]
 Id. at 14322 (Aug. 27, 1914)
 
 
 [58]
 Id. at 11109 (June 25, 1914) (emphasis added)
 
 
 [59]
 Id. at 14321-14322 (Aug. 27, 1914)
 
 
 [60]
 See id. at 11109 (June 25, 1914) (remarks of Senator Newlands)
 
 
 [61]
 See 15 U.S.C. § 45(b) (1976)
 
 
 [62]
 51 Cong.Rec. 14224 (Aug. 25, 1914) (statement of Senator Walsh); see Ash Grove Cement Co. v. FTC, 577 F.2d 1368, 1374 n.9 (9th Cir.), cert. denied, 439 U.S. 982, 99 S.Ct. 571, 58 L.Ed.2d 653 (1978)
 
 
 [63]
 48 Stat. 1102 (1934)
 
 
 [64]
 S.Rep. No. 781, 73d Cong., 2d Sess. 11 (1934); H.R.Rep. No. 1850, 73d Cong., 2d Sess. 8-9 (1934). See also 78 Cong.Rec. 8826 (May 15, 1934) (remarks of Senator Dill)
 
 
 [65]
 See H.R.Rep. No. 580, 86th Cong., 1st Sess. 15 (1959), (letter from Federal Reserve stating that the Board's only proceeding under § 11 had terminated before final action); id. at 18 (letter from CAB stating that it had never exercised its § 11 authority); id. at 20 (letter from FCC stating that it had only "limited" experience under § 11)
 
 
 [66]
 See Admiral Luke McNamee's testimony in favor of the amendment, Hearings Before a Subcomm. of the Senate Comm. on Interstate Commerce on S. 3875, a Bill to Amend Section 313 of the Communications Act of 1934, 75th Cong., 3d Sess. (1938) at 3; see also id. at 74-75 (statement of Mr. Kern)
 
 
 [67]
 Id. at 14 (comment of Senator White). Opponents of the bill suggested that the amendment would "make competition a fetish and require that where there is one radio circuit now there shall be two, regardless of the effect on the public." Id. at 107 (statement of Frank Wozencraft, counsel to RCA Communications, Inc.). All participants in the discussion seemed in agreement that competition is not an overriding factor in the public interest calculus. See id. at 14 (Senator Minton); id. (Admiral McNamee); id. at 17-19 (exchange between Senator White and Mr. Wozencraft); id. at 36 (statement of Mr. Winterbottom); id. at 44-45 (statement of Mr. Winterbottom); id. at 107 (exchange between Senator Minton and Mr. Wozencraft)
 
 
 [68]
 S. 726, 86th Cong., 1st Sess. (1959)
 
 
 [69]
 105 Cong.Rec. 12733 (July 6, 1959)
 
 
 [70]
 The McLean decision remains good law, having been cited favorably as recently as 1974 in Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 298 95 S.Ct. 438, 448, 42 L.Ed.2d 447 (1974)
 
 
 [71]
 American Satellite and Western Union have attempted to distinguish McLean Trucking and Seaboard Air Lines on the ground that the ICC has a power not involved in the case at bar to immunize certain transactions from the operation of the antitrust laws, see 49 U.S.C. § 5(11) (1976). In this they are joined by Judge Robinson. See opinion of Judge Robinson, text and notes at notes 112-116. However, these Supreme Court opinions do not distinguish between the § 5(11) determination and the public interest determination. As stated in McLean Trucking Co. v. United States, 321 U.S. 67, 83, 64 S.Ct. 370, 378, 88 L.Ed. 544 (1944):
 The history of the development of the special national transportation policy suggests, quite apart from the explicit provision of § 5(11), that the policies of the antitrust laws determine "the public interest" in railroad regulation only in a qualified way. * * *
 (Emphasis added.)
 
 
 [72]
 Also significant is Denver's reliance on McLean Trucking, 387 U.S. at 493, 87 S.Ct. at 1759, since the earlier case explicitly rejected the idea that competitive considerations must be paramount, see text at note 70 supra
 
 
 [73]
 Moog Industries, Inc. v. FTC, 355 U.S. 411, 413, 78 S.Ct. 377, 379, 2 L.Ed.2d 370 (1958) (per curiam) (FTC); Seaboard Air Lines R. Co. v. United States, 382 U.S. 154, 86 S.Ct. 277, 15 L.Ed.2d 223 (1954) (ICC); McLean Trucking Co. v. United States, supra note 71, 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544 (ICC)
 
 
 [74]
 Inmates of Attica Correctional Facility v. Rockefeller, 477 F.2d 375, 379-381 (2d Cir. 1973); Peek v. Mitchell, 419 F.2d 575, 577-578 (6th Cir. 1970); Smith v. United States, 375 F.2d 243, 247 (5th Cir.), cert. denied, 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106 (1967); Powell v. Katzenbach, 359 F.2d 234, 235 (D.C.Cir.1965); United States v. Cox, 342 F.2d 167, 171-172 (5th Cir.), cert. denied, 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700 (1965)
 
 
 [75]
 Section 4 of the Sherman Act, 15 U.S.C. § 4 (1976), and § 15 of the Clayton Act, 15 U.S.C. § 25 (1976), provide in identical language that "it shall be the duty of the several United States Attorneys * * * to institute proceedings in equity to prevent and restrain such violations." (Emphasis added.)
 
 
 [76]
 Another oddity would result from the interpretation suggested by American Satellite and Western Union: the FCC would be considered to exercise prosecutorial discretion with respect to the Sherman Act, but not with respect to the Clayton Act. See Rogers Radio Communications Services, Inc. v. FCC, 193 U.S.App.D.C. 71, 77 n.16, 593 F.2d 1225, 1231 n.16 (D.C.Cir.1978). There is no reason in statutory language or policy to justify such a result
 
 
 [77]
 Accord, FCC v. RCA Communications, Inc., 346 U.S. 86, 93, 73 S.Ct. 998, 1003, 97 L.Ed.2d 1400 (1953)
 
 
 [78]
 Id. at 98
 
 
 [79]
 See also Moog Industries, Inc. v. FTC, supra note 73, 355 U.S. at 413, 78 S.Ct. at 379
 
 
 [80]
 Section 309(e) reads:
 If, in the case of any application to which subsection (a) of this section applies, a substantial and material question of fact is presented or the Commission for any reason is unable to make the finding specified in such subsection, it shall formally designate the application for hearing on the ground or reasons then obtaining and shall forthwith notify the applicant and all other known parties in interest of such action and the grounds and reasons therefor, specifying with particularity the matters and things in issue but not including issues or requirements phrased generally. * * * Any hearing subsequently held upon such application shall be a full hearing in which the applicant and all other parties in interest shall be permitted to participate. The burden of proceeding with the introduction of evidence and the burden of proof shall be upon the applicant, except that with respect to any issue presented by a petition to deny or a petition to enlarge the issues, such burdens shall be as determined by the Commission.
 
 
 [81]
 See Columbus Broadcasting Coalition v. FCC, 505 F.2d 320, 323-324 (D.C.Cir.1974)
 
 
 [82]
 See JA 1013-1063 (Western Union petition to deny); id. 1068-1172 (American Satellite petition to deny). The supporting affidavits may be summarized as follows:
 (1) John D. Jackson, Executive Vice President and General Manager of American Satellite, stated simply that the "facts and matters stated in the foregoing 'Petition to Deny' are true * * *." JA 1120.
 (2) Charles R. Blankenship, a sales officer of American Satellite, stated that a potential customer had told him that IBM had conducted a seminar partially concerning the SBS system. JA 1436-1437; see also JA 1087 n.2 (American Satellite petition to deny).
 (3) John A. Keyes, a sales officer of American Satellite, stated that another potential customer had attended another such seminar. JA 1438; see also JA 1087 n.2 (American Satellite petition to deny).
 (4) H. R. Johnson, Vice President of Western Union, stated (1) that potential customers do not need to be given simultaneous presentations by communications and computer suppliers; (2) that 72% of present interstate private line communications is generated by 88 large customers; and (3) that data communications users are among the long-distance communications service customers. He also asserted, without support, that "large corporations and the federal government" comprise a "principal market" for domestic satellite services, and that "certain users" identities unspecified may be able to employ only satellite, and not terrestrial, communications services. JA 1058-1060.
 (5) Jayaram Ramasastry, electrical engineer and Director of Transmission Systems Engineering of Western Union, stated that the SBS system will perform "highly sophisticated data organization and integration functions" that other systems cannot, and that development of the system required very substantial research expenditures. He concluded that he was unable to evaluate the accuracy of SBS's research cost summary. He also challenged the completeness and accuracy of other SBS cost data. JA 1061-1063, 1497-1499.
 (6) Robert R. Nathan, an economic consultant hired by Western Union, stated as his expert opinion (1) that information could be generated to define relevant submarkets with sufficient precision at any one given point in time; (2) that potential competition from IBM or Comsat could competitively influence the market; and (3) that more information is needed to evaluate whether the SBS entry would become so entrenched as to deter future entry. JA 1485-1496.
 Our dissenting colleague asserts that the petitions to deny submitted by Western Union and American Satellite "set forth allegations that indisputably are specific in nature." Opinion of Judge Robinson, text at note 185. Our examination of these documents, however, reveals a detailed legal and economic analysis, but little in the way of "specific allegations of fact." Indeed, Judge Robinson's three selected illustrations of purportedly specific factual allegations in the petitions underscore this conclusion. See id., note 185. The first illustrative allegation Western Union's statement concerning the principal customers for domestic satellite service is essentially undisputed. Disputed is the inference that might be drawn: for example, whether these principal customers so dominate SBS's potential clientele, and are so separate an economic unit, as to constitute a relevant submarket for purposes of antitrust analysis. The second and third examples concerning entry requirements and IBM's 1975 statement that it had considered separate entry were supported by citations to the CML Decision, supra note 35, 51 FCC2d 14, and statements by IBM. These "allegations" were not disputed, nor did they contribute anything not already known to the Commission.
 The disagreements among the parties are not genuinely factual; rather, they concern the appropriate public interest determination on the antitrust and communications issues. An evidentiary hearing is not required in such a situation.
 
 
 [83]
 Cf. Home Box Office, Inc. v. FCC, 567 F.2d 9, 42 (D.C.Cir.), cert. denied, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977) ("(W)e think it odd that the Department (of Justice) has not presented factual data to the Commission which would allow it to assess the likely effect of its rules on various fields of competition. The Department's arguments are basically speculative * * *."). In this case, though the Department's submissions have been more detailed and sophisticated, they still fall short of the "specific allegations of fact" required of petitions to deny by § 309(d)
 
 
 [84]
 The Department of Justice has in effect admitted that the allegations of fact in the petitions to deny were in themselves insufficient to trigger the hearing requirement of § 309(e): "We lack sufficient information to make such a judgment. So does the Commission, but it has refused to admit as much." Brief for appellant United States of America (hereinafter Dep't of Justice) at 18
 In view of this admission, the position of our dissenting colleague, see opinion of Judge Robinson at Part II-B, is puzzling. It is even more puzzling when compared to this court's decision in Columbus Broadcasting Coalition v. FCC, supra note 81, in which Judge Robinson joined. In that case the court upheld an FCC licensing decision against the challenge that an evidentiary hearing under § 309(e) had been erroneously denied. The Columbus Broadcasting petitioner had submitted a petition to deny relying on four substantial alleged deviations of the licensee from the public interest standard. The petition alleged facts more specific, more disputed, and more within its personal knowledge than any in the present case. Nevertheless, the court recognized that the FCC's decision not to hold a hearing was within its discretion and expertise. Following a similar standard in this case, we must affirm the Commission.
 
 
 [85]
 Supplemental brief for Dep't of Justice at 33; see also brief for Dep't of Justice at 51 n.29
 
 
 [86]
 Supplemental brief for Dep't of Justice at 33-34
 
 
 [87]
 Thus, our dissenting colleague's professed adherence to a congressional decision to require hearings in cases such as this, see opinion of Judge Robinson, text and notes at notes 156-169, is misplaced. Section 309(e) does not "give( ) the Commission no authority to consider the public interest in deciding whether a hearing must be conducted(.)" Id., text following note 168. Nor did the FCC in this case "ignor(e) the will of Congress" or show "flat disregard of a procedure mandated by statute." Id., text at note 199. Section 309(e) requires an evidentiary hearing if a substantial and material question of fact is presented, or if the FCC is unable to reach a determination on the public interest. Contrary to our colleague's mechanical approach, these determinations require judgment. The substantiality and materiality of purported issues of fact, and the need for further information, are issues to be evaluated in the first instance by the Commission in the light of its public interest responsibility. This court's oversight role is quite limited. Columbus Broadcasting Coalition v. FCC, supra note 81; West Michigan Telecasters, Inc. v. FCC, 396 F.2d 688 (D.C.Cir.1968). Of course, this does not mean that the FCC may "ignore" or "disregard" the requirements of the Communications Act. Nor does it mean, however, that this court is free to substitute its judgment for the judgment of the Commission
 
 
 [88]
 See also Rogers Radio Communications Services, Inc. v. FCC, supra note 76, 593 F.2d at 1232-1233; Nat'l Ass'n for Better Broadcasting v. FCC, 591 F.2d 812, 816 (D.C.Cir.1978); Stone v. FCC, 466 F.2d 316, 321-323 (D.C.Cir.1972)
 
 
 [89]
 See also FCC v. Nat'l Citizens Committee for Broadcasting, 436 U.S. 775, 813-814, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978); FPC v. Transcontinental Gas Pipe Line Corp., 365 U.S. 1, 29, 81 S.Ct. 435, 450, 5 L.Ed.2d 377 (1961)
 
 
 [90]
 See Gulf States Utilities Co. v. FPC, 411 U.S. 747, 763, 93 S.Ct. 1870, 1880, 36 L.Ed.2d 635 (1973): " '* * * Whether or not an abuse of discretion is present must ultimately depend upon the transaction approved, its possible consequences, and any justifications for the deferral' or summary treatment." (Quoting Denver & Rio Grande Western Railroad v. United States, 387 U.S. 485, 498, 87 S.Ct. 1754, 1765, 18 L.Ed.2d 905 (1967).)
 
 
 [91]
 JA 576-793
 
 
 [92]
 SBS Decision, 62 FCC2d at 1068 P 199, JA 1591
 
 
 [93]
 See text and notes at notes 14-26 supra
 
 
 [94]
 Proposed Second Report and Order, supra note 14, 34 FCC2d at 90-92
 
 
 [95]
 Domsat II, supra note 5, 35 FCC2d at 844
 
 
 [96]
 Network Project v. FCC, supra note 28, 511 F.2d at 786
 
 
 [97]
 We observe that the appellants and amicus curiae as a group offer or imply at least seven purported grounds for distinguishing Network Project. The Department of Justice had offered three: (1) that the satellite industry is no longer experimental, brief of Dep't of Justice at 53; (2) that Network Project involved only inferences from undisputed facts, supplemental brief of Dep't of Justice at 32; and (3) that Network Project involved vertical integration or anticompetitive behavior susceptible of alleviation by FCC restrictive orders, reply brief of Dep't of Justice at 11 n.4. In its main brief American Satellite offered two grounds for distinguishing the cases: that Network Project involved no disputed material facts, and that it involved the question whether the FCC could impose a per se disqualification on all entries posing vertical integration problems. Brief of American Satellite at 38 n.2. In its reply brief American Satellite offered a third: that in this case unlike the original license proceeding there are carriers operating in the field that deserve protection from a new entrant. Reply brief of American Satellite at 2-3. The FTC suggests that Network Project did not involve a balancing of anticompetitive and other factors, and that the present case, unlike Network Project, presents a prima facie Clayton Act violation. Brief of FTC at 31 n.66; supplemental brief of FTC at 9 n.8. We do not consider any of these grounds for distinction persuasive. If anything, this appeal presents a clearer case for affirmance than did Network Project, because the factual record is more complete and the analysis of the antitrust issues more careful. We especially reject American Satellite's argument that once several firms are granted entrance into the field the rules should be changed to block competition from additional entrants
 Our dissenting colleague also attempts to distinguish Network Project, on the ground that the petitioner in that case "did not dispute any of the material facts upon which the determination was predicated, but asserted only that those facts were insufficient to underpin a public-interest finding." This he calls "only a legal question, on which a hearing was obviously unnecessary." Opinion of Judge Robinson at note 144. In the case at bar, however, appellants have not disputed any of the material facts, but have concentrated instead on the ultimate conclusion, just as the Network Project did. Here, as in Network Project, appellants primarily assert that insufficient facts have been adduced to make a public interest finding. See text and notes at notes 82-84 supra.
 
 
 [98]
 SBS Decision, 62 FCC2d 1063-1064 P 186, JA 1586-1587; id. at 1099 P 305, JA 1622
 
 
 [99]
 The process of proving that a joint venture would violate the antitrust laws is described in Pitofsky, Joint Ventures Under the Antitrust Laws: Some Reflections on the Significance of Penn-Olin, 82 Harv.L.Rev. 1007 (1969)
 
 
 [100]
 E.g. id., at 1021-1030. Pitofsky concluded: "A likelihood-of-entry test which depends exclusively or even principally on determining the subjective intent of corporate management * * * is clearly inadequate." Id. at 1029
 
 
 [101]
 United States v. Penn-Olin Chemical Co., 378 U.S. 158, 174, 84 S.Ct. 1710, 1718, 12 L.Ed.2d 775 (1964). In United States v. Falstaff Brewing Corp., 410 U.S. 526, 93 S.Ct. 1096, 53 L.Ed.2d 475 (1973), the Court criticized the lower court's dependence on the testimony of corporate officials, id. at 532, 93 S.Ct. at 1100, and urged instead the use of "objective economic facts," id. at 535 n.13, 93 S.Ct. at 1102. "This does not mean that the testimony of company officials about actual intentions of the company is irrelevant or is to be looked upon with suspicion," the Court said, "but it does mean that theirs is not necessarily the last word in arriving at a conclusion about how (a company) should be considered in terms of its status as a potential entrant into the market at issue." Id. at 534-536, 93 S.Ct. at 1101
 
 
 [102]
 See SBS Decision, 62 FCC2d at 1066 P 193, JA 1589
 
 
 [103]
 Id. at 1091-1094 PP 280-290, JA 1614-1617
 
 
 [104]
 Of course, the conclusions reached by the FCC must be analytically sound and supportable in the record. We consider the substance of those conclusions in Part VI infra
 
 
 [105]
 SBS Decision, 62 FCC2d at 1094 P 290, JA 1617
 
 
 [106]
 See Part VI infra
 
 
 [107]
 We also observe that "proper conclusions" in the context of agency decisionmaking are judged by a more relaxed standard than the "proper conclusions" of a District Court in a Clayton Act trial. Compare United States v. Third National Bank, 390 U.S. 171, 88 S.Ct. 882, 19 L.Ed.2d 1015 (1968), with Seaboard Air Lines R. Co. v. United States, supra note 73, 382 U.S. 154, 86 S.Ct. 277, 15 L.Ed.2d 223
 
 
 [108]
 The Department of Justice has proposed that SBS be given conditional authority to proceed pending the result on remand. Under this proposal either IBM or Comsat would be forced to divest its share of SBS if the venture's anticompetitive effects are found to be substantial. Dep't of Justice supplemental brief at 61-62. In the Department's view, such a procedure should allay the FCC's fears about regulatory delay. We cannot endorse this proposal. First, it assumes what the hearing is designed to prove: that Comsat or IBM would be willing to operate SBS alone, without the other. Second, it would impede SBS's attempts to garner customers, since those customers may rely on the combined expertise of Comsat and IBM. Finally, the uncertainty of the capital structure would make the raising of capital difficult, and would place the three joint venturers in a most uncomfortable position with respect to their $165 million investments
 
 
 [109]
 See Calvert Cliffs' Coordinating Committee, Inc. v. USAEC, 449 F.2d 1109, 1115 (D.C.Cir.1971). Calvert Cliffs concerned an agency's rules regarding the preparation of National Environmental Policy Act (NEPA) statements. No special considerations of urgency were involved. We held that "(c)onsiderations of administrative difficulty, delay or economic cost" would not suffice to permit the agency to avoid its duties under the Act. 449 F.2d at 1115. The case at bar, in contrast, is a particular decision of demonstrable urgency, and these procedures were adopted to enable the agency better to fulfill not to frustrate, its statutory mandate
 
 
 [110]
 United States v. CAB, 511 F.2d 1315, 1325 (D.C.Cir.1975); see text at notes 89-90 supra. We confine our review to the antitrust issues. See note 11 supra
 
 
 [111]
 United Sates v. E. I. duPont deNemours & Co., 351 U.S. 377, 404, 76 S.Ct. 994, 1012, 100 L.Ed. 1264 (1956), quoted in SBS Decision, 62 FCC2d at 1073-1074 P 218, JA 1596-1597
 
 
 [112]
 SBS Decision, 62 FCC2d at 1078-1079 PP 231-233, JA 1601-1602
 
 
 [113]
 Id. at 1079-1080 PP 234-235, JA 1602-1603
 
 
 [114]
 Dep't of Justice supplemental brief at 54; Western Union brief at 47
 
 
 [115]
 See SBS Decision, 62 FCC2d at 1075 P 223, JA 1598
 
 
 [116]
 This dominance may be seen in the revenue data before the FCC: in 1975 AT&T had total revenues of $29.5 billion and private line revenues of $1 billion, compared with total revenues of all nine specialized common carriers of $43 million. See SBS brief at 50 n*
 
 
 [117]
 See text and notes at notes 111-113 supra
 
 
 [118]
 SBS Decision, 62 FCC2d at 1082 PP 244-245, JA 1605
 
 
 [119]
 Id. at 1086 P 259, JA 1609
 
 
 [120]
 See id
 
 
 [121]
 Dep't of Justice brief at 30-31
 
 
 [122]
 SBS Decision, 62 FCC2d at 1087 P 262, JA 1610
 
 
 [123]
 The six characteristics were: time division multiple access, demand assignment, digital transmission, integrated voice/data/image communications, switched private-line customer networks, and operation in the 12 and 14 GHz bands. Id. at 1083-1085 PP 247-255, JA 1606-1608
 
 
 [124]
 Dep't of Justice brief at 30. None of the appellants or the amicus curiae has addressed with particularity the FCC's analysis of emergent markets, yet all feel free to assert that the analysis was inadequate
 
 
 [125]
 SBS Decision, 62 FCC2d at 1088-1089 P 270, JA 1611-1612
 
 
 [126]
 Western Union, AT&T, and GTE have well known positions in the telegraph and telephone industries. RCA Alascom, the terrestrial telephone carrier in Alaska, seeks to transfer most of Alaska's telephone traffic to RCA's satellite system. American Satellite presently has no such capability, but it has announced plans to combine its satellite effort with Continental Telephone, which does. See note 3 supra
 
 
 [127]
 SBS Decision, 62 FCC2d at 1091 P 279, JA 1614
 
 
 [128]
 In its CML Decision, supra note 35, 51 FCC2d at 40-41 P 42, the Commission described the "substantial economic and technical resources" of IBM, which might enable IBM to enter the field separately
 
 
 [129]
 The Department of Justice has charged that the FCC's conclusion that IBM is not likely to enter the domestic satellite communications industry alone is contradicted by a statement in the earlier CML Decision. According to the Department's supplemental brief at 46, the FCC had "found it 'likely' that IBM would enter if denied the opportunity to engage in a joint venture with Comsat. 51 FCC2d at 39." The baselessness of this charge is revealed by quoting the cited language of the CML Decision in context:
 It is, of course, possible that both IBM and Comsat General would seek independent entry as domestic satellite applicants if we forbid their joint entry in any manner whatsoever. Indeed, our decision herein implicitly acknowledges as much in providing them with the option of doing so in the event they find this preferable to the balanced CML and leasing options set forth herein. But in arriving at a determination on the Section 7 allegations of the various parties we must pragmatically acknowledge the fact that the financial barriers to both IBM and Comsat General entering independently are formidable indeed. On a conservative estimate, entry into the domestic satellite field requires a capital investment well in excess of $100 million. Considering this enormous capital investment cost, in light of the present difficulties in raising capital and the very uncertain nature of the demand for satellite communications services * * *, we cannot indulge in the same assumptions about the (e)ase of entry that might be appropriate for other industries * * *. Given IBM's resources we might well suppose it likely that it would proceed alone if necessary, but if it did so, could we suppose it is equally likely that Comsat General would enter in competition with IBM and the other domestic satellite carriers such as AT&T, Western Union and RCA satellite carriers? Reasonable men can debate at length over the probabilities of independent entry by both IBM and Comsat General, but the debate cannot be resolved simply by recitation of antitrust decisions dealing with assorted other industries and other circumstances. * * *
 CML Decision, supra note 35, 51 FCC2d at 39 P 40 (emphasis in original; citations omitted). Obviously, the FCC did not find it "likely" that IBM would enter the field alone.
 
 
 [130]
 See, e. g., United States v. Falstaff Brewing Corp., supra note 101, 410 U.S. 526, 93 S.Ct. 1096, 53 L.Ed.2d 475; FTC v. Proctor & Gamble Co., 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967); United States v. Penn-Olin Chemical Co., supra note 101, 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775; Pitofsky, supra note 99
 
 
 [131]
 SBS Decision, 62 FCC2d at 1091 P 281, JA 1614
 
 
 [132]
 It is important to remember that joint ventures are the characteristic form of entry in the domestic satellite industry, and have been encouraged from the start. See Proposed Second Report and Order, supra note 14, 35 FCC2d at 850 P 17. If joint ventures are necessarily suspect under the Penn-Olin doctrine, then most current satellite firms and presumably most potential entrants are suspect as well. The doctrine cannot be confined to IBM and Comsat alone
 
 
 [133]
 The relevant market analysis considered in text and notes at notes 111-116 supra is equally important to the entrenchment argument, but it need not be considered again here
 
 
 [134]
 It is ironic, therefore, that appellants argue in effect that the joint venture should be disallowed because it prevents IBM from entering the market separately from Comsat, and also that IBM should be prohibited from entering because of entrenchment problems
 
 
 [135]
 See text and notes at notes 138-147 infra
 
 
 [136]
 See the entrenchment theory argument presented by Western Union's expert economic witness, Robert Nathan, JA 1495-1496 P 23
 
 
 [137]
 See text at notes 126-127 supra
 
 
 [138]
 See the summary of these restrictions in SBS Decision, 62 FCC2d at 1037 n.45, JA 1560
 
 
 [139]
 CML Decision, supra note 35, 51 FCC2d at 34-35 PP 34-35
 
 
 [140]
 SBS Decision, 62 FCC2d at 1048 P 131, JA 1571
 
 
 [141]
 Id. at 1046-1047 PP 126-129, JA 1569-1570
 
 
 [142]
 Id
 
 
 [143]
 Id. at 1044 PP 121-122, JA 1567; id. at 1096 P 295, JA 1619. To police this requirement the IBM subsidiary must maintain separate books of account to enable the FCC to detect any instance of cross-subsidization
 
 
 [144]
 Id. at 1002-1003 PP 12-13, JA 1525-1526
 
 
 [145]
 Id. at 1095 P 292, JA 1618; id. at 1097 P 301, JA 1620
 
 
 [146]
 Western Union brief at 59
 
 
 [147]
 American Satellite brief at 64
 
 
 [148]
 See text and notes at notes 3-5 supra; SBS brief at 6-7
 
 
 [149]
 See text at note 7 supra
 
 
 [150]
 See note 11 supra
 
 
 [151]
 SBS Decision, 62 FCC2d at 1098 P 303, JA 1621
 
 
 [152]
 Id. at 1092-1093 PP 284-285, JA 1615-1616
 
 
 [153]
 Id. at 1091 P 279, JA 1614
 
 
 [154]
 Id. at 1092 P 282, JA 1615
 
 
 [155]
 Id. at 1089 P 273, JA 1612
 
 
 [156]
 Western Union Petition to Deny, JA 1053-1054
 
 
 [157]
 In its CML Decision, supra note 35, 51 FCC2d at 35 P 36, the FCC observed that "AT&T has shown every intention recently of competing vigorously in all aspects of the specialized communications service marketplace and when the restrictions expire upon its full participation in the domestic satellite market with a multipurpose system of its own it seems likely it will be competing vigorously therein." (Footnotes omitted.)
 
 
 [158]
 The FCC also noted in its CML Decision that "IBM has indicated * * * that a domestic satellite applicant would have to offer not only data communications services but video and voice services as well thereby making competition with AT&T appear inevitable." Id
 
 
 [159]
 SBS Decision, 62 FCC2d at 1092 P 282, JA 1615
 
 
 [160]
 Id. at 1095 P 292, JA 1618; id. at 1097 P 301, JA 1620
 
 
 [161]
 We also said that "(i)n spite of our conclusion that significant anticompetitive effects may well result * * *, the court holds that the * * * allocation is not, at this time, a breach of the broad discretion allocated to the Commission under the statute." Nat'l Ass'n of Regulatory Utility Comm'rs v. FCC, 525 F.2d 630, 638 (D.C.Cir.), cert. denied, 425 U.S. 992, 96 S.Ct. 2203, 48 L.Ed.2d 816 (1976) (footnote omitted). Here, where we agree with the Commission that serious anticompetitive effects are unlikely to result from the SBS venture, we are even more convinced "that there will be ample opportunity to challenge anticompetitive effects as the time approaches when they will be felt." Id., 525 F.2d at 639
 
 
 [1]
 Communications Act of 1934, Pub.L.No. 73-416, 48 Stat. 1064, as amended, 47 U.S.C. §§ 151 et seq. (1976) (hereinafter cited as codified)
 
 
 [2]
 Clayton Act, Pub.L.No. 63-212, 38 Stat. 730 (1914), as amended, 15 U.S.C. §§ 12 et seq. (1976)
 
 
 [3]
 Clayton Act, § 7, 15 U.S.C. § 18 (1976)
 
 
 [4]
 47 U.S.C. § 309(a) (1976)
 
 
 [5]
 See 47 U.S.C. § 309(e) (1976)
 
 
 [6]
 See Part II infra
 
 
 [7]
 See Part I infra
 
 
 [8]
 Majority Opinion (Maj.Op.), text following note 79; see Part I infra
 
 
 [9]
 47 U.S.C. § 309(a) (1976)
 
 
 [10]
 Sherman Act, ch. 647, 26 Stat. 209 (1890), as amended, 15 U.S.C. §§ 1 et seq. (1976)
 
 
 [11]
 United States v. Radio Corp. of America, 358 U.S. 334, 351, 79 S.Ct. 457, 467-468, 3 L.Ed.2d 354, 366 (1959), relying upon National Broadcasting Co. v. United States, 319 U.S. 190, 220-224, 63 S.Ct. 997, 1011-1013, 87 L.Ed. 1344, 1354-1356 (1943); see NAACP v. FPC, 425 U.S. 662, 666-671, 96 S.Ct. 1806, 1809-1812, 48 L.Ed.2d 284, 289-292 (1976)
 
 
 [12]
 Clayton Act, § 11, 15 U.S.C. § 21 (1976), which reads in pertinent part:
 Authority to enforce compliance with sections 13, 14, 18, and 19 of this title (Clayton Act §§ 2, 3, 7, and 8) by the persons respectively subject thereto is vested ... in the Federal Communications Commission where applicable to common carriers engaged in wire or radio communication or radio transmission of energy....
 
 
 [13]
 See Clayton Act, § 11(b), 15 U.S.C. § 21(b) (1976):
 Whenever the Commission or Board vested with jurisdiction thereof shall have reason to believe that any person is violating or has violated any of the (enumerated) provisions ..., it shall issue and serve upon such person and the Attorney General a complaint....
 (emphasis supplied).
 
 
 [14]
 See Maj.Op., text at notes 51-62
 
 
 [15]
 See note 10 supra and accompanying text
 
 
 [16]
 See FCC v. RCA Communications, Inc., 346 U.S. 86, 90, 73 S.Ct. 998, 1002, 97 L.Ed. 1470, 1475 (1953); National Broadcasting Co. v. United States, supra note 10, 319 U.S. at 216-217, 63 S.Ct. at 1009-1010, 87 L.Ed. at 1362-1363
 
 
 [17]
 See Part I(A) infra
 
 
 [18]
 See Maj.Op. at Part III(B)
 
 
 [19]
 See Part I(B) infra
 
 
 [20]
 The bill, in fact, was entitled "An Act To supplement existing laws against unlawful restraints and monopolies." See 38 Stat. 730 (1914); see also S.Rep.No. 698, 63d Cong., 2d Sess. 1 (1914)
 
 
 [21]
 Clayton Act, § 11, 15 U.S.C. § 21 (1976). See note 24 infra. To become effective, however, the agency's cease and desist order must be reviewed by a court. 15 U.S.C. § 21 (1976). Moreover, alternative methods of judicial enforcement were also established. See notes 42-45 infra and accompanying text
 
 
 [22]
 See H.R.Rep.No. 627, 63d Cong., 2d Sess. 1-3 (1914); S.Rep.No. 698, supra note 20, at 53-62
 
 
 [23]
 See 15 U.S.C. §§ 1-3 (1976)
 
 
 [24]
 S.Rep.No. 698, supra note 20, at 43-48. At this stage, only the Federal Trade Commission and the Interstate Commerce Commission were specified, see id. at 69-70, although when the bill emerged from conference the Federal Reserve Board had been added. See H.R.Rep.No. 1168, 63d Cong., 2d Sess. 4 (1914) (conference report)
 
 
 [25]
 S.Rep.No. 698, supra note 20, at 43
 
 
 [26]
 E. g., 51 Cong.Rec. 14096-14100, 14225-14229, 14271-14276 (1914)
 
 
 [27]
 See 51 Cong.Rec. 14089-14100 (1914)
 
 
 [28]
 See 51 Cong.Rec. 14089 (1914)
 
 
 [29]
 See Clayton Act, Pub.L.No. 63-212, §§ 2-3, 38 Stat. 730 (1914), 15 U.S.C. §§ 13-14 (1976)
 
 
 [30]
 See notes 52-66 infra and accompanying text
 
 
 [31]
 Clayton Act, § 2, 15 U.S.C. § 13 (1976)
 
 
 [32]
 Clayton Act, § 3, 15 U.S.C. § 14 (1976)
 
 
 [33]
 Clayton Act, § 8, 15 U.S.C. § 19 (1976)
 
 
 [34]
 This language was in § 7 of the House bill, and it stated that
 (n)othing contained in the antitrust laws shall be construed to forbid associations of traffic, operating, accounting, or other officers of common carriers for the purpose of conferring among themselves or of making any lawful agreement as to any matter which is subject to the regulating or supervisory jurisdiction of the Interstate Commerce Commission, but all such matters shall continue to be subject to such jurisdiction of the commission, and all such agreements shall be entered and kept of record by the carriers, parties thereto, and shall at all times be open to inspection by the commission....
 See H.R.Rep.No. 627, supra note 22, at 2.
 
 
 [35]
 The clarifying amendment, providing that "no such agreement shall go into effect or become operative until the same shall have first been submitted to and approved of by the Interstate Commerce Commission," was added on the floor of the House. See 51 Cong.Rec. 9581 (1914). Nevertheless, the Senate committee recommended striking the paragraph "because it is not believed that such agreements, as those named, should be made whether approved or not by the Interstate Commerce Commission, nor that such traffic and operating associations as those mentioned should be formed." S.Rep.No. 698, supra note 20, at 46. The Senate agreed, see 51 Cong.Rec. 14028 (1914), and the language did not appear in the final bill
 
 
 [36]
 S.Rep.No. 698, supra note 20, at 48
 
 
 [37]
 See H.R.Rep.No. 1168, supra note 20, at 14
 
 
 [38]
 Id. at 4
 
 
 [39]
 See 51 Cong.Rec. 9598 (1914), reprinting H.R.Rep.No. 681, 63d Cong., 2d Sess. (1914) (report on proposed amendments to Interstate Commerce Act)
 
 
 [40]
 The first amendment offered would have countenanced interlocking bank directorates and empowered the Board to remove an officer serving multiple institutions if, after a hearing, it determined that he was taking advantage of his position to substantially lessen competition. See 51 Cong.Rec. 9604-9606 (1914). The second would have allowed the Board to give special permission in individual instances where there would be no restraint of trade or other detriment to the public welfare. See 51 Cong.Rec. 9607 (1914)
 
 
 [41]
 51 Cong.Rec. 9605 (1914) (remarks of Representative Floyd)
 
 
 [42]
 Clayton Act, §§ 15-16, 15 U.S.C. §§ 25-26 (1976). Private suits for damages were also allowed. Clayton Act, § 4, 15 U.S.C. § 15 (1976)
 
 
 [43]
 Clayton Act, § 16, 15 U.S.C. § 26 (1976)
 
 
 [44]
 See notes 46-51 infra and accompanying text
 
 
 [45]
 The change was accomplished implicitly when the communications common carriers were placed under FCC control, see note 52 infra and accompanying text, because § 16 of the Clayton Act exempts "any common carrier subject to the provisions of the (Interstate Commerce Act) in respect of any matter subject to the regulation, supervision, or other jurisdiction of the Interstate Commerce Commission." 15 U.S.C. § 26 (1976)
 
 
 [46]
 See 51 Cong.Rec. 9598 (1914), reprinting H.R.Rep.No. 681, 63d Cong., 2d Sess. (1914) (report on proposed amendments to Interstate Commerce Act)
 
 
 [47]
 See Act of Feb. 28, 1920, 41 Stat. 494, § 439, adding 49 U.S.C. § 20a(12) (1976)
 
 
 [48]
 See 49 U.S.C. § 5 (1976)
 
 
 [49]
 See statutes cited notes 47-48 supra
 
 
 [50]
 See H.R.Rep.No. 627, supra note 22, at 3
 
 
 [51]
 See S.Rep.No. 698, supra note 20, at 48
 
 
 [52]
 Communications Act of 1939, Pub.L.No. 73-416, § 602(d), 48 Stat. 1102, amending Clayton Act, § 11, 15 U.S.C. § 21(a) (1976)
 
 
 [53]
 See Maj.Op., text at notes 63-64
 
 
 [54]
 See H.R.Rep.No. 1850, 73d Cong., 2d Sess. 9 (1934); S.Rep.No. 781, 73d Cong., 2d Sess. 11 (1934)
 
 
 [55]
 See generally 47 U.S.C. §§ 201-223 (1976)
 
 
 [56]
 See generally 47 U.S.C. §§ 301-330 (1976)
 
 
 [57]
 See 47 U.S.C. § 301 (1976)
 
 
 [58]
 See United States v. Radio Corp. of America, supra note 10, 358 U.S. at 351, 79 S.Ct. at 467-468, 3 L.Ed.2d at 366, relying upon National Broadcasting Co. v. United States, supra note 10, 319 U.S. at 220-224, 63 S.Ct. at 1011-1013, 87 L.Ed. at 1354-1356; NAACP v. FPC, supra note 10, 425 U.S. at 666-671, 96 S.Ct. at 1809-1812, 48 L.Ed.2d at 289-292
 
 
 [59]
 47 U.S.C. § 309(a) (1976)
 
 
 [60]
 E. g., 78 Cong.Rec. 8851, 10309-10310, 10323 (1934). See generally H.R.Rep.No. 404, 69th Cong., 1st Sess. 6-24 (1926) (minority views on Radio Act, H.R. 9108, containing summary of attempts to control radio monopolies)
 
 
 [61]
 See 47 U.S.C. § 313(a) (1976). This language originally appeared in § 311, see 48 Stat. 1086 (1934)
 
 
 [62]
 47 U.S.C. § 313(a) (1976)
 
 
 [63]
 47 U.S.C. § 313(b) (1976)
 
 
 [64]
 Clayton Act, § 11, 15 U.S.C. § 21 (1976)
 
 
 [65]
 47 U.S.C. §§ 221-222 (1976). As with the similar power exercised by ICC, see notes 48-49 supra and accompanying text, any approved consolidation is thereafter immune from prosecution under the antitrust laws. 47 U.S.C. §§ 221-222 (1976)
 
 
 [66]
 47 U.S.C. § 212 (1976). Compare 49 U.S.C. § 20a(12) (1976) (granting similar authority to ICC)
 
 
 [67]
 Notes 52-66 supra and accompanying text
 
 
 [68]
 See H.R.Rep.No.1850, supra note 54, at 1, 3-4; S.Rep.No.781, supra note 54, at 1-2
 
 
 [69]
 See H.R.Rep.No.1850, supra note 54, at 5-7; S.Rep.No.781, supra note 54, at 3-5
 
 
 [70]
 See S.Rep.No.781, supra note 54, at 6-8. As passed by the House, the bill simply abolished the Radio Commission and transferred its functions to the newly created FCC. H.R.Rep.No.1850, supra note 54, at 7. The Senate opted instead for repealing the applicable sections of the Radio Act and reenacting them in order to make a few changes, and because "certain provisions of the Radio Act are no longer applicable to radio regulation." S.Rep.No.781, supra note 54, at 2
 
 
 [71]
 H.R.Rep.No.1850, supra note 54, at 3:
 The bill is largely based upon existing legislation and except for the change of administrative authority does not very greatly change or add to existing law; most controversial questions are held in abeyance for a report by the new commission recommending legislation for their solution.
 In fact, among the questions so deferred were several involving various forms of anticompetitive activity, in particular, whether it would be desirable to enact additional legislation subjecting carrier-supplier contracts to Commission approval where one corporation was controlled by the other or the two were under common control, see 47 U.S.C. § 215(a)(2) (1976), or to legislate on the subject of common carrier contracts that prevent the other party from dealing with another common carrier, 47 U.S.C. § 215(c) (1976).
 
 
 [72]
 See United States v. Radio Corp. of America, supra note 10, 358 U.S. at 351-352, 79 S.Ct. at 467-469, 3 L.Ed.2d at 366-367; National Broadcasting Co. v. United States, supra note 10, 319 U.S. at 222-224, 63 S.Ct. at 1011-1013, 87 L.Ed. at 1365-1367; Home Box Office, Inc. v. FCC, 185 U.S.App.D.C. 142, 173 n.67, 567 F.2d 9, 40 n.67, cert. denied, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977)
 
 
 [73]
 See 47 U.S.C. §§ 313(a), 314 (1976); 78 Cong.Rec. 8851, 10309-10310, 10323 (1934); H.R.Rep.No.404, supra note 60, at 6-24
 
 
 [74]
 Hawaiian Tel. Co. v. FCC, 162 U.S.App.D.C. 229, 235, 498 F.2d 771, 777 (1974)
 
 
 [75]
 See 47 U.S.C. § 308(b) (1976)
 
 
 [76]
 Mansfield Journal Co. v. FCC, 86 U.S.App.D.C. 102, 107, 180 F.2d 28, 33 (1950)
 
 
 [77]
 47 U.S.C. § 312(a)(2) (1976)
 
 
 [78]
 See 47 U.S.C. § 205 (1976)
 
 
 [79]
 See 15 U.S.C. § 13 (1976)
 
 
 [80]
 See 15 U.S.C. § 18 (1976)
 
 
 [81]
 See 47 U.S.C. § 214 (1976) (requiring certificate before carrier extends or constructs transmission line or discontinues service)
 
 
 [82]
 47 U.S.C. §§ 221-222 (1976)
 
 
 [83]
 47 U.S.C. § 212 (1976)
 
 
 [84]
 Radio Act of 1927, Pub.L.No.69-632, § 13, 44 Stat. 1167
 
 
 [85]
 See generally H.R.Rep.No.404, supra note 60, at 6-24; United States v. Radio Corp. of America, supra note 10, 358 U.S. at 339-346, 79 S.Ct. at 461-464, 3 L.Ed.2d at 359-362
 
 
 [86]
 See H.R.Rep.No.404, supra note 60, at 6-24
 
 
 [87]
 Communications Act of 1934, Pub.L.No.73-416, § 311, 48 Stat. 1086
 
 
 [88]
 Id
 
 
 [89]
 S.Rep.No.781, supra note 54, at 7
 
 
 [90]
 Act of July 16, 1952, Pub.L.No.82-554, § 9, 66 Stat. 716
 
 
 [91]
 See S.Rep.No.44, 82d Cong., 1st Sess. 9 (1951)
 
 
 [92]
 Id
 
 
 [93]
 The Senate Report stated:
 (T)here is merit in the contention that citizens should not be subject to trial for the same allegations before two different tribunals. Moreover, such an argument is particularly pertinent in connection with alleged violations of the antitrust statutes which are the particular province of the Department of Justice and do not, by any other law, come within the jurisdiction of any independent quasi-judicial agency of government.
 Id. at 9. Only the Sherman Act, which relies on criminal penalties, is "the particular province of the Department of Justice." See 15 U.S.C. §§ 1-7 (1976). The Clayton Act, on the other hand, is administered by FTC, FCC and several other "independent quasi-judicial agenc(ies) of government." See 15 U.S.C. § 21 (1976).
 
 
 [94]
 47 U.S.C. § 313(a) (1976) (emphasis supplied):
 All laws of the United States relating to unlawful restraints and monopolies and to combinations, contracts, or agreements in restraint of trade are declared to be applicable to ... interstate or foreign radio communications. Whenever in any suit, ... civil or criminal, brought under the provisions of any of said laws or in any proceedings brought to enforce or to review findings and orders of the Federal Trade Commission or other governmental agency ... any licensee shall be found guilty ... the court ... may adjudge ... that the license of such licensee shall ... be revoked....
 
 
 [95]
 See note 93 supra ; S.Rep.No.44, supra note 91, at 9 ("... the Commission's power to protect against monopoly control of radio licenses remains unaffected by the changes herein recommended; it is merely estopped from initiating and proceeding with an antitrust case of its own")
 
 
 [96]
 See Maj.Op., note 65 and accompanying text
 
 
 [97]
 See S.Rep.No.44, supra note 91, at 9:
 The committee desires to emphasize that the Commission's existing authority under law to examine into the character of a licensee or permittee in granting a license or a renewal is in no way impaired or modified by the change here recommended in section 311. The Commission's authority to determine whether or not the public interest, convenience, or necessity will be served by the granting of a license remains paramount and if it finds that the conviction of a licensee under the antitrust laws or under section 313 has materially affected the character or standing of such licensee so as to warrant refusal of a renewal, or grant of license, it may so proceed.
 See also 98 Cong.Rec. 7399, 7403, 7417-7421 (reaffirming primacy of public interest standard).
 
 
 [98]
 I note, too, that in 1950 Congress amended § 7 of the Clayton Act to increase substantially the scope of coverage by outlawing anticompetitive intercorporate acquisitions of assets, Act of Dec. 29, 1950, Pub.L.No.81-899, 64 Stat. 1125, to close a significant loophole under the earlier provision barring such shifts of control only if accomplished by stock purchases. S.Rep.No.1775, 81st Cong., 2d Sess. 3 (1950). But in so doing, Congress included only those businesses subject to FTC jurisdiction, declining to grant this important antitrust tool to the other agencies mentioned in § 11. Finding no recorded explanation for this action, I can only speculate that it reflects a further diminishing of legislative interest in administrative enforcement of the Clayton Act outside FTC itself
 I find unpersuasive, however, the court's attempt to discern present legislative intent in the failure of Congress to adopt bills that would have expressly declared competition to be in the public interest. See Maj.Op., text at notes 65-69. "Legislative silence is a poor beacon to follow in discerning the proper statutory route," Zuber v. Allen, 396 U.S. 168, 185, 90 S.Ct. 314, 323, 24 L.Ed.2d 345, 355 (1969), and I hesitate to rely on failure of a particular measure, without more, as demonstrating adoption of the contrary view.
 
 
 [99]
 Maj.Op., text at note 77, quoting Hawaiian Tel. Co. v. FCC, supra note 74, 162 U.S.App.D.C. at 235, 498 F.2d at 777
 
 
 [100]
 Kahn v. Shevin, 416 U.S. 351, 356 n.10, 94 S.Ct. 1734, 1737 n.10, 40 L.Ed.2d 189, 193 n.10 (1974); Evans v. Abney, 396 U.S. 435, 447, 90 S.Ct. 628, 635, 24 L.Ed.2d 634, 645 (1970); McLean Trucking Co. v. United States, 321 U.S. 67, 79, 64 S.Ct. 370, 376, 88 L.Ed. 544, 552 (1944)
 
 
 [101]
 See Maj.Op., text at notes 77-79
 
 
 [102]
 See Maj.Op. Part III(C)
 
 
 [103]
 E. g., Volkswagenwerk Aktiengesellschaft v. FMC, 390 U.S. 261, 273-274 & n.20, 88 S.Ct. 929, 936 & n.20, 19 L.Ed.2d 1090, 1098-1099 & n.20 (1968); FMC v. Aktiebolaget Svenska Amerika Linien, 390 U.S. 238, 244, 88 S.Ct. 1005, 1009, 19 L.Ed.2d 1071, 1076-1077 (1968); Denver & R. G. W. R.R. v. United States, 387 U.S. 485, 492-494, 87 S.Ct. 1754, 1759-1760, 18 L.Ed.2d 905, 912-913 (1967); California v. FPC, 369 U.S. 482, 484-485, 82 S.Ct. 901, 903, 8 L.Ed.2d 54, 57 (1962); United States v. Radio Corp. of America, supra note 10, 358 U.S. at 351-352, 79 S.Ct. at 467-469, 3 L.Ed.2d at 366-367; McLean Trucking Co. v. United States, supra note 100, 321 U.S. at 86-87, 64 S.Ct. at 380-381, 88 L.Ed. at 556-557; National Broadcasting Co. v. United States, supra note 10, 319 U.S. at 222-224, 63 S.Ct. at 1011-1013, 87 L.Ed. at 1365-1367; Northern Natural Gas Co. v. FPC, 130 U.S.App.D.C. 220, 228, 399 F.2d 953, 961 (1968); see NAACP v. FPC, supra note 10, 425 U.S. at 666-667, 96 S.Ct. at 1809-1812, 48 L.Ed.2d at 289-292
 
 
 [104]
 E. g., Seaboard Air Line R. R. v. United States, 382 U.S. 154, 156-157, 86 S.Ct. 277, 278, 15 L.Ed.2d 223, 224-225 (1965); FCC v. RCA Communications, Inc., supra note 16, 346 U.S. at 91-93, 73 S.Ct. at 1002-1003, 97 L.Ed. at 1476; McLean Trucking Co. v. United States, supra note 100, 321 U.S. at 86-88, 64 S.Ct. at 380-381, 88 L.Ed. at 556-557. See also Maj.Op. Part III(C)
 
 
 [105]
 Supra note 100
 
 
 [106]
 Supra note 104
 
 
 [107]
 Seaboard Air Line R. R. v. United States, supra note 104, 382 U.S. at 156-157, 88 S.Ct. at 278, 15 L.Ed.2d at 224-225; McLean Trucking Co. v. United States, supra note 100, 321 U.S. at 83, 64 S.Ct. at 378, 88 L.Ed. at 554
 
 
 [108]
 See Maj.Op., text at notes 70-71
 
 
 [109]
 49 U.S.C. § 5(2) (1976)
 
 
 [110]
 McLean Trucking Co. v. United States, supra note 100, 321 U.S. at 84-85, 64 S.Ct. at 379-380, 88 L.Ed. at 555-556
 
 
 [111]
 49 U.S.C. § 5(11) (1976); see McLean Trucking Co. v. United States, supra note 100, 321 U.S. at 84-85, 64 S.Ct. at 379-380, 88 L.Ed. at 555-556
 
 
 [112]
 Maj.Op. at note 71, quoting McLean Trucking Co. v. United States, supra note 100, 321 U.S. at 83, 64 S.Ct. at 378, 88 L.Ed. at 554 (emphasis supplied in Maj.Op.)
 
 
 [113]
 See Maj.Op. at note 71
 
 
 [114]
 McLean Trucking Co. v. United States, supra note 100, 321 U.S. at 80, 64 S.Ct. at 377, 88 L.Ed. at 553
 
 
 [115]
 See id. at 84-86, 64 S.Ct. at 379-380, 88 L.Ed. at 555-556
 
 
 [116]
 Seaboard Air Line R.R. v. United States, supra note 104, simply reaffirmed the proposition that in deciding whether to approve a consolidation under § 5(2), ICC may find it consistent with the public interest despite resulting curtailment of competition. 382 U.S. at 156-157, 86 S.Ct. at 278, 15 L.Ed.2d at 224-225. I cannot agree that, as the court claims, Seaboard "specifically addressed the ICC's responsibilities under Section 11 of the Clayton Act." Maj.Op., text following note 70. To be sure, Seaboard involved Clayton Act questions, while in McLean the Sherman Act was at issue. The three-judge District Court reviewed in Seaboard found the distinction important and held that, in part because of its Clayton Act responsibilities, ICC was required to make specific findings under that Act's standards before deciding to grant immunity. Florida E. C. Ry. v. United States, 242 F.Supp. 14, 20-22 (M.D.Fla.1965). But the Supreme Court merely held that such findings were unnecessary because, as McLean had indicated, the final determination under § 5(2) is not controlled by antitrust considerations, a result that says nothing about the effect of § 11 of the Clayton Act when not counterpoised against a provision, such as § 5(11), specifically waiving antitrust enforcement
 
 
 [117]
 See, e. g., United States v. Radio Corp. of America, supra note 10; National Broadcasting Co. v. United States, supra note 10
 
 
 [118]
 See notes 52-66 supra and accompanying text
 
 
 [119]
 See FCC v. RCA Communications, Inc., supra note 16; see also Hawaiian Tel. Co. v. FCC, supra note 74
 
 
 [120]
 Supra note 103
 
 
 [121]
 See Supplemental Brief for American Satellite Corporation, Fairchild Industries, Inc., and Western Union Telegraph Company, at 9
 
 
 [122]
 209 U.S.App.D.C. --, 652 F.2d at 87(Maj. op.)
 
 
 [123]
 See 387 U.S. at 509, 87 S.Ct. at 1767, 18 L.Ed.2d at 921 (opinion of White, J.):
 But I am doubtful about those parts of the Court's opinion which indicate that although the public interest requires the consideration of competitive factors in connection with the issuance of stock under § 20a, the public interest also demands that if a lessening of competition is found or threatened within the meaning of § 7 of the Clayton Act, the issuance must be disapproved.
 
 
 [124]
 49 U.S.C. § 20a(2) (1976); see Denver & R. G. W. R.R. v. United States, supra note 103, 387 U.S. at 487-488, 87 S.Ct. at 1756-1757, 18 L.Ed.2d at 909-910
 
 
 [125]
 See Denver & R. G. W. R.R. v. United States, supra note 103, 384 U.S. at 490-491, 87 S.Ct. at 1758, 18 L.Ed.2d at 911
 
 
 [126]
 Id. Approval under § 5(2), it will be remembered, was the determination at issue in McLean Trucking Co. v. United States, supra note 100, and Seaboard Air Line R.R. v. United States, supra note 104
 
 
 [127]
 387 U.S. at 499-501, 87 S.Ct. at 1762-1763, 18 L.Ed.2d at 916-917
 
 
 [128]
 Id. at 502, 87 S.Ct. at 1764, 18 L.Ed.2d at 918
 
 
 [129]
 In contrast, the Clayton Act is prohibitive, and imposes a positive obligation upon the ICC to act. The Commission is directed, whenever it has reason to believe any carrier within its jurisdiction is violating § 7, to "issue and serve upon such person and the Attorney General a complaint stating its charges in that respect, and containing a notice of a hearing...." 15 U.S.C. § 21(b). Section 16, 15 U.S.C. § 26, excepts from the power of private persons to bring § 7 suits for injunctive relief all cases involving matters subject to ICC jurisdiction. By thus limiting the authority of private persons to institute court proceedings to enjoin § 7 violations, this provision underscores the ICC's responsibility to act when such violations are brought to its attention
 Id. (emphasis supplied). Similar language appeared earlier in the opinion, see id. at 493, 87 S.Ct. at 1759-1760, 18 L.Ed.2d at 912-913, where the Court found in ICC's § 11 enforcement responsibility support for its conclusion that anticompetitive conduct is a factor not to be ignored in the public interest determination under § 20a. It was in reference only to its use in this context that the Court later stated that the presence of § 11 had not controlled the result in Denver. See Gulf States Utils. Co. v. FPC, 411 U.S. 747, 761-762, 93 S.Ct. 1870, 1879, 36 L.Ed.2d 635, 645-646 (1973).
 
 
 [130]
 It is not entirely clear that the Court so holds, however. Ultimately it concludes that "if (an alliance between Greyhound and Railway Express) would in fact be against the public interest, then § 7 of the Clayton Act requires that it be stopped in its incipiency." Id. at 504, 87 S.Ct. at 1765, 18 L.Ed.2d at 919. The Court may have meant that a combination in violation of § 7 necessarily contravenes the public interest, and consequently is forbidden. On the other hand, one may plausibly read it as saying that only those Clayton Act violations that, on balance, are against the public interest need be proscribed
 
 
 [131]
 See 209 U.S.App.D.C. at --, 652 F.2d at 87. (Maj. op.)
 
 
 [132]
 "Reviewing courts are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate(s) the congressional policy underlying a statute. Such review is always properly within the judicial province, and courts would abdicate their responsibility if they did not fully review such administrative decisions." NLRB v. Brown, 380 U.S. 278, 291-292, 85 S.Ct. 980, 988, 13 L.Ed.2d 839, 849 (1965). See also note 154 infra
 
 
 [133]
 47 U.S.C. § 309(e) (1976)
 
 
 [134]
 47 U.S.C. § 308 (1976)
 
 
 [135]
 47 U.S.C. § 309(a) (1976)
 
 
 [136]
 47 U.S.C. § 309(d)(1) (1976)
 
 
 [137]
 47 U.S.C. § 309(d)(2) (1976)
 
 
 [138]
 Id
 
 
 [139]
 47 U.S.C. § 309(e) (1976)
 
 
 [140]
 This conclusion is buttressed by further references to a "full" hearing in the House Report accompanying the 1960 amendments to § 309, see, e. g., H.R.Rep.No.1800, 86th Cong., 1st Sess. 12 (1959), U.S.Code Cong. & Admin.News 1960, p. 3516 amendments later discussed. See text infra at notes 187-191. Congress believed that the new pre-grant petition system inaugurated by those amendments would streamline FCC procedures, but it intended to allow the Commission to dispose of only "those petitions which were of no real consequence ... without the necessity for a formal hearing." Id. (emphasis supplied)
 
 
 [141]
 Satellite Business Sys., 62 F.C.C.2d 997, 1063, reconsideration denied, 64 F.C.C.2d 872 (1977)
 
 
 [142]
 Id. at 1066. See note 154 infra
 
 
 [143]
 Id
 
 
 [144]
 Maj.Op., text preceding note 91. Network Project v. FCC, 167 U.S.App.D.C. 220, 511 F.2d 787 (1975), wherein we sustained a public interest determination reached without a hearing, is inapposite here. The petitioner in that case did not dispute any of the material facts upon which the determination was predicated, but asserted only that those facts were insufficient to underpin a public interest finding. Id. at 230, 511 F.2d at 796. This contention thus posed only a legal question, on which a hearing was obviously unnecessary. That, I submit, is a far cry from the milieu here
 
 
 [145]
 Supra note 129
 
 
 [146]
 503 F.2d 1250 (3d Cir. 1974), cert. denied, 422 U.S. 1026, 95 S.Ct. 2620, 45 L.Ed.2d 684 (1975)
 
 
 [147]
 In Gulf States, supra note 129, the Supreme Court interpreted § 204 of the Federal Power Act, 49 Stat. 850, 16 U.S.C. § 824c (1976) (hereinafter cited as codified). The relevant portion of this statute states:
 (a) No public utility shall issue any security ... unless and until, and then only to the extent that, upon application by the public utility, the Commission by order authorizes such issue.... The Commission shall make such order only if it finds that such issue ... (a) is for some lawful object, within the corporate purposes of the applicant and compatible with the public interest, which is necessary or appropriate for or consistent with the proper performance by the applicant of service as a public utility and which will not impair its ability to perform that service, and (b) is reasonably necessary or appropriate for such purposes....
 (b) The Commission, after opportunity for hearing, may grant any application under this section in whole or in part, and with such modifications and upon such terms and conditions as it may find necessary or appropriate, and may from time to time, after opportunity for hearing and for good cause shown, make such supplemental orders in the premises as it may find necessary or appropriate....
 16 U.S.C. § 824c(a), (b) (1976) (emphasis supplied).
 In Bell Tel. Co., supra note 146, § 201(a) of the Communications Act was interpreted by the Third Circuit. Section 201(a) provides:
 It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the divisions of such charges, and to establish and provide facilities and regulations for operating such through routes.
 47 U.S.C. § 201(a) (1976) (emphasis supplied).
 
 
 [148]
 See 16 U.S.C. § 824c(b) (1976), quoted in relevant part supra note 147; 47 U.S.C. § 201(a), quoted supra note 147
 
 
 [149]
 47 U.S.C. § 309(e), quoted infra note 155. See note 151 infra
 
 
 [150]
 Supra note 146
 
 
 [151]
 Satellite Business Sys., supra note 141, 62 F.C.C.2d at 1066, quoting Bell Tel. Co. v. FCC, supra note 146, 503 F.2d at 1266. The Bell Tel. Co. case involved a dispute over FCC's authority to require Bell of Pennsylvania to establish interconnections with other carriers. One issue focused on whether the Commission could require establishment of interconnections as provided in § 201(a), see note 147 supra, without first holding evidentiary hearings. The Third Circuit refused to interpret § 201(a) as imposing a per se hearing requirement. See 503 F.2d at 1265. In reaching this conclusion the court specifically noted that "the statutory phrase ('opportunity for hearing') is neutral: it no more requires an evidentiary hearing than does the equivocal phrase 'proceeding.' " Id. at 1264
 
 
 [152]
 This reasoning is also consonant with the Supreme Court's decision in Gulf States, supra note 129. In Gulf States, as in Denver & R. G. W. R.R. v. United States, supra note 103, cited in Gulf States, the Court spoke of close scrutiny of the agency decision not to hold a hearing in the course of review under the abuse-of-discretion standard. This is perfectly consistent with my interpretation of § 309. Review of the agency's determination as to procedures to employ in reaching a decision is governed by the abuse-of-discretion standard where the statute itself requires only opportunity for a hearing rather than specifically mandated procedures
 
 
 [153]
 See text infra at notes 157-163
 
 
 [154]
 In Calvert Cliffs' Coordinating Comm. v. Atomic Energy Comm'n, 146 U.S.App.D.C. 33, 39, 449 F.2d 1109, 1115 (1971), we required AEC to adhere to § 102 of the National Environmental Protection Act, 42 U.S.C. § 4321 et seq. (1976). We stated that statutorily-prescribed "duties are not inherently flexible. They must be complied with to the fullest extent, unless there is a clear conflict of statutory authority. Considerations of administrative difficulty, delay or economic costs will not suffice to strip the section of its fundamental importance." Id. at 39, 449 F.2d at 1115 (emphasis in original). Contrary to the position advanced by the court in the instant case, see Maj.Op. at note 109, so-called considerations of "demonstrable urgency" do not make statutory requirements any more flexible. Nor can an agency excuse its failure to obey the statute on the ground that the "procedures were adopted to enable the agency better to fulfill, not to frustrate, its statutory mandate." Id. n.109. Just as § 102 of NEPA, § 309 of the Communications Act "mandates a particular sort of careful and informed decision-making process and creates judicially enforceable duties." Calvert Cliffs' Coordinating Comm. v. Atomic Energy Comm'n, supra, 146 U.S.App.D.C. at 39, 449 F.2d at 1115
 
 
 [155]
 Section 309(e) contains the hearing provisions. In full, it provides:
 If, in the case of any application to which (§ 309(a)) applies, a substantial and material question of fact is presented or the Commission for any reason is unable to make the finding specified in such subsection, it shall formally designate the application for hearing on the ground or reasons then obtaining and shall forthwith notify the applicant and all other known parties in interest of such action and the grounds and reasons therefor, specifying with particularity the matters and things in issue but not including issues or requirements phrased generally. When the Commission has so designated an application for hearing the parties in interest, if any, who are not notified by the Commission of such action may acquire the status of a party to the proceeding thereon by filing a petition for intervention showing the basis for their interest at any time not less than ten days prior to the date of hearing. Any hearing subsequently held upon such application shall be a full hearing in which the applicant and all other parties in interest shall be permitted to participate. The burden of proceeding with the introduction of evidence and the burden of proof shall be upon the applicant, except that with respect to any issue presented by a petition to deny or a petition to enlarge the issues, such burden shall be as determined by the Commission.
 47 U.S.C. § 309(e) (1976).
 
 
 [156]
 The only exception Congress made to the requirements of § 309 was to permit temporary license authorizations in cases of emergency operations. This exception is set forth in § 309(f):
 When an application subject to subsection (b) of this section has been filed, the Commission, notwithstanding the requirements of such subsection, may, if the grant of such application is otherwise authorized by law and if it finds that there are extraordinary circumstances requiring emergency operations in the public interest and that delay in the institution of such emergency operations would seriously prejudice the public interest, grant a temporary authorization, accompanied by a statement of its reasons therefor, to permit such emergency operations for a period not exceeding ninety days, and upon making like findings may extend such temporary authorization for one additional period not to exceed ninety days. When any such grant for a temporary authorization is made, the Commission shall give expeditious treatment to any timely filed petition to deny such application and to any petition for rehearing of such grant filed under section 405 of this title.
 47 U.S.C. § 309(f) (1976).
 The Commission's authority under § 309(f) is extremely cabined. The only time the Commission may consider the need for expedition as an element of the decision as to which procedures to employ is in electing whether to proceed pursuant to subsection (f) or subsection (e). According to the Senate Report accompanying the 1960 amendments, § 309(d) "provides a safety valve to protect the public interest in those rare cases in which the Commission finds that the delay required by subsection (309(a)) would seriously prejudice the public interest." S.Rep.No. 690, 86th Cong., 1st Sess. 4 (1959). At that time it was acknowledged by John C. Doerfer, Chairman of the FCC, that
 (i)n view of the findings necessary for invoking this section, it is anticipated that it will be rarely used. However, it is felt that it does provide the Commission with flexibility to take care of emergency situations where any delay would prejudice the public interest, and at the same time would reserve final action on the application until after the objections are disposed of.
 Id. at 6.
 
 
 [157]
 The Communications Act, 47 U.S.C. § 151 et seq., was amended in several respects in 1960. Section 309 was revised in an effort to provide more efficient and meaningful Commission review of objections to license applications filed pursuant to § 308(a). See text supra at notes 155-163. The 1960 amendments resulted in the replacement of the prior mechanism for registering such objections with a new procedure. Prior to 1952, § 309 required the Commission to grant a license application if it found it in the public interest to do so. If the Commission was unable to make such a finding, it was to notify the applicant and provide an opportunity for a hearing on the matter. In 1952, the section was amended to allow parties in interest to protest any license granted by the Commission within 30 days of this action. Protestants were required to include in their pleadings statements demonstrating their interest in the matter, and they were to specify, on the basis of information and belief, see note 188 infra, facts evidencing the impropriety of granting the license. The Commission was required to rule on protests within thirty days, and to designate a hearing on a license with respect to which a sufficient protest had been filed. In 1956, § 309 was again amended, in order to permit the Commission to dispense with the hearing requirement where no ground for setting aside the license grant existed, even if the facts were as alleged in the petition. The 1960 amendments also altered the notice requirements devised in 1952. See note 169 infra
 
 
 [158]
 The current statutory scheme works as follows. Pursuant to subsection (a), the Commission is directed to grant any application whenever the grant would serve the public interest, convenience, and necessity. With a few special exceptions provided in subsection (c), however, the Commission is directed by subsection (b) to hold each application for at least 30 days following the issuance of public notice by the Commission of the acceptance of the application for filing. Subsection (d) provides the means by which parties may object to license applications. Combined with subsection (e), which sets forth the evidentiary hearing requirements, subsection (d) sets forth the new pre-grant procedure devised in 1960. See text supra at notes 134-139. Subsection (f) provides temporary emergency authorization power, see note 156 supra; subsection (g) provides that the Commission must adopt reasonable classifications for applications and amendments; and subsection (h) provides for the form and condition of station licenses
 
 
 [159]
 S.Rep.No. 690, supra note 156, at 2
 
 
 [160]
 Id
 
 
 [161]
 Id
 
 
 [162]
 See notes 157, 158 supra
 
 
 [163]
 H.R.Rep.No. 1800, supra note 140, at 12, U.S.Code Cong. & Admin.News 1960, p. 3520. Congress established the requirements of § 309 "believ(ing) that these procedural safeguards (would) provide an adequate opportunity for proper parties to protect their interests in an orderly and logical manner...." Id. at 10, U.S.Code Cong. & Admin.News 1960, p. 3518
 
 
 [164]
 The court's position on this point is less clear
 
 
 [165]
 Satellite Business Sys., supra note 141, 62 F.C.C.2d at 1068
 
 
 [166]
 Maj.Op., at text following note 109
 
 
 [167]
 See, e. g., notes 132, 154 supra
 
 
 [168]
 According to the Commission,
 (t)he SBS system is a technologically innovative proposal. It will be the first domestic satellite system that utilizes: (1) small-sized earth stations available in most instances at the customer's premises; (2) integrated voice/data/image transmission service utilizing a largely digital format; (3) A TDMA and demand assignment technology which allows more efficient use of the spectrum than present use allows; and (4) the 12 and 14 GHz band. The most important aspect of this proposal is not the possible advancement in technology, although that is significant, but the fact that these advancements are directly related to the carrier being able to provide more efficient and better service at a more efficient cost. Another benefit will be the stimulation of competitive responses to further advance the field.
 Satellite Business Sys., supra note 141, 62 F.C.C.2d at 1098.
 
 
 [169]
 Congress was well aware of the problems of delay in 1960. The Senate Report accompanying the amendment to § 309, however, reveals that the chief concern was not so much the length of hearings as the pre-hearing notice provision then in effect. According to the reports, "(t)hat requirement (had) prove(d) to be the principal reason for the increasing backlogs in the Commission's workload." S.Rep.No. 690, supra note 156, at 4. See also H.R.Rep.No. 1800, supra note 140, at 9, U.S.Code Cong. & Admin.News 1960, p. 3516. This notice requirement was also altered by the 1960 amendments. Compare Act of July 16, 1952, Pub.L.No. 554, § 309(c), 66 Stat. 715 with 47 U.S.C. § 309(e) (1976)
 
 
 [170]
 Maj.Op., at text following note 86
 
 
 [171]
 Id
 
 
 [172]
 See Satellite Business Sys., supra note 141, 62 F.C.C.2d at 1073, 1088
 
 
 [173]
 See id. at 1073-1088
 
 
 [174]
 See id. at 1088-1094
 
 
 [175]
 See id. at 1094-1097
 
 
 [176]
 See id. at 1097
 
 
 [177]
 See text at note 135 supra
 
 
 [178]
 47 U.S.C. § 309(d)(1) (1976)
 
 
 [179]
 See text supra at notes 157-163; text infra at notes 187-191
 
 
 [180]
 Maj.Op., text at note 81, quoting S.Rep.No. 690, supra note 156 at 3
 
 
 [181]
 Id
 
 
 [182]
 See id., text at notes 82-84
 
 
 [183]
 The Western Union Telegraph Company and American Satellite Corporation petitions to deny are reproduced at App. 1013-1063 & 1068-1172
 
 
 [184]
 47 U.S.C. § 309(d)(1) (1976)
 
 
 [185]
 Both petitions begin with specific allegations charging that the SBS joint venture in its current form fails to comply with the conditions prescribed by the Commission in its earlier decisions on the matter. With respect to the antitrust problems with the joint venture, the following illustrations serve as examples of the specificity of the petitions. One part of Western Union's petition alleges that the relevant markets must be defined. After making several legal arguments, Western Union states that its "marketing experts and the SBS Applications recognize that the principal customers for domestic satellite service will be large corporations and the federal government. These organizations presently generate almost three-quarters of the interstate private line communications revenues." App. 1043-1044 (footnote omitted). This statement is supported both by the affidavit of an officer of Western Union, H. R. Johnson, and a quote from one of SBS' applications. App. 1043 & n.34. On the basis of these allegations Western Union proceeds to state its reasons why the relevant markets must be defined, specifying its views about the cross-elasticity of demand for satellite and terrestrial services and other relevant considerations. These allegations support the material issue Western Union raises over the accuracy of the ultimate factual conclusion, accepted by the Commission, that there is only one market because all forms of telecommunications both terrestrial and satellite are reasonably interchangeable. Similarly, with respect to its allegations concerning the question of the effects of the SBS entry on potential competition, Western Union cites, among other sources, the Commission's own findings a proper subject of official notice that IBM has the economic and technical resources required for independent and sustained entry into the domestic satellite industry. See Approval of Changes in Corporate Structure of CML Satellite Corporation (CML), 51 F.C.C.2d 14, 26, 27, 39-41 (1975) (hereinafter cited as CML ). American Satellite also alleges that the entry of SBS will result in elimination of potential competition, citing IBM's own concession at the oral argument in the CML proceeding again a proper subject of official notice CML, supra, at 30 (Nov. 25, 1975) (transcript of oral argument). IBM stated that it had considered independent entry, and that it likely would proceed alone if necessary. App. 1113
 To some extent the petitions also rely on legal arguments, citing Supreme Court and other federal cases requiring evidentiary hearings in proceedings of this type, see, e. g., App. 1041-1042, and they include considerable economic analysis. There is no question that through citation to specific facts in their possession and reference to sources of which the Commission may take official notice, combined with legal and economic analysis, Western Union and IBM raised substantial disputed issues of fact.
 
 
 [186]
 47 U.S.C. § 309(d) (1976)
 
 
 [187]
 The language with respect to specificity of factual allegations in the petitions, see text supra at note 184, was to ensure that the Commission would have discretion to dispense with petitions containing only vague, conclusory allegations. See S.Rep.No.690, supra note 156, at 3; H.R.Rep.No.1800, supra note 140, at 12
 
 
 [188]
 See S.Rep.No.690, supra note 156, at 2. The information-and-belief standard did not appear on the face of the statute; it resulted from the Commission's interpretation of § 309, which then contained no explicit standard with respect to the foundation of supporting affidavits. See H.R.Rep.No.1800, supra note 140, at 11
 
 
 [189]
 S.Rep.No.690, supra note 156, at 3
 
 
 [190]
 Id. at 2
 
 
 [191]
 Id. at 4
 
 
 [192]
 5 C. Wright & A. Miller, Federal Practice and Procedure § 1335 (1969)
 
 
 [193]
 2A J. Moore, Federal Practice § 11.04 (1979) (footnotes omitted)
 
 
 [194]
 The Commission did not find fault with the petitions or affidavits submitted by Western Union and American Satellite, but proceeded to analyze the questions raised in these pleadings. See Satellite Business Sys., supra note 141, 62 F.C.C.2d at 1005-1015. By seizing on this ground as a means of dispensing with the problems caused by the disputed issues of fact in this case, the court improperly looks beyond the agency's own rationale for its decision
 
 
 [195]
 Maj.Op., text preceding note 83
 
 
 [196]
 Comments of United States Department of Justice (June 1, 1976), App. 990; Comments of Federal Trade Commission (Mar. 3, 1976), App. 929
 In its reply comments, the Department of Justice stated that
 (a)t a minimum the Commission must develop the factual basis to assess the following issues: (1) the appropriate service market in which to assess the competitive effects of this joint venture (e. g., general communications, satellite communications, or digital communications); (2) the current market structure; (3) the identity of possible potential entrants; (4) the likelihood that IBM would enter on its own (an inquiry that includes the question whether it considered less anticompetitive alternatives to the joint venture with Comsat); (5) the likelihood that Comsat would enter on its own, or with others; (6) the perception of those in the market of IBM and/or Comsat as potential competitors and their effect on competition in the market; (7) the financial, technological, and competitive barriers to entry into communications that this joint venture may raise; and (8) the likely result of IBM's entry into communications in terms of enhancing competition with existing firms.
 Reply Comments of United States Department of Justice (Oct. 8, 1976), App. 1500, 1518-1519.
 
 
 [197]
 Retail Store Employees Local 880 v. FCC, 141 U.S.App.D.C. 94, 100, 436 F.2d 248, 254 (1970), first quoting Southwestern Publishing Co. v. FCC, 100 U.S.App.D.C. 251, 254, 243 F.2d 829, 832 (1957), and last quoting Midwestern Gas Transmission Co. v. FPC, 103 U.S.App.D.C. 360, 368, 258 F.2d 660, 668 (1958), vacated, 358 U.S. 280, 79 S.Ct. 316, 3 L.Ed.2d 299 (1959) (footnotes omitted). These warnings should have been viewed most seriously by the Commission. As we stated in Northern Natural Gas Co. v. FPC, supra note 103, "(t)he basic goal of direct governmental regulation through administrative bodies and the goal of indirect governmental regulation in the form of antitrust law is the same to achieve the most efficient allocation of resources possible." 130 U.S.App.D.C. at 226, 399 F.2d at 959 (footnote omitted)
 
 
 [198]
 Maj.Op., text preceding note 110, quoting Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 392-395, 444 F.2d 841, 850-853 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971). The determination whether a hearing must be held pursuant to § 309 lies in the first instance with the Commission. Columbus Broadcasting Coalition v. FCC, 164 U.S.App.D.C. 213, 217, 505 F.2d 320, 324 (1974); West Mich. Telecasters, Inc. v. FCC, 130 U.S.App.D.C. 39, 42, 396 F.2d 688, 691 (1968). This decision, however, must be reversed if it is arbitrary, capricious or contrary to law. While in a proper case such an exercise of administrative discretion must be given considerable deference, an act or omission that clearly controverts the governing statute cannot be tolerated. See text at note 132 supra. See also note 154 supra
 
 
 [199]
 See notes 132, 154, 198 supra. I am unable to detect the value the court attaches to Columbus Broadcasting Coalition v. FCC, 164 U.S.App.D.C. 213, 505 F.2d 320 (1974). See Maj.Op. at note 84. Of four contentions that the public interest question on a license-renewal application was laden with substantial fact issues, one was never presented to the Commission, another left decisive evidence entirely unrebutted, and each of the remaining two rested on factual premises too innocuous in any event to generate a dispute material to the outcome. Id. at 218-223, 505 F.2d at 325-330. Moreover, there the Commission itself determined that no material fact remained in dispute, while in the instant case the court itself has conjured up this position, failing to come to grips with the Commission's own rationale for its procedures. See note 194 supra. Thus the claimed similarity of this situation to that at bar is lost on me
 
 
 [200]
 For example, a hearing is not required when the material facts are undisputed or when an administrative decision is based on inferences drawn from undisputed facts. Network Project v. FCC, supra note 144, 167 U.S.App.D.C. at 230, 511 F.2d at 796; Columbus Broadcasting Coalition v. FCC, supra note 198, 164 U.S.App.D.C. at 217, 505 F.2d at 324; Stone v. FCC, 151 U.S.App.D.C. 145, 152, 466 F.2d 316, 323 (1972); accord, Marsh v. FCC, 140 U.S.App.D.C. 384, 387-388, 436 F.2d 132, 135-136 (1970)
 
 
 [201]
 Satellite Business Sys., supra note 141, 62 F.C.C.2d at 1068. See also id. at 1067
 
 
 [202]
 See Fed.R.Civ.P. 56
 
 
 [203]
 In United States v. CAB, 167 U.S.App.D.C. 313, 511 F.2d 1315 (1975), we noted that there is a special need for factual findings with respect to antitrust issues
 because such grounds are unusually "complex, requiring painstaking assessment of many relevant considerations." As a result, such "issues are particularly suited to resolution by evidentiary hearing... (D)isposition of antitrust questions by other means creates a greater likelihood of administrative error, and invites a more skeptical judicial scrutiny."
 Id. at 323, 511 F.2d at 1325 (footnotes omitted). Similarly, in Marine Space Enclosures, Inc. v. FMC, 137 U.S.App.D.C. 9, 420 F.2d 577 (1969), we noted that "(o)rdinarily, ... antitrust issues do not lend themselves to disposition solely on briefs and argument." Id. at 21, 420 F.2d at 589. It has also been held that even in cases where the underlying facts are undisputed, summary judgment is inappropriate where conflicting inferences can be drawn from these facts. See, e. g., Carroll v. American Fed'n of Musicians, 35 F.R.D. 535, 539-540 (S.D.N.Y.1964); United States v. United Scenic Artists Local 829, Brotherhood of Painters, 27 F.R.D. 499, 501 (S.D.N.Y.1961).
 
 
 [204]
 Moreover, in attempting to make such an assumption, the Commission must give the antitrust laws the full consideration to which they are entitled. The Commission is correct in asserting that the Sherman and Clayton Acts assume that promotion of competition in and of itself serves the public interest, while competitive effects are but one element of the public interest determination in the communications field. See Satellite Business Sys., supra note 141, at 1069. Antitrust problems are an important factor, however, as the Supreme Court has emphasized on a number of occasions. See notes 10-12, 58-63 supra and accompanying text. As we stated in Northern Natural Gas Co. v. FPC, supra note 103, the antitrust laws and regulation by administrative agencies are intended to be complementary. An "example of their common purpose is that both types of regulation seek to establish an atmosphere which will stimulate innovations for better service at a lower cost." 130 U.S.App.D.C. at 226, 399 F.2d at 959. See also note 197 supra. Another example of the complementary nature of antitrust laws and administrative regulation is the enforcement authority given to certain agencies, including the FCC, under § 11 of the Clayton Act, 15 U.S.C. § 21(a) (1976). See note 12 supra and accompanying text. See also Northern Natural Gas Co. v. FPC, supra note 103, 130 U.S.App.D.C. at 227, 399 F.2d at 960
 
 
 [205]
 Brief for Appellant United States of America, at 18. While it is not up to the Department to determine whether FCC has sufficient information to reach a decision on the SBS entry, the expertise of the Department, as well as that of FTC, in the antitrust field should not be disregarded. It is significant that both agencies strongly urged the Commission to hold an evidentiary hearing on the anticompetitive effects of the SBS venture. See note 196 supra and accompanying text
 
 
 [206]
 United States v. Third Nat'l Bank, 390 U.S. 171, 183, 88 S.Ct. 882, 890, 19 L.Ed.2d 1015, 1025 (1968)
 
 
 [207]
 Satellite Business Sys., supra note 141, 62 F.C.C.2d at 1100
 
 
 [208]
 See, e. g., United States v. Morgan (Morgan IV), 313 U.S. 409, 422, 61 S.Ct. 999, 1004, 85 L.Ed. 1429, 1435 (1941), quoting United States v. Morgan (Morgan II), 304 U.S. 1, 18, 58 S.Ct. 773, 776, 82 L.Ed. 1129, 1132 (1938); Gifford, The Morgan Cases: A Retrospective View, 30 Ad.L.Rev. 237, 276-287 (1978)
 
 
 [209]
 Satellite Business Sys., supra note 141, 62 F.C.C.2d at 1089 (emphasis supplied)
 
 
 [210]
 Id. at 1094-1095 (emphasis supplied)
 
 
 [211]
 Id. at 1097
 
 
 [212]
 Id
 
 
 [213]
 The Commission also raises two other contentions: that it can stop any incipient antitrust violation at the outset by exercising continuing regulatory supervision over SBS, see Satellite Business Sys., supra note 141, 62 F.C.C.2d at 1068, 1096, and that it has addressed substantially the same questions as those in controversy in this case in the course of several years of prior proceedings concerning the domestic satellite industry. See id. at 1068. The Commission's assurance that it will continue to scrutinize SBS' development and behavior carefully is laudable, but it does not excuse the failure to hold an evidentiary hearing to determine whether the joint venture should be permitted even to enter the industry. See Gulf States Utils., supra note 129, 411 U.S. at 760, 93 S.Ct. at 1876, 36 L.Ed.2d at 644. And it goes without saying that the mere fact that the Commission had previously resolved similar problems does not necessarily mean that it did so correctly
 
 
 [214]
 Id. at 1067, quoting 1 K. Davis, Administrative Law Treatise § 702 (1958)
 
 
 [215]
 2 K. Davis, Administrative Law Treatise § 12:3 (2d ed. 1979)
 
 
 [216]
 Id
 
 
 [217]
 The decision to adopt a policy on multiple entry in order to encourage competition in the domestic satellite industry was made by the Commission several years ago in Establishment of Communications Satellite Facilities by Non-Governmental Entities (Domsat II), 35 F.C.C.2d 844 (second report and order), reconsideration order, 38 F.C.C.2d 665 (1972)
 
 
 [218]
 See text at notes 172-176 supra
 
 
 [219]
 The disputed facts in this case are clearly adjudicative in nature. It is useful to note, however, that we have held that a hearing may sometimes be necessary "(e)ven though there may be no disputed 'adjudicatory' facts, (since) the application of the law to the underlying facts involves the kind of judgment that benefits from ventilation at a formal hearing." Marine Space Enclosures, Inc. v. FMC, supra note 203, 137 U.S.App.D.C. 9, 21, 420 F.2d 577, 589 (1969) (footnote omitted)
 
 
 [220]
 Satellite Business Sys., supra note 141, 62 F.C.C.2d at 1064. Oddly, the Commission also asserts that "the 'facts' involved in (its) determinations ... are well-known and not controverted." Id. at 1066. This unfortunate attempt to reduce the disputed issues concerning the SBS entry to a matter of drawing inferences is completely devoid of merit
 
 
 [221]
 Maj.Op., text following note 98
 
 
 [222]
 The court expends considerable effort in attempting to support the Commission's assertions that the facts in controversy concerning the SBS entry are incapable of definite ascertainment, therefore eliminating the need for an evidentiary hearing. See id., text at notes 99-105. In the course of this argument the court cites the Supreme Court's statement in United States v. Penn-Olin Chem. Co., 378 U.S. 158, 174, 84 S.Ct. 1710, 1717, 12 L.Ed.2d 775, 787 (1964), to the effect that, "(p)otential competition cannot be put to a subjective test. It is not 'susceptible of a ready and precise answer.' " Maj.Op., text at note 101. In Penn-Olin, however, this statement was made by the Court in rejecting a District Court's finding that no reason existed to conclude that a firm formed by the merger of two corporations would be a less effective competitive force than the two separate entities, even if only one actually entered the market and the other remained in the wings. The Court concluded "that a finding should have been made as to the reasonable probability that either one of the corporations would have entered the market ... (or) the other would have remained a significant potential competitor." Id. at 175-176, 84 S.Ct. at 1719, 12 L.Ed.2d at 788. The Court went on to note generally criteria which the District Court could take into account in assessing the potential anticompetitive effects:
 (T)he number and power of the competitors in the relevant market; the background of their growth; the power of the joint venturers; the relationship of their lines of commerce; the competition existing between them and the power of each in dealing with the competitors of the other; the setting in which the joint venture was created; the reasons and necessities for its existence; the joint venture's line of commerce and the relationship thereof to that of its parents; the adaptability of its line of commerce to noncompetitive practices; the potential power of the joint venture in the relevant market; an appraisal of what the competition in the relevant market would have been if one of the joint venturers had entered it alone...; the effect, in the event of this occurrence, of the other joint venturer's potential competition; and such other factors as might indicate potential risk to competition in the relevant market.
 Id. at 177, 85 S.Ct. at 1720, 12 L.Ed.2d at 789.
 Penn-Olin thus does not stand for the proposition that further inquiry need not be undertaken where the disputed facts are "incapable of definite ascertainment." To the contrary, the Court required that such an inquiry be carefully conducted. Similarly, in United States v. Falstaff Brewing Corp., 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973), also cited by the court, see Maj.Op. at note 101, the court's criticism of the District Court's dependence on the testimony of corporate officials was made in the context of assigning error to the District Court's assumption that because Falstaff would never have entered the market de novo, it could in no sense be considered a potential competitor. The outcome of Falstaff was a decision by the Supreme Court that the District Court should have considered whether the corporation was a potential competitor exercising influence on the market from its fringes. Again this is a directive to undertake study of antitrust questions carefully, especially where such issues are not readily susceptible to absolute proof.
 Moreover, if all facts incapable of definite ascertainment could be determined without benefit of evidentiary proceedings, hearings would never be held in cases where violations of § 7 of the Clayton Act were alleged, because § 7 looks toward future economic behavior and "can deal only with probabilities, not with certainties." FTC v. Procter & Gamble Co., 386 U.S. 568, 577, 87 S.Ct. 1224, 1229, 18 L.Ed.2d 303, 309 (1967).
 
 
 [223]
 Memphis Light, Gas & Water Div. v. FPC, 164 U.S.App.D.C. 156, 165, 504 F.2d 225, 234 (1974)
 
 
 [224]
 Id
 
 
 [225]
 Even in cases where the controversy in question is clearly within the agency's field of expertise, however, a hearing may be useful
 Expert discretion is secured, not crippled, by the requirements for substantial evidence, findings and reasoned analysis. Expertise is strengthened in its proper role as the servant of government when it is denied the opportunity to "become a monster which rules with no practical limits on its discretion."
 Greater Boston Television Corp. v. FCC, supra note 198, 143 U.S.App.D.C. at 392, 444 F.2d at 850, quoting Burlington Truck Lines v. United States, 371 U.S. 156, 167, 83 S.Ct. 239, 245, 9 L.Ed.2d 207, 215 (1962).
 
 
 [226]
 See notes 195, 206 supra
 
 
 [227]
 The Commission claims that the SBS proceeding is distinguishable from trials of antitrust issues before federal district courts, noting its familiarity with the communications industry and past experience in dealing with questions such as those presented in the instant case. See Satellite Business Sys., supra note 141, 62 F.C.C.2d at 1064. While the Commission is certainly on more intimate terms with the communications industry than the federal courts, it is not necessarily more expert in handling the antitrust matters. Even if the Commission were expert in all aspects of the antitrust field, however, this would still not excuse its failure to hold an evidentiary hearing as required by statute where disputed questions of material fact existed
 
 
 [228]
 See, e. g., 47 U.S.C. § 201(a) (1976), quoted in note 147 supra, discussed in note 151 supra